1
2
3
4
5

# UNITED STATES DISTRICT COURT

for the WESTERN DISTRICT of WASHINGTON

| | |
|---|---|
| *Ashley M. Gjovik* (*pro se*), | CASE NO. <u>2:22-cv-00807-BAT</u> |
| Plaintiff(s), | |
| v. | COMPLAINT AND REQUEST FOR INJUNCTION |
| *State of Washington, et al.* | |
| Defendant(s). | |

## I.   PRELIMINARY STATEMENT

1. This is an action challenging the ***state of Washington's*** current[1] and impending[2] harassment protection order statutes, and ***the Order*** against Plaintiff, as facial and as applied violations of the United States Constitution.

2. The Plaintiff, ***Gjovik***, who was deprived of her federal Constitutional rights by this state statute, seeks injunctive and declaratory relief, and a writ of prohibition, against Defendants.

---

[1] Washington RCW Chapter 10.14 "*Harassment*," [Effective Until July 1, 2022], https://apps.leg.wa.gov/RCW/default.aspx?cite=10.14

[2] Washington RCW Chapter 7.105 "*Civil Protection Orders*," [Effective July 1, 2022], https://app.leg.wa.gov/RCW/default.aspx?cite=7.105.060

## II.   PARTIES TO THIS COMPLAINT

A.   **Plaintiff**

3. The Plaintiff is Ashley M. Gjovik (*surname pronounced JOE-vik*), an individual residing in Santa Clara, California and a citizen of the United States of America. *Gjovik* has resided in California since 2015. Before living in California, *Gjovik* resided in Vermont from 2004-2005, and resided in Oregon for all other years. Under information and belief, *Gjovik* did no business, nor has any contractual ties, with *the state of Washington*, currently or previously.[3]

4. *Gjovik* is a public figure,[4] with a detailed "biography of a living person" article on Wikipedia and extensive media coverage. Wikipedia requires "notability" to justify a dedicated biography article, with the notability test requiring the person is "worthy of note," "well known," and/or has made "widely recognized contributions."[5]

5. *Gjovik* is a U.S. federal CERCLA, SOX, OSHA, and California state labor whistleblower with open whistleblower retaliation cases and labor cases against Apple Inc within the U.S. NLRB, U.S. Department of Labor Whistleblower Protection Program, and the California Department of Labor agencies.[6] Many of these cases have already been found to have merit with formal *Ashley Gjovik v Apple Inc* cases docketed. *Gjovik* is also a privacy whistleblower with open domestic & international invasion of privacy and unlawful data

---

[3] *Walden v Fiore*, 134 S. Ct. 4115 (2014).

[4] Ashley Gjøvik, Wikipedia, https://en.wikipedia.org/wiki/Ashley_Gjøvik

[5] Notability, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:Notability_(people)

[6] U.S. Department of Labor Whistleblower Protection Program, *Ashley Gjovik v Apple Inc*, 9-3290-22-051 (SOX, CERCLA, & OSHA Whistleblower Retaliation); California Department of Labor, *Ashley Gjovik v Apple*, RCICM-842830 (CA Labor Code § 232.5, § 6310, § 1102.5, & § 6399); U.S. NLRB charges against Apple Inc (32-CA-284428, 32-CA-28444, 32-CA-282142, 32-CA-283161, & 32-CA-288816); U.S. SEC Whistleblower complaints against Apple Inc (16304-612-987-465, 16353-506-600-213, 16488-304-158-087).

harvesting charges against Apple.[7] [*all cases in paragraph 5 from here forward referred to as the "**Apple Lawsuits**"*]

6. ***Gjovik*** is scheduled to graduate from law school at Santa Clara University in June 2022 with a Juris Doctor degree, specializing in Human Rights. ***Gjovik*** previously planned to sit for the July 2022 California Bar exam. ***Gjovik's*** Moral Character exam was previously approved by the California Bar, but the Bar requested information about the anti-harassment Order at issue in this complaint (which currently cannot be legally provided by ***Gjovik***, per ***the Order***). [*from here forward referred to as "**the Order**"*]. She has since postponed sitting for the Bar exam.

7. ***Gjovik*** is a writer/journalist with bylines *in Business Insider, Modern Diplomacy, San Francisco Bay View*, and others.[8] She has been quoted in major press extensively over the last year, including being featured as a *The New York Times* "Quote of the Day."[9] She has been diligently documenting and publishing the details of her legal challenges with Apple Inc on Twitter, with a large global following, and on her personal website.[10]

8. ***Gjovik*** was the respondent for a petition filed by a Washington state resident in Washington state court for a harassment protective order under Washington RCW 10.14. The petition was filed 31 January 2022, the TRO hearing held 1 February, ***Gjovik*** was served 14 February and asked for a continuance at the 15 February hearing which was granted, and the full hearing occurred 1 March 2022.

---

[7] Cases opened based on Gjovik's complaints against Apple Inc for invasion of privacy, and violations of data collection and biometrics protections: U.K. Information Commissioner's Office (case IC-164649-C0F7); France Commission Nationale de L'informatique et des Libertés (case 22006530); Ireland Data Protection Commission (case C -22-4-59); Germany Der Bundesbeauftragte für den Datenschutz und die Informationsfreiheit (case # 11-540 II#3693).

[8] MuckRack, https://muckrack.com/ashleygjovik; Ashley Gjovik, https://www.ashleygjovik.com/my-writing.html

[9] "Quotation of the Day: Virus Surge Complicates Return-to-Office Plans," The New York Times, Ashley Gjovik (July 24, 2021), https://www.nytimes.com/2021/07/24/todayspaper/quotation-of-the-day-virus-surge-complicates-return-to-office-plans.html; Press, Ashley Gjovik, https://www.ashleygjovik.com/press-on-ashleys-apple-saga.html

[10] Ashley Gjovik, Twitter, https://twitter.com/ashleygjovik

9. The state district court judge granted *the Order* against Gjovik for five years, based solely on *Gjovik*'s publishing of already public information and public records. The information in dispute was published either via Twitter posting or in one of *Gjovik's* legal filings (a formal legal complaint PDF, here forward referred to as *Legal Memo*) which alleged Apple was committing federal witness intimidation against **Gjovik** and was part of her labor and whistleblower cases against Apple Inc.

10. The judge found *Gjovik* did not contact the petitioner, but found "indirect" contacts were sufficient. In addition to instructions to stay-away and no-surveillance*, the Order* prohibits *Gjovik* from making any statements whatsoever about the Petitioner with the only exception of testifying to the government or courts. *Gjovik* is appealing in state court in addition to this federal complaint.

**Name**: Ashley Marie Gjovik
**Email**: legal@ashleygjovik.com; amgjovik@gmail.com
**Address**: P.O. Box 119, Santa Clara, CA, 95050
**Telephone Number**: (408) 883-4428

B.   **The Defendant(s)**

11. Defendant is the government of the *state of Washington*. Named Defendants consist of representatives from the *state of Washington*, serving in their official capacities: Bob Ferguson, Attorney General of *the state of Washington*, who is the chief legal officer for the state; and Jay Inslee, the Governor *of the state of Washington*, the chief law enforcement officer for the state.

12. While states in the U.S. are generally immune from suit under the Eleventh Amendment and the doctrine of sovereign immunity, the *Ex parte Young* exception allows

private parties to seek judicial orders in U.S. federal court preventing state executive officials from enforcing state laws that are contrary to federal law.[11]

13. Service was provided upon *the state of Washington* as requested on Attorney General Ferguson's website, by emailing serviceATG@atg.wa.gov [12] (*Exhibit A*).

**Defendant No. 1**:
**Name**: Bob Ferguson,
**Title**: Attorney General of Washington (official capacity)
**Street Address**: 1125 Washington St SE, PO Box 40100, Olympia, WA 98504
**Telephone Number**: (360) 753-6200

**Defendant No. 2**:
**Name**: Jay Inslee
**Title**: Governor of Washington (official capacity)
**Street Address**: PO Box 40002 Olympia, WA 98504-0002
**Telephone Number**: 360-902-4111

### III. BASIS FOR JURISDICTION

A. **Federal Question Jurisdiction**

14. This complaint raises a Constitutional challenge to statutes and orders in *the state of Washington*, which qualifies as a Federal Question under 28 USC § 1331 as it arises from the U.S. Constitution. Under FRCP 5.1, notice of a Constitutional Challenge was served upon the Attorney General of *the state of Washington* (*Exhibit A*).[13]

15. The nature of this complaint is disputing federal issues (violation of the U.S. Constitution), federal issue and law will be raised in this case (numerous provisions of the U.S. Constitution, as well as considerations of the NLRA, SOX, CERCLA, & OSHA statutes), federal law is integral to this complaint, and the federal issues raised are substantial and important to the

---

[11] *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 211 L. Ed. 2d 316 (2021); *Santiago v. N.Y. State Dep't of Corr. Servs.*, 945 F.2d 25, 32 (2d Cir. 1991); *M.M. v. New York State Ct. of Appeals,* No. 21-2924, 2022 WL 1565694 (2d Cir. May 18, 2022).

[12] Service of Washington AG, https://www.atg.wa.gov/electronic-service-original-summons-complaint

[13] Federal Rules of Civil Procedure, *Rule 5.1. Constitutional Challenge to a Statute*

federal system as a whole (including but not limited to **the state of Washington's** fundamental misunderstanding of the Constitutional due process requirements for personal jurisdiction related to out of state defendants).[14]

B.  **Basic for Venue**

16. Venue is proper under 28 U.S. Code § 1391 as **the state of Washington** inherently resides in Washington, and a substantial part of the events and omission which gave rise to the claim occurred in **the state of Washington**.

C.  **Basis for Standing**

17. These issues are ripe and actionable. This complaint addresses a live case and controversy and the court can still provide effective relief.[15]   The as-applied challenge is ripe pending appeal of **the Order** in state court and will continue to be ripe if the state superior court upholds the state district court's decision. The facial challenge is ripe as long as the statute is enforced.[16] Since **the Order** was granted, **Gjovik** has been deprived of her rights protected by the U.S. Constitution, as well as her rights protected by the constitution of the state of California.

18. The injuries are concrete, direct, individualized, and would not have occurred but for **the state of Washington's** violation of **Gjovik**'s rights.[17] **Gjovik** is actually injured (injury in fact) and is in immediate danger of more injury.[18] That statutes were enforced against **Gjovik** and Petitioner can ask to have **the Order** enforced at any time. **Gjovik** has been injured and continues

---

[14] *Gunn v Minton*, 133 S.Ct. 1059 (2013); *Grable v Darue*, 545 US 308 (2005).

[15] U.S. Const. art. III, § 2, cl. 1, *Pentagram Corp. v. City of Seattle*, 28 Wn. App. 219, 223, 622 P.2d 892 (1981); *Hough v. Stockbridge*, 113 Wn. App. 532, 537, 54 P.3d 192 (2002), reversed on other grounds, 150 Wn.2d 234 (2003).

[16] *Alexander v U.S.,* 509 US 544 (1993)

[17] *Clapper v Amnesty International*, 133 S.Ct. 1138 (2013); *Schlesinger v Reservists* 418 US 208 (1974).

[18] *City of Los Angeles v. Lyons,* 103 S. Ct. 1660, 1665 (1983), *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

to be injured related to her employment, education, reputation, relationships, and mental health. **Gjovik** has now been further ostracized and alienated.

19. The injuries are irreparable. **Gjovik** is suffering irreparable injury which is continuing to present time and is expected to continue unless there is judicial intervention. **Gjovik**'s open legal cases, this appeal, ongoing press coverage, and her online advocacy expose **Gjovik** to potential future prosecution under this statute, which has an unconstitutional chilling effect in her political and public activities.[19] Because **the Order** is based solely on **Gjovik**'s Constitutionally protected activity, it chills her ability to freely speak, write, publish, read, listen, and associate; for fear of subjecting herself to criminal or contempt liability (including thousands of dollars in fines and years of criminal incarceration), [20] additional protection order(s), and/or renewal of the existing order.

20. Immediate injunctive relief is necessary. **Gjovik** worries constantly about somehow violating **the Order** that was issued against her, or at least having to face allegations that she violated it. The Supreme Court & 9th Circuit have consistently upheld that the loss of First Amendment freedoms, even for minimum time, constitutes irreparable injury.[21] When First Amendment rights are chilled daily, it requires immediate injunctive relief.[22]

21. There is a credible threat of persecution. **Gjovik**'s fears are reasonable as the Petitioner admitted in the petition against **Gjovik**, that she already reported **Gjovik** to the police, the FBI, **Gjovik**'s law school, numerous commercial services, and complained about **Gjovik** to the press and **Gjovik**'s friends. Petitioner has also threated to pursue cyberbullying criminal

---

[19] *Rynearson v. Ferguson*, No. 17-35853 (9th Cir. 2018)

[20] Washington RCW 7.21; RCW 7.105, RCW 10.14

[21] *Klein v City of San Clemente* 584 F.3d 1196 (9th Circ. 2009); *Elrod v Burns*, 427 US 347 (1976).

[22] *Sanders v Bullock*, 698 F.3d 741 (9th Cir. 2012).

charges against **Gjovik** in **the state of Washington**. (*see Gjovik's state district court evidence*).
The day after the district court hearing, Petitioner reported **Gjovik**'s **Legal Memo** against Apple
Inc to **Gjovik's** web host as one of the most serious federal crimes (child pornography) and cited
**the Order** as justification to have **Gjovik**'s legal filing taken down under that category of
material. (Exhibit G: Web Host Complaint)

22. **Gjovik** previously had a record free of civil or criminal decisions against her. In fact,
**Gjovik** publicly prided herself in her unblemished record and her reputation for ethical and
compassionate conduct.[23] **The Order,** in much detriment to **Gjovik**, now shows up on
background checks as **Gjovik** is actively looking to find a new job (employment applications),
move to a new location (renters' application), and become a lawyer (Moral Character). The
California Moral Character examiners have asked **Gjovik** to provide additional information on
**the Order,** which **Gjovik** believes she is unable to legally do under **the Order**, and have informed
them as such. **Gjovik** planned to go into human rights legal work and now worries she will be
disallowed from working with victims of human rights violations due to **the Order.**

23. Further, **Gjovik** fears Apple Inc will argue a claim/issue preclusion effect **of the
Order**, as a defense to **Gjovik**'s January 10 2022 labor charges against Apple Inc, including
harassment by Petitioner on behalf of Apple Inc (which is why California prevents protection
orders arising out of labor disputes while the dispute is still pending).[24] **Gjovik** also fears Apple
may attempt to use **the Order** to disrupt the legal basis for **Gjovik**'s request for reinstatement to
Apple Inc (she previously requested this injunctive relief). Further, a third party requested a copy
of **the Order** on March 4 2022 and paid for a legal service to obtain a copy. Under information
and belief, **Gjovik** believes Apple Inc already obtained a copy of **the Order** against her.

---

[23] Twitter, Ashley Gjovik, Aug 9 2021, https://twitter.com/ashleygjovik/status/1424828430894333952

[24] Cal. Code Civ. Proc. § 527.3; California Labor Code 1138.2 (also see federal version, Norris-LaGuardia Act)

1

2

## IV.  STATEMENT OF FACTS

3

A.     **Gjovik's Charges Against Apple Inc**

4

24. Background on *Gjovik's Apple Lawsuits* will be provided here due to Petitioner

5

providing extensive testimony in state district court for *the Order* related to *Gjovik's Apple*

6

*Lawsuits* and Gjovik's *Legal Memo, Gjovik's* objections in state court relating to interference

7

with her *Apple Lawsuits* and Gjovik's *Legal Memo,* and because the state Judge's justification

8

for *the Order* was partially based upon *Gjovik's Legal Memo* as part of her *Apple Lawsuits*.

9

25. *Gjovik* worked for Apple Inc from February 2015 to September 2021 as a Senior

10

Engineering Program Manager in Software and Hardware Engineering. Around March 2021,

11

*Gjovik* began organizing with other Apple Inc employees around concerns about health, safety,

12

labor, retaliation, and discrimination at Apple Inc. *Gjovik* began speaking out publicly about her

13

concerns about Apple's work conditions in July of 2021.[25]

14

26. On or around June 2021, *Gjovik* began forming associations with other employees

15

related to labor concerns, and discussing options for protesting Apple Inc's unlawful conduct

16

related to work conditions. Gjovik and other employees discussed ideas including unions, public

17

records requests, gathering shared evidence, forming petitions, and sending centralized

18

communications about requests for improved work conditions – all of which *Gjovik* became

19

involved in, including leading the efforts. *Gjovik* sent a letter to Apple's CEO requesting

20

improved work conditions, on behalf of hundreds of other employees, in June 2021.

21

22

23

[25] NYT Quote of the Day, Ashley Gjovik, https://www.nytimes.com/2021/07/24/todayspaper/quotation-of-the-day-virus-surge-complicates-return-to-office-plans.html; The Verge: "Apple places female engineering program manager on administrative leave after tweeting about sexism in the office," August 4, 2021,

24

https://www.theverge.com/2021/8/4/22610112/apple-female-engineering-manager-leave-sexism-work-environment

27. *Gjovik* and Petitioner [this person will be referred to as "Petitioner", as *Gjovik* is not legally allowed to write Petitioner's name per *the Order* in question here] were coworkers, with *Gjovik* working onsite at the Apple headquarters in Cupertino and Sunnyvale, California; and Petitioner working remotely from Seattle, Washington. (Apple Inc has over 150,000 employees dispersed globally). [26] Petitioner, under information and belief, worked in Apple's Global Security team within Apple's Legal organization; this was the same team involved in terminating *Gjovik*.

28. Petitioner originally approached *Gjovik* online through work communication channels, on or around June 2021, inquiring and commenting on the labor-related activities *Gjovik* was helping to lead. *Gjovik* did not initiate contact, and before this, *Gjovik* did not know or know of Petitioner. *Gjovik* and Petitioner had limited interactions until late July 2021, but during that time there were several instances where Petitioner would attack or accuse Gjovik of things, though later apologizing. Because Petitioner wanted to work on labor issues, and Gjovik cares about labor issues, Gjovik tried to be forgiving of the outburst and attempted build a positive (or at least neutral) working relationship with Petitioner as a fellow Apple employee.

29. On or around late July through mid-August 2021, Petitioner began sending *Gjovik* frequent text messages and engaging *Gjovik* in phone and video calls with her: "*I tried to FaceTime you. I'm really freaking out [about Gjovik's suspension]."* (Aug 4 2021, the day *Gjovik* was suspended). *Gjovik* generally agreed to speak with Petitioner when Petitioner requested. On or around mid-August, Petitioner even began to insist *Gjovik* provide her with regular updates on *Gjovik*'s dispute with Apple Inc and expressed displeasure when *Gjovik* did not, *"HOW [DID] YOU NOT TELL ME YOU GOT ISSUE CONFIRMATION."* (Aug 17 2021,

---

[26] *[REDACTED] v. Ashley Marie Gjovik*, Petition for an Order for Protection, King County District Court, case no. 22CIV01704KCX (31 January 2022).

referencing *Gjovik's* Twitter post about receiving a confirmation from Apple Inc about which of Gjovik's labor and discrimination complaints they would investigate).

30. On August 13 2021, upon learning that *Gjovik* was organizing and assembling with certain other labor activists, Petitioner insisted *Gjovik* introduce her to the group and include the Petitioner in their activities, "*Wait. Include me. Hello,*"[27] Petitioner wrote *Gjovik*. *Gjovik* agreed to introduce Petitioner to other activists, as Petitioner requested.  By August 17, 2021 the group *Gjovik* had been organizing with had decided to call themselves "AppleToo" and *Gjovik* texted a journalist that day to inform her Petitioner had formally been added to the group.[28] On August 18 2021, *Gjovik* texted the same journalist that she was concerned the group had suddenly begun making allegations against her. *Gjovik* told the reporter "*I want to cry.*"[29] An hour later *Gjovik* wrote that *Gjovik* had "*ejected [herself] from that group for now*." [30]

31. Petitioner began making frequent accusations against *Gjovik* in late August 2021, including accusing *Gjovik* of "*making racist statements*," "*being racist*," and insisting *Gjovik* publicly apologize for "*being racist*" or else insisting *Gjovik* should "*delete [Gjovik's] Twitter account*." Both *Gjovik* and Petitioner are white women.

32. On September 2 2021, Petitioner called *Gjovik*, making vague allegations that it somehow harmed Petitioner after *Gjovik* publicly posted a statement on Twitter to Apple employees saying "*We're stronger together*." Petitioner demanded *Gjovik* apologize for saying "*we're stronger together*" and apologize for "*abandoning the movement*." [31] On September 2 2021, a journalist described actions allegedly taken by Petitioner against *Gjovik* as "*pretty toxic*"

---

[27] Text messages, Aug 13 2021

[28] Text messages with 3rd Party, Aug 13 2021

[29] Text messages with 3rd Party, Aug 18 2021

[30] Text messages with 3rd Party, Aug 18 2021

[31] Screenshots of text message with 3rd party on September 2 2021

1   and said she couldn't believe "*someone would go to these lengths to try and make **Gjovik** look*

2   *bad.*"[32]

3   33. On September 7 2021, Gjovik was posting on Twitter about her **Apple Lawsuits**,

4   unrelated to Petitioner, and Petitioner commented on Twitter to Gjovik around 7:55AM that

5   **Gjovik** was being "*aggressive*" and "*presumptuous*." Gjovik did not respond and around 8:00AM

6   Petition privately messaged **Gjovik** "*Ping ^^ / Idk why you feel the need to talk to me like this*?"

7   **Gjovik** replied to Petitioner that **Gjovik** was concerned Petitioner was frequently treating **Gjovik**

8   like "*a perpetrator*." [33]   That day, September 7, **Gjovik** blocked Petitioner from further

9   communicating with **Gjovik** via text messages or phone calls.

10   34. **Gjovik** was terminated by Apple Inc on Sept 9 2021 for reasons that were not

11   disclosed to her, but were assumed by many to be retaliation for **Gjovik**'s protected activities.[34]

12   By the time Gjovik was fired, Gjovik had tried to cease contact with Petitioner. Gjovik did not

13   attempt to initiate any contact with Petitioner after she was no longer coworkers with Petitioner.

14   35. On, Sept 9 2021, Petitioner began posting public allegations on Twitter that implied,

15   and messaging Gjovik's friends implying, that **Gjovik**'s U.S. NLRB, U.S. EEOC, and California

16   DFEH charges against Apple Inc were meritless and made in bad faith.[35] By the end of

17   September, **Gjovik** had blocked Petitioner from directly contacting **Gjovik** via any social media,

18   email, or messaging applications.

19

20

---

21   [32] Screenshots of text message with 3rd party on September 2 2021

22   [33] Screenshots of text messages on September 7 2021

23   [34] Justia: "Former Apple Employee Alleges Workplace Violations and Wrongful Termination," Sept 20 2021, https://news.justia.com/former-apple-employee-alleges-workplace-violations-and-wrongful-termination/ ; Gizmodo: "Apple Wanted Her Fired. It Settled on an Absurd Excuse," Oct 14 2021, https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789

24   [35]  [*see **Legal Memo**, pg. 28, 156; see Gjovik's state district court Reply, pages 17-18*].

36. In a letter from Apple Inc's lawyers to the federal government as part of Gjovik's federal whistleblower retaliation cases (dated March 4 2022), Apple Inc alleged that on September 15 2021, Petitioner reported *Gjovik* via a "Business Conduct Complaint" at work. Apple Inc claims Petitioner alleged *Gjovik* "*publicly disclosed [internal] information*," and Petitioner provided Apple Inc screenshots of private texts between Petitioner and *Gjovik* on the matter.[36] (*Gjovik* would not learn of this until March 2022, after *Gjovik* was already subject to *the Order*). Apple Inc cited this alleged complaint from Petitioner in their defense(s) against *Gjovik.* However, the complaint was immaterial as the information in dispute was shared by *Gjovik* openly, under her own name, and it was a protected disclosure.[37]

37. On Oct 14 2021, the *Washington Post* published a 3,000-word article profiling the Petitioner. The article was published in print and online and continues to be available publicly online. The article included high-resolution photos of Petitioner and photos captioned "*near [Petitioner's] home.*"[38]  (Exhibit J)

38. The article covered many details of Petitioner's life, as provided by an interview with Petitioner, including that she: "*grew up poor and dropped out of high school. As a teenager, she struggled with addiction…and tried to overdose on pills.*" [39] The article includes information provided by Petitioner about, including among other things, her bipolar disorder diagnosis, drug use and addiction, alleged history of check fraud, that she is a "*single mom.*"[40] (Exhibit J)

---

[36] Orrick on behalf of Apple Inc, *Re: Ashley Gjovik v. Apple Inc., Case No. 9-3290-22-051* (March 4 2022)

[37] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple,* The Verge (Aug. 30, 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

[38] Washington Post, *She pulled herself from addiction by learning to code. Now she's leading a worker uprising at Apple,* Oct 14 2021, https://www.washingtonpost.com/technology/2021/10/14/apple-worker-[REDACTED]

[39] Washington Post, *She pulled herself from addiction by learning to code. Now she's leading a worker uprising at Apple,* Oct 14 2021, https://www.washingtonpost.com/technology/2021/10/14/apple-worker-[REDACTED]

[40] Washington Post, *She pulled herself from addiction by learning to code. Now she's leading a worker uprising at Apple,* Oct 14 2021, https://www.washingtonpost.com/technology/2021/10/14/apple-worker-[REDACTED]

39. The *Washington Post* article also said that "*On Twitter, [Petitioner] has openly discussed the messy details of her life*" and the publisher called Petitioner's Twitter presence "*brutally honest.*" [41] Petitioner is a public figure who has a detailed Wikipedia biography article about her.[42] (Exhibit J)

40. From September through December 2021, **Gjovik** would be made aware of numerous negative, public posts made about her by Petitioner, would be made aware that Petitioner was persistently contacting **Gjovik's** friends and followers on social media to make negative statements about **Gjovik** and discourage them from supporting **Gjovik**, and **Gjovik** would be made aware by reporters that Petitioner was telling the press negative things & not to talk to her.

41. In late December 2021, Gjovik was made aware that Petitioner made public statements and contacted **Gjovik**'s friends accusing **Gjovik** of "*leaking unreleased Intellectual Property*," accusing **Gjovik** of "*perjuring herself,*" and implied bad things would happen to **Gjovik**'s friends (they'd "*get sucked into this [explicative]*") if they continued to support **Gjovik**. [*see **Legal Memo,** page 17, 30-31; 223*]

42. On December 30 2021, Petitioner posted publicly confirming that she understood **Gjovik** had blocked Petitioner from contacting in September 2021. [*see **Legal Memo**, page 31; 233*]

43. On December 31 2021, **Gjovik** initiated her first contact with Petitioner since September by posting a message addressed to Petitioner on **Gjovik**'s Twitter feed (despite Petitioner being blocked). **Gjovik** warned Petitioner to stop harassing her and her friends or else **Gjovik** would request a restraining order. (*See Gjovik's state district court evidence).* Due to

---

[41] Washington Post, *She pulled herself from addiction by learning to code. Now she's leading a worker uprising at Apple,* Oct 14 2021, https://www.washingtonpost.com/technology/2021/10/14/apple-worker-[REDACTED]

[42] Wikipedia, Petitioner, https://en.wikipedia.org/wiki/[REDACTED]

Petitioner's frequent comments, and directed contact to *Gjovik's* friends about *Gjovik*, all based on *Gjovik's* posts, and following very soon after publishing, Gjovik believed and believes Petitioner has been covertly surveilling *Gjovik's* Twitter account for nearly a year

44. In January 2022, *Gjovik* filed additional charges against Apple Inc for harassment, threats, intimidation, denylisting, coercing, and retaliation, among other allegations. *Gjovik* named dozens of employees, managers, and agents of Apple, of whom she had diligently documented and preserved their alleged unlawful conduct. (Note: No one else named in the *Legal Memo* has contacted *Gjovik* about the *Legal Memo* except for Petitioner.)

45. *Gjovik* submitted a new charge to the NLRB against Apple Inc on 10 January 2022 and made a public statement about doing so.

46. On or around early January, online accounts (that *Gjovik* now believes to be agents of Apple Inc, staging this entire situation) began sharing public records with her about Petitioner. Several accounts participated and shared live, public links to information about Petitioner's marital status, family, education, and employment – information which directly contradicted recent public statements made by Petitioner. After confirming the records, *Gjovik* then "retweeted" a few of these posts, and shared some of the content the accounts had sent her and/or pointed her to, comparing/contrasting public statements made by Petitioner. *Gjovik* made several posts on this theme and only over a period of a several days (Indeed the Twitter posts Petitioner pointed to in her Petitioner were only between Jan 9-11 2022). Before *Gjovik* was served for this lawsuit, she had already realized the accounts were trying to provide her "*oppo research*" and had "*too much joint interest in [her],* so she blocked them and said she found the contact "*disturbing*."[43]

---

[43] Twitter, Ashley Gjovik https://twitter.com/ashleygjovik/status/1492824861504270336

47. As part of the new witness intimidation and retaliation charges, ***Gjovik's "Legal Memo"*** documented and cited (directly linking to numerous public postings) hundreds of negative comments made to and about ***Gjovik***. ***Gjovik*** submitted the ***Legal Memo*** to the U.S. & California Department of Labor, the U.S. NLRB, and the U.S. Department of Justice. On Jan 10 2022, ***Gjovik*** published the ***Legal Memo*** to a document sharing website (as a law firm or newspaper might), and notified the general public it had been submitted and that records of what was submitted are now posted (again as a journalist or law firm might).

48. ***Gjovik*** organized the ***Legal Memo*** with a summary, review of the methodology she used for collecting the evidence, a summary of unlawful threats made by Apple Inc by type, and then a chronological listing of relevant statements, linked to their public URLs where available. The Appendices included a 24-page list of employees, manager, and agents allegedly acting on behalf of Apple Inc on the matter. (*Exhibit D:* ***Legal Memo***).

The January ***Legal Memo's*** Summary includes:

> Under information & belief, Apple Inc, (via their managers, employees, & agents), have been orchestrating an extensive propaganda & harassment campaign against ***Gjovik*** since August 2021. Under this campaign, Apple Inc has made frequent, damaging false accusations about ***Gjovik***'s actions and statements, her motives and character, and her mental health. Apple Inc has also made numerous threats against her related to retaliation, termination, litigation, blacklisting, and violence.

> The campaign started while she was still an Apple employee & has been waged by Apple managers under their name & Apple position (i.e. [FIVE APPLE MANAGER'S NAMES], & others) as well as current and ex-Apple employees ([Petitioner], [SIX APPLE EMPLOYEE'S NAMES] & others), again, under their own names & positions at Apple. There also appears to be a large online presence assumably contracted by Apple Global Security which appears to have access to much of her private &/or personal information, and repeats, ad nauseum, specific talking points assumably selected by Apple Inc for this campaign.

> This campaign is believed to be being waged in retaliation for ***Gjovik***'s protected activity starting in March 2021, and also in retaliation for her reporting Apple Inc's unlawful conduct to the government and law enforcement in the summer of 2021, and continuing to participate in the government investigations. This campaign is believed to be being waged in an effort to chill organizing & unionization efforts at Apple Inc, intimidate witnesses from testifying to what Apple Inc did to ***Gjovik***,

coerce *Gjovik* to withdraw her complaints, and to generally intimidate current Apple Inc employees from speaking out or reporting unlawful activity.

This campaign began shortly after *Gjovik* started talking to the press and the government about her safety, labor, and discrimination concerns but quickly amplified once she filed formal complaints against Apple Inc with the NLRB, EEOC, U.S. Department of Labor, California Department of Labor, U.S. SEC, U.S. FBI, and other regulatory & law enforcement agencies. Within days of her reports, the frequency and intensity of the abuse dramatically increased, including threats of termination & other retaliation, threats of violence, threats of litigation, threats of bankruptcy, threats against her friends and supporters, and much coercion to drop her government complaints & to not file a lawsuit.

Assumed agents of Apple Inc referred to *Gjovik*'s protected activities as "worthy of death," and made references to *Gjovik* dying from "double tap" gunshot wounds, that in Russia Apple whistleblowers would die from a "car accident," suggested Apple employee organizing around discrimination concerns be "relocated to Afghanistan" to see how the "Taliban" would "deal" with Apple's employee organizers, and noted *Gjovik* was deserving of "death and rape threats." One Twitter account posted the day after *Gjovik* was fired that the world was "reaming" her and that *Gjovik* deserved it (violent anal sex).

After *Gjovik* was fired, Apple Inc mailed her possessions from her office in a box full of broken glass shards and them commented to her on her Twitter about the box before she opened it, alluding to it containing a severed head of one of her loved ones. Agents of Apple Inc wrote *Gjovik* was "deserving of misery," that they looked forward to seeing Apple "swallow her & spit her out," and that she is lucky Apple has not "crushed her like a bug." Even as of this week, an Apple Global Security employee communicated to *Gjovik* she did not want *Gjovik* "to exist in her world."

Apple employees & assumed agents of Apple Inc suggested Apple Inc should / will sue *Gjovik* for corporate espionage, disinformation, reputational bias, defamation, blackmail, and federal crimes, among other things. Employees & agents suggested appropriate consequences for *Gjovik*'s protected activity included jail, the death penalty, "suing her into oblivion," "ending her," "destroying her," "ruining her," and bankrupting her. Apple managers & agents of Apple Inc referred publicly to the retaliation she faced from Apple Inc, including termination of her employment, as "invited upon herself" like "walking down a dark alley," "finding out" for "fucking around," a "self-fulfilling prophecy," and the "consequence" of "airing Apple's dirty laundry."

Apple Inc agents also threatened to blacklist *Gjovik* from the technology, engineering, and legal employment fields: including "never working in the tech industry again, never working for a large corporation again, never getting a job as a lawyer, failing the California bar association's Moral Character investigation, and never getting a job anywhere again other than working in fast food." ….

Apple managers, employees, and agents have referred to **Gjovik**'s complaints to the federal and state government about Apple Inc as "unsubstantiated," "meritless," "baseless," "dead in the water," and that there's "no case." Apple's agents referred to **Gjovik** as an "ambulance chaser" and her cases as "shakedown lawsuits." Apple manager [Redacted] and ex-Apple employees [Petitioner] and [Apple employee] have publicly called **Gjovik** a "liar," "predator," "racist," "inconsequential," "not a real whistleblower," "not a real activist." These parties have described **Gjovik**'s protected activities as a "vendetta," "warpath," "perjury," "fabricated nonsense," "misleading rhetoric," & "misinformation." Among other things, Apple Inc & their agents have publicly called **Gjovik** a "liar, toxic, attention-seeking, obnoxious, vindictive, entitled, cancer, lacking credibility, dishonest, malicious, a sociopath, a provocateur, unhinged, insane, overweight, a narcissist, 'universally hated', a psychopath, paranoid, Bipolar, psychotic, schizophrenic, a grifter, a Karen, a Super Karen, Karenx100, a 'typical feminist,' a 'classic cow'.

(*See Exhibit D: Legal Memo, pg5-8, Jan 30 2022*)

49. On January 30 **Gjovik** replied to a Twitter post she made about the **Legal Memo,** and **Gjovik** commented on Apple's Global Security team in relation to the "propaganda" section of the document, writing about how the head of Apple's Global Security team was an ex-US Navy Intelligence Specialist and before him, a "25-year FBI veteran." [44] Gjovik noted the head of Apple Global Security has a degree in Rhetoric and she wrote "(*a.k.a. propaganda*)," then noted between his time with the Navy in the 1980s and his degree, he's "*probably an expert in Soviet propaganda.*"[45]

50. **Gjovik**'s **Legal Memo** included dozens of pages of online accounts as part of her complaint against Apple. On January 30, **Gjovik** posted additional links to the **Legal Memo** on Twitter, with screenshots of tables writing, "*Note: a (working) directory of Apple propaganda agents & accounts involved in the current union-busting efforts can be referenced on pages:*

---

[44] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1487890091670251504, Gizmodo, *Apple Gestapo: How Apple Hunts Down Leaks*, Dec 15 2009, https://gizmodo.com/apple-gestapo-how-apple-hunts-down-leaks-5427058

[45] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1487892050611564546; CNN, *Apple's global security chief and two members of Sheriff's office indicted for alleged bribery*, Nov 23 2020, https://www.cnn.com/2020/11/23/tech/apple-thomas-moyer-bribery-indictment/index.html ; Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1488226165064040448

165-182.[46].… '*Cause here the thing... all this effort Apple is dedicat[ing] to discredit me & try to get me to give-up... it has very little to do with me. It's about their own liability. It's about their preference of silencing employees. It's about their hate for unions & employee organizing."* [47]

B.   **[Redacted]'s Petition for an Anti-Harassment Protective Order**

51. On 31 January 2022, Petitioner, a Washington resident, petitioned the King County District Court in the state of Washington for an anti-harassment restraining against *Gjovik*. As mentioned, Petitioner was a previous Apple coworker who worked in Apple's Global Security team. The day Petitioner filed the petition she also posted on Twitter a photo of a "Challenge Coin" she received from Apple Global Security, she said for doing "really important stuff."[48]

52. Petitioner alleged in her 31 January 2022 *Petition for an Order for Protection* that she was the victim of online stalking and online unlawful harassment by *Gjovik* beginning in December 2021. Petitioner made a number of unsubstantiated and frivolous allegations against *Gjovik* including but not limited to: harassment, defamation, cyberstalking, extortion, and invasion of privacy. Petitioner wrote to the court claiming she reported *Gjovik* to the police, to the FBI, Twitter, Scribd (a document sharing platform), and *Gjovik*'s law school. [49]

53. Petitioner's evidence of her allegations in the Petition was six hyperlinks. First, the link to *Gjovik*'s Twitter account home page (pointing to *Gjovik*'s 10,000+ Twitter posts), then

---

[46] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1487894003638943745

[47] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1487894689441218560

[48] Twitter, Petitioner, https://twitter.com/[redacted]thedev/status/1488274880319537153

[49] *[REDACTED] v. Ashley Marie Gjovik*, Petition for an Order for Protection, King County District Court, case no. 22CIV01704KCX (31 January 2022).

ORIGINAL COMPLAINT          – PAGE 19 –          ASHLEY M. GJOVIK

1    four individual Twitter posts made by Gjovik between January 9ᵗʰ and 11ᵗʰ 2022, and finally a

2    link to **Gjovik's Legal Memo**.[50]

3    54. One of the four Twitter posts was a post **Gjovik** made addressed to Apple on January

4    11ᵗʰ 2022, alerting Apple of the new charges she was filing against them and suggesting they

5    consider sending a Cease & Desist letter to named parties, as well as initiate document retention.

6    (Apple has admitted to monitoring **Gjovik**'s Twitter feed, and was assumed to be anyways, so

7    **Gjovik** had reason to think they would see the post).

8    55. In the above Cease & Desist post, **Gjovik** named eight people, once of which was

9    Petitioner. **Gjovik** referred both the formal legal name **Gjovik** knew Petitioner was known by at

10   Apple (the name Petitioner used for email, messaging, etc. at work) as well as Petitioner's online

11   alias, to ensure Apple understood who she was referencing. The post also asked Apple to suggest

12   to these employees to cease reporting **Gjovik** to local and federal law enforcement, and domestic

13   and foreign governments, with bad faith and retaliatory allegations against her.

14   56. Petitioner's own evidence in her allegations against **Gjovik** included a letter from

15   Apple Inc to Petitioner warning Petitioner of multiple breaches of contract of her settlement

16   agreement with Apple Inc. The letter, dated 20 December 2021, referenced Petitioner's legal

17   name, as Gjovik knew it at Apple. In March 2021, Petitioner posted publicly on Twitter

18   referencing her legal name as well as the online alias she goes under. She made two posts, still

19   public today, which reference both her alias and legal name.[51] In the *Petition for the Order*

20   against **Gjovik**, Petitioner claimed her legal name was secret and forbidden.

21

22

23   [50] *[REDACTED] v. Ashley Marie Gjovik*, Petition for an Order for Protection, King County District Court, case no.
     22CIV01704KCX (31 January 2022).

24   [51] [PETITIONER], Twitter, March 1 2021, https://twitter.com/[REDACTED]thedev/status/1366488907844575235;
     https://twitter.com/[REDACTED]thedev/status/1366441803101143047

ORIGINAL COMPLAINT                    – PAGE 20 –                    ASHLEY M. GJOVIK

57. The next post of *Gjovik's* that Petitioner complained about was from January 9th 2022. The Twitter post was directed at the general public and critiqued Petitions public false statements about herself (to show a pattern of Petitioner, and in relation to Petitioner making false statements about *Gjovik* for months). *Gjovik* compared statements Petitioner made in the Washington Post profile article and Petitioners own Twitter posts, where she claimed to have grown up in poverty and said her mother worked in construction.

58. *Gjovik* had been anonymously sent links to public posts by Petitioner's family with photos that appeared to directly contradict Petitioner's claims, and shared them comparing to Petitioner's own statements. *Gjovik* attempted to redact the family members names out of courtesy, even though it was public information, but apparently missed one mention. *Gjovik* made no negative comments about Petitioners family and in fact commented Petitioner's mother "*looked like a late 1990s goddess*."

59. In the third post in dispute, from January 9th 2022, *Gjovik* compared Petitioner's claim of being "*a single mom*," as noted in the 2021 Washington Post article, with social media posts in the same time period, posted by Petitioner and Petitioner's husband making positive statements about their marriage. *Gjovik* also added a comparison of a public quote from Petitioner's personal website which claimed Petitioner achieved an advanced degree in web design in 2007, contrast with Petitioner's 2021 profile in the Washington Post where Petitioner said she simply "*taught herself how to code and dabbled in web development*" in 2007. *Gjovik* included screenshots of all statements & URLs to the original public posts, so others could verify for themselves.

60. The final Twitter post at issue, from January 9th, was a general post by *Gjovik* stating to the general public why she felt the need to impeach the statements of Petitioner. *Gjovik* posted that she was "*revealing the truth*."

61. In the January 31 petition, under "other pending litigation," Petitioner noted that *Gjovik* had recently filed a NLRB charge (CA-288816) against Apple Inc which Petitioner claimed included "*false/misleading information*" about Petitioner and alleges the charge was "*made in bad faith*" by *Gjovik*.[52]

62. Petitioner requested a Temporary & Full Protection Order, to be effective longer than one year and prohibit *Gjovik* from making contact, "surveilling," her, and force *Gjovik* to pay legal fees.[53]

63. On 1 February 2022, the next day, the Judge heard Petitioner in an *ex parte* hearing where Petitioner would claim she filed the petition but-for Gjovik's NLRB charge against Apple, and complained of Gjovik's NLRB charge, the **Legal Memo** for the **Apple Lawsuits**, and Gjovik's Twitter posts, including posts about the NLRB charge and **Legal Memo.**

64. Petitioner complained of Gjovik's "*document for the NLRB*" and that Gjovik posted it "*on Twitter,*" and "*posted a link to it on a website called Scribd,*" and "*posts[ed] screenshots of it on Twitter*." (2/1 TRO Transcript)

65. The Judge denied the petition for a temporary order but scheduled a hearing for the full order. The Judge wrote, "*Respondent lives in California. There is no emergency/irreparable harm if emergency order not issues. Many of the complained upon actions serve a lawful purpose (filing with NLRB) and involve free speech. However, other allegations may have merit, thus this Court will set a full-order hearing.*"[54]

---

[52] *[REDACTED] v. Ashley Marie Gjovik*, Petition for an Order for Protection, King County District Court, case no. 22CIV01704KCX (31 January 2022).

[53] *[REDACTED] v. Ashley Marie Gjovik*, Petition for an Order for Protection, King County District Court, case no. 22CIV01704KCX (31 January 2022).

[54] *[REDACTED] v. Ashley Marie Gjovik*, Order Re: Petition/Motion Harassment, King County District Court, case no. 22CIV01704KCX (1 February 2022).

66. On 5 February 2022, Petitioner emailed **Gjovik** [*here forward referred to as "The February Email"*] a very long, uninvited message via **Gjovik**'s personal website's "Contact" form (assumably since Petitioner was blocked from all other methods of contacting **Gjovik**).

67. **The February Email** was over 3,000 words. Amongst other curious statements, Petitioner informed **Gjovik** she had reported **Gjovik** to the FBI, and informed **Gjovik** she believed **Gjovik**'s latest SEC Whistleblower tip was "*immaterial*." (Exhibit I)

68. In **The February Email**, Petitioner demanded **Gjovik** remove allegations and evidence about her from **Gjovik**'s federal charges against Apple. "*You need to delete my tweets from your memo that contain personal information …You need to remove all assertions that I am accounts trolling you.*" (*see Exhibit I*).

69. Petitioner also told **Gjovik** that she reported **Gjovik** to Apple Inc in January 2022 for posts **Gjovik** made on Twitter which Petitioner described as "*harmful*." (Exhibit I) Petitioner supposedly no long worked for Apple at this point and it is unclear who at Apple Inc she reported **Gjovik** and **Gjovik's** Twitter posts to.

70. In **The February Email,** Petitioner admitted to making false statements about her employment history, education, and gender; admitted to "check fraud" & enrolling in college to get student loan funds and then dropping out: "*I have lied about my education in the past, and my role, tried to hide my gender, and invented whole companies. I had an infant, was making poverty wages at multiple hourly jobs, and I was trying to survive. I did what I needed to do, including enrolling in college multiple times and withdrawing for the student loans.*" She also claimed she "*invented whole companies.*" Petitioner wrote, "*I've been very open about my past.*" (Exhibit I)

71. In **The February Email**, Petitioner wrote she would have been "supportive" of **Gjovik** if **Gjovik** had "*admitted*" that she "*leaked Intellectual Property.*" Petitioner claimed there

was "*no collaborating evidence*" for **Gjovik**'s **Apple Lawsuits,** that there were "*unanswerable questions*," and Petitioner admitted she had called **Gjovik** a liar and "*corrected misinformation*" with journalists covering **Gjovik**'s Apple Lawsuits. (Exhibit I)

72. In **The February Email**, Petitioner did not inform **Gjovik** of the petition for an anti-harassment order or of the impending hearing. The TRO hearing was February 1 2022 and the hearing was scheduled for February 15, but Petitioner did not mention anything about it in this February 5 email. In fact, Petitioner told **Gjovik** she did not plan to testify against **Gjovik**:*" I am not testifying against you, nor on Apple's behalf. I wouldn't do that unless I was subpoenaed*," Petitioner wrote. (Exhibit I) Per the court records, Petitioner had just testified against Gjovik in state court five days prior and then would testify against Gjovik again on February 15 & March 1.

73. **Gjovik** never replied to **The February Email**.

74. On February 5 2022, Petitioner posted a message publicly on Twitter which she sent someone earlier in January 2022, where Petitioner said she did not want **Gjovik** to "*exist in her world*." In this February 5th Twitter thread, Petitioner alleged **Gjovik** was being manipulative, abusive, acting in bad faith, and had committed extortion. (*See **Gjovik**'s state district court evidence*)

75. Petitioner also wrote that if **Gjovik** was *"acting good faith, she'd share the entire [February Email] while redacting the personal and/or private info that [Petitioner] only shared with [**Gjovik**] for empathy and context."* Petitioner added*, "and that's what [Petitioner] tried to have this morning before hiring a process server. Empathy."* (*See **Gjovik**'s state district court evidence*)

C.    **Anti-Harassment Protective Order Hearings**

76. A full hearing was scheduled for 15 February 2022, but ***Gjovik*** was not served until mid-day 14 February 2022. Overnight, ***Gjovik*** prepared and submitted a reply, evidence, and five motions. During the hearing on 15 February 2022, ***Gjovik*** introduced a motion for a continuance due to lack of sufficient notice, which was granted by the Judge.[55]

77. ***Gjovik*** also introduced a notice of her intention to file an anti-SLAPP motion and requested the statutory 14-day notice to provide Petitioner opportunity to withdraw.[56] ***Gjovik*** also introduced a motion to dismiss with prejudice under Washington's Anti-SLAPP statute (RCW 4.105.020).[57]

78. In the Anti-SLAPP notice, ***Gjovik*** wrote that the petition against her was *"retaliatory, abusive, and unlawful."* ***Gjovik*** noted Petitioners allegations were not grounded in fact or law, and the petition served an improper purpose to further intimidate and retaliate against a federal and California state witness, victim, and informant. ***Gjovik*** wrote that Petitioner's request was an extension of her concerted effort to coerce ***Gjovik*** to modify or withdraw testimony and to "*chill if not restrict **Gjovik***'s exercise of First Amendment speech on matters of public concern.*" [58]

79. ***Gjovik*** noted Washington's Anti-SLAPP statute applies to no-contact orders "*arising from someone gathering, receiving, or posting information for communication to the public for the creation, dissemination, or exhibition of a literary, political, or journalistic work regardless*

---

[55] *[REDACTED] v. Ashley Marie Gjovik*, Motion for a Continuance, King County District Court, case no. 22CIV01704KCX (15 February 2022).

[56] *[REDACTED] v. Ashley Marie Gjovik*, Notice of Filing Anti-SLAPP Motion, King County District Court, case no. 22CIV01704KCX (15 February 2022).

[57] *[REDACTED] v. Ashley Marie Gjovik*, Motions to Dismiss under RCW 4.105.020 & RCW 4.24.510, King County District Court, case no. 22CIV01704KCX (15 February 2022).

[58] *[REDACTED] v. Ashley Marie Gjovik*, Notice of Filing Anti-SLAPP (RCW 4.105.020) Motion, King County District Court, case no. 22CIV01704KCX (15 February 2022).

1    *of the mans of distribution."* [59] ***Gjovik*** cited an applicable Washington statute on statutory

2    interpretation, noting the Anti-SLAPP statute should *"be broadly construed and applied to*

3    *protect the exercise of the right of freedom of speech and of the press, the right to assemble and*

4    *petition, and the right of association."* [60]

5        80. ***Gjovik*** also introduced a motion to dismiss with prejudice under a Washington

6    whistleblower protection statute (RCW 4.24.510).[61] That statute was enacted to *"protect good*

7    *faith communications to government agencies."* In ***Gjovik***'s motion, she elaborated on

8    Petitioner's witness intimidation and noted Petitioner's frequent, public statements about the

9    petition for a protection order against ***Gjovik*** not only intimidate ***Gjovik***, but also *"intimidate*

10   *other Apple employees who might want to report Apple's unlawful actions to the government but*

11   *who are now in fear of being publicly attacked."* Further, as ***Gjovik*** wrote in her Reply,

12   Petitioner's intentions were unlawful and requests for prevention from surveillance appeared to

13   be an attempt to prevent collection of evidence.[62] That statute allows or a $10,000 statutory fine

14   but ***Gjovik*** offered to waive it in good faith, only asking for a dismissal and $1.00 in nominal

15   damages.[63]

16       81. ***Gjovik*** also introduced two motions for counter-claims of sanctions/fines, one under

17   a Washington anti-frivolous claims statute and another under Washington's Rule 11 statute.

18

19

20   [59] RCW 4.105.060(l)(i); RCW 4.105.010, RCW 4.105.090; 4.105.901

21   [60] *[REDACTED] v. Ashley Marie Gjovik*, Motions to Dismiss under RCW 4.105.020 & RCW 4.24.510, King County District Court, case no. 22CIV01704KCX (15 February 2022).

22   [61] *[REDACTED] v. Ashley Marie Gjovik*, Motions to Dismiss under RCW 4.105.020 & RCW 4.24.510, King County District Court, case no. 22CIV01704KCX (15 February 2022).

23   [62] *[REDACTED] v. Ashley Marie Gjovik*, Gjovik's Reply, King County District Court, case no. 22CIV01704KCX (15 February 2022).

24   [63] *[REDACTED] v. Ashley Marie Gjovik*, Motions to Dismiss under RCW 4.105.020 & RCW 4.24.510, King County District Court, case no. 22CIV01704KCX (15 February 2022).

Again, for each *Gjovik* only asked for $1.00 in nominal damages. [64] The four motions to dismiss and for fees/sanctions were noted but not acted upon by the King County District Court Judge. The Judge granted the motion for a continuance writing, *"Respondent was just served yesterday and has asked for a continuance to prepare and potentially seek legal counsel. Case is continued as requested. No further service necessary*." [65]

82. In addition to prior conduct, *Gjovik*'s reply and evidence included Twitter posts and direct messages from Petitioner to the public and to *Gjovik*'s friends between 2/5-2/13 (before Petitioner even severed *Gjovik* for the 2/15 hearing. On February 12, Petitioner directly reached out to *Gjovik*'s friends on Twitter, evading *Gjovik*'s block of Petitioner's account and requests to leave *Gjovik* alone. Petitioner publicly informed them of the Petition against *Gjovik* (*Gjovik* was still not served) and when questioned why *Gjovik* would do what Petitioner alleged, Petitioner responded "*I do not know her motives*."[66]

83. An anonymous Twitter account also began interacting with *Gjovik* on 2/11, posting "Can you still be admitted to the bar if you had an antiharassment order against you? Asking for *Ashley Gjovik*." The account posted a photo of a smirking adolescent with a link to the California Moral Character Exam page. Another post said "Search of public records indicates Ashley has a court date coming up!" The account's profile included a screenshot of the Petition against *Gjovik* (before *Gjovik* was even served), and the phrase "*Ashley's a [expletive]*.[67] [Exhibit M]. *Gjovik* promoted reported all of this to the investigators assigned to her cases.

[64] *[REDACTED] v. Ashley Marie Gjovik*, Motion Counter-Claims of RCW 4.84.185 & Civil Rule 11 Sanctions *(sue sponte)*, King County District Court, case no. 22CIV01704KCX (15 February 2022).

[65] *[REDACTED] v. Ashley Marie Gjovik*, Order Re Petition/Motion Harassment, King County District Court, case no. 22CIV01704KCX (15 February 2022).

[66] *[REDACTED] v. Ashley Marie Gjovik*, Gjovik's Reply, pg21, King County District Court, case no. 22CIV01704KCX (15 February 2022).

[67] *[REDACTED] v. Ashley Marie Gjovik*, Gjovik's Reply, King County District Court, case no. 22CIV01704KCX (15 February 2022).

84. On February 13 2022, a woman Petitioner strangely cited as witness against **Gjovik**, wrote to **Gjovik** *"[Petitioner] stirred up shit and it had consequences and [Petitioner's] trying to sue the law to avoid those consequences. Even really rich people have trouble doing that. And she's not rich."* The next day, on February 14, Petitioner's witness encouraged **Gjovik** to request a restraining order against Petitioner, "*ugh maybe you should try for a restraining order*." (see Gjovik's district court evidence)

85. On 15 February 2022, during the first hearing, Petitioner introduced her evidence and submitted written testimony which she referenced under oath. Petitioner's evidence was a hodge podge of random and misleading documents including screenshots of around 19 posts by **Gjovik** about her Apple Lawsuits, 17 posts by **Gjovik** complaining of witness intimidation and retaliation, a copy the state of California denying **Gjovik**'s request for unemployment insurance. The evidence included several pages of correspondence from Apple's attorneys to Petitioner, and several pages about a court action related to Petitioner's family's criminal history.

86. The evidence also included 5 screenshots of private messages between **Gjovik** and Petitioner, most of which referenced the invasion of privacy disclosures **Gjovik** made and which Apple is now under multi-national investigations over. It also included a post by **Gjovik** capturing an email sent by **Gjovik** writing about how important it is to her to protect the right to free speech.

87. In Petitioner's written testimony, she again referenced **Gjovik**'s Apple Lawsuits. Petitioner accused **Gjovik** of "*leaking information protected by [Apple's] non-disclosure agreement*" and noted Apple Inc denied **Gjovik** unemployment benefits (even including a copy of **Gjovik**'s denial letter in Petitioner's evidence). Petitioner alleged in her testimony that it was a

1    "*bonafide fac*t" that *Gjovik* "*leaked private documents about unreleased intellectual property*

2    *owned by Apple."* [68]

3          88. Petitioner argued *Gjovik*'s "*retaliatory discharge*" by Apple would be "*difficult to*

4    *prove*" in *Gjovik*'s US NLRB and US Department of Labor cases because *Gjovik* "*leaked those*

5    *documents*."[69] Petitioner once again cited *Gjovik*'s NLRB case and noted she communicated

6    with the NLRB about *Gjovik*'s case, spoke directly with the federal investigator assigned to

7    *Gjovik*'s case, his supervisor, and someone in physical security. [70] *Gjovik* found this information

8    and Petitioner's conduct deeply unsettling.

9          89. Petitioner also wrote in her testimony she reported *Gjovik* to the FBI internet crimes

10   division in January 2022 and included a copy of the FBI complaint in her evidence *for the*

11   *Order*.[71] In the 5 Feb 2022 email, Petitioner would tell *Gjovik* she reported *Gjovik* to the FBI

12   because Petitioner had relapsed. She wrote, "*Yes, I reported you to the FBI. I was in a terrible*

13   *place mentally, had relapsed*…" (Exhibit I)

14         90. Petitioner also admitted to repeatedly reporting *Gjovik*'s legal filings for the *Apple*

15   *Lawsuits*, to whatever digital service they were hosted on, with an intent to have them removed

16   from the internet and from public view. [72]

17

18

---

19   [68] *[REDACTED] v. Ashley Marie Gjovik*, Statement by [Redacted], King County District Court, case no.
     22CIV01704KCX.

20   [69] *[REDACTED] v. Ashley Marie Gjovik*, Statement by [Redacted], King County District Court, case no.
     22CIV01704KCX. *[Petitioner was assumably referencing Gjovik's intentional disclosures of Apple's illegal*
     *photography of employees in their homes, including in their bathrooms and bedrooms, and while naked, which were*
21   *being uploaded to Apple servers, see Footnote x on invasion of privacy complaints].*

22   [70] *[REDACTED] v. Ashley Marie Gjovik*, Statement by [Redacted], King County District Court, case no.
     22CIV01704KCX.

23   [71] *[REDACTED] v. Ashley Marie Gjovik*, Statement by [Redacted], King County District Court, case no.
     22CIV01704KCX.

24   [72] *[REDACTED] v. Ashley Marie Gjovik*, Statement by [Redacted], King County District Court, case no.
     22CIV01704KCX.

91. Remarkably, Petitioner's written testimony includes the statement "Ms. *Gjovik* and I had not been in contact," that *Gjovik* and Petitioner had blocked each other on Twitter since September 2021, and the only contact *Gjovik* and Petition had since September was on 5 February 2022.[73] Petitioner omitted *Gjovik*'s post warning Petitioner to cease harassment on 31 December 2021. Petitioner included in her evidence *The February Email* where she informed *Gjovik* that she "*doesn't follow [Gjovik] on Twitter.*"

92. It's unclear how Petitioner became aware of so much of *Gjovik's* expression and activities if she wasn't following *Gjovik* on Twitter.

93. In Petitioner's 15 February 2022 written testimony, Petitioner added allegations against *Gjovik* of "*criminal cyber-harassment, blackmail and/or extortion, retaliation, and a violation of her human dignity.*" [74]  Petitioner also admitted that on 5 February 2022, she decided to "*move forward with hiring a process server*" on the restraining order "*because of*" *Gjovik*'s "*public response*" of the 5 February 2022 email. [75]

94. Petitioner also included attached to her written testimony, testimony she claims she provided on a Washington cyber-harassment bill (SB-5628) where Petitioner apparently testified to Washington Congress, vaguely accusing *Gjovik* of cyber-harassment, defamation, and violating federal laws. [Note: SB-5628is the replacement bill for the *state of Washington* statute found unconstitutional by the 9th circuit in 2019].

95. Before the 1 March 2022 hearing, *Gjovik* introduced two witness statements from parties familiar with Petitioner's harassment of *Gjovik*. The first witness [Witness 1] swore under

---

[73] *[REDACTED] v. Ashley Marie Gjovik*, Statement by [Redacted], King County District Court, case no. 22CIV01704KCX.

[74] *[REDACTED] v. Ashley Marie Gjovik*, Statement by [Redacted], King County District Court, case no. 22CIV01704KCX.

[75] *[REDACTED] v. Ashley Marie Gjovik*, Statement by [Redacted], King County District Court, case no. 22CIV01704KCX.

penalty of perjury that Petitioner had been persistently antagonizing *Gjovik*, made "baseless accusations" against *Gjovik* in an effort to undermine *Gjovik*'s public policy activism & legal battle against Apple. Witness 1 cited her own experience of harassment by Petitioner. She described Petitioner's surveillance of her own Tweets, Petitioner bypassing Witness' own block on Petitioner, Petitioner also arbitrarily accusing the Witness of racism, and Petitioner directly messaging the Witness and then blocking the Witness immediately after so the Witness could not reply. The Witness summarized Petitioner's behavior as: "*an abusive communication pattern, effectively yelling at me while holding her hand over my mouth*."[76] Witness said she now protects her Twitter posts to prevent further interaction with Petitioner, which Witness said "*limits [Witness'] ability to interact with the internet at large, and to perform [her] own activism. [Witness is] dismayed to constrict [her] digital life in this way, but it's the only way [she] can stop [Petitioner] from evading the clear boundaries I set that she repeatedly failed to respect.*" [77]

96. The second witness [Witness 2] swore under penalty of perjury that Petitioner had been attempting to "silence" *Gjovik* and "implied *Gjovik* was a liar." The witness stated Petitioner had contacted her twice after the witness had interacted positively with *Gjovik* online, and Petitioner "attempted to persuade her not to support *Gjovik*." [78]  *Gjovik* quickly obtained counsel based in Seattle, Washington for the 1 March 2022 hearing.

97. On February 28, 2022 Petitioner wrote to *Gjovik*'s counsel saying she was "*happy to withdraw the anti-harassment order if Ms. Gjovik can agree to cease defamatory commentary… and stop publishing personal and private information about [Petitioner and her family] on*

---

[76] *[REDACTED] v. Ashley Marie Gjovik*, Witness Statement by Kate Rotondo signed 28 February 2022, King County District Court, case no. 22CIV01704KCX.

[77] *[REDACTED] v. Ashley Marie Gjovik*, Witness Statement by Kate Rotondo signed 28 February 2022, King County District Court, case no. 22CIV01704KCX.

[78] *[REDACTED] v. Ashley Marie Gjovik*, Witness Statement by Dawn Underwood signed 25 February 2022, King County District Court, case no. 22CIV01704KCX.

1   *public platforms, including… [**Gjovik's**] self-written and self-published memos regarding*

2   *[**Gjovik's**] ongoing allegations against Apple Inc."* Petitioner aid that her "*only wish*" was to

3   have **Gjovik** "*remove or redact personal and private information about [her] and to cease*

4   *making defamatory comments publicly about [her]*." Petitioner did not reference harassment in

5   the email. **Gjovik**'s counsel never informed **Gjovik** of this until after **Gjovik** and her prior counsel

6   parted ways.

7        98. During the March 1 hearing, Petitioner also complained about a post Gjovik made

8   about Petitioner's husband (originally about Petitioner simply being married when she frequently

9   held herself out as a "single mom"). Petitioner then complained of Gjovik discussing Petitioner's

10  husband's criminal history.  Petitioner testified, *"My husband's criminal record.. and then his*

11  *name is not in any of her Tweets, I don't think. They're only in the thing that she published on*

12  *Scribd and her website.* [referring to **Gjovik's Legal Memo** for **Gjovik's Apple Lawsuits**] *and*

13  *that is where the medical information that I posted is. She had Tweeted it but they were deleted*

14  *before I got them.*" (3/1 Transcript, Page 16, 7-10). It's difficult to comprehend such an alleged

15  "directed course of conduct" that is also behind an account block and transient. A unilateral

16  decree that public information shall now be declared "private and personal information" does not

17  hold water.

18       99. Petitioner complained, and the Judge acted, upon Gjovik discussing someone's public

19  criminal record. Gjovik found this information directly relevant to her situation and February 6

20  had emailed the federal government asking for help, saying: "*I'm also incredibly freaked out*

21  *about [Petitioner] sending someone to my home. I've been living in terror from Apple after the*

22  *way they fired me and then sending me the box of broken glass... and now the severed head*

23  *comment about the box of broken glass. I'm also worried that someone else could try to get to me*

24  *pretending to be a process server since she posted it publicly. I def had what appeared to be*

*PIs/private security around my apartment at least back in Aug & Sept.  I'm also worried who she hired to come to my house. She's married to a guy with a history of violent felonies, a lot of felonies, & a he's a sex offender. His most recent felony appears to be 2017 for failure to reg as a sex offender -- and today he still appears to be unregistered. I'm pretty freaked out right now.''*[79]

D.     **District Court Judge Orders Anti-Harassment Protective Order**

100. The full hearing was on March 1 2022.  At the March 1 trial, Petitioner testified, "*With the NLRB charge -- I'm not bringing up the charge specifically. I'm talking specifically about Ashley -- excuse me, Ms. **Gjovik**, posting -- publishing these things on a platform called Scribd, which actually removed it for account abuse. A platform of her website. These are not government websites that are hosting these, these are things that Ashley -- that Ms. **Gjovik** is writing herself and publishing herself that she is claiming are related to these federal charges. But they're really just her, and that's who is publishing this information. She's just doing it under the guise that it is federally protected.*" (3/1 Transcript, pg 14, line 7-16)

101. During the March 1st hearing, Petitioner testified that ***Gjovik***: "*has some of (her) Tweets posted in here -- in this thing* **[Gjovik's]** *published, which talk about that [Petitioner's] bipolar. Again, I don't understand the purpose or what public interest that would be of.*" (3/1 Transcript, pg 17) Regardless of why that content was part of the ***Legal Memo***, see footnotes for numerous news articles and interviews about Petitioner's bipolar disorder.[80] Petitioner is even

[79] Email from Gjovik to U.S. government, February 6 2022

[80] News coverage: *Getting hired at Apple Despite a Bipolar Disorder with* [REDACTED] (2020), https://www.software-engineering-unlocked.com/disability-at-apple/, *She pulled herself from addiction by learning to code. Now she's leading a worker uprising at Apple*. (2021), https://www.washingtonpost.com/technology/2021/10/14/apple-worker-[Petitioner] / , *A Single-Mother, Self-Taught Software Developer Living With Mental Illness Raises Concerns Over Apple's Limited Remote-Work Policy* (2021),

explicitly mentioned in the Wikipedia reference for "List of notable people with bipolar disorder." [81] (Exhibit K).

102. At the March 1st hearing, the court questioned Petitioner, "*I'm sorry; so are you saying that the information about your medical -- various medical conditions, your mother's whereabouts and those sorts of things that she's reposting things that you have already posted on Twitter?*" (3/1 Transcript, pg 18-9) Note, it was unclear how Gjovik was accused of sharing Petitioner's mother's location or "whereabouts." Gjovik posted two public social media photos without comment about geographical location.

103. Petitioner responded, "*Some of it are things that I posted on Twitter that she's republishing in this document. Some things are things that other people -- I don't know how they found. And then my mother's personal information, she actually posted that -- or my mother's name, she actually posted that stuff. So some of it is her republishing things in this memo. Some of the stuff is her republishing other people's – the things that other people say that has private information about it that I didn't consent to in this memo. And then some of it is things that she has posted on Twitter herself.*" (3/1 Transcript, pg 18-9)

104. During the hearing, Petitioner directly references **Gjovik's Legal Memo** numerous times. At once point she says, "*....  And in this document, I was mentioned ... much of which are republishings of my Tweets. And I don't -- I'm not trying to bring up copyright law...  in this one she posts to my husband's .... the link to my husband's Instagram.*" (3/1 Transcript, pg 18-9)

---

https://www.forbes.com/sites/jackkelly/2021/07/01/a-single-mother-self-taught-software-developer-living-with-mental-illness-raises-concerns-over-apples-limited-remote-work-policy

[81] Wikipedia, List of people with bipolar disorder, https://en.wikipedia.org/wiki/List_of_people_with_bipolar_disorder

105. The King County District Court in the state of Washington, granted the Washington state resident a five-year long anti-harassment order against *Gjovik*. *The Order* expires 1 March 2027.

106. The judge *said "there's no absolute right to free speech. Free speech can be curtailed in many ways." The Order* was based on indirect (admittedly <u>not directed</u>) speech and conduct consisting of Twitter posts made by *Gjovik* and *Gjovik*'s Legal Memo for her Apple Lawsuits. The points made by the judge exclusively reference the republication of already public information, most of which was already intentionally released by Petitioner.

107. The Judge's justification for *the Order* was that she believed *Gjovik* was posting content "at" the Petitioner, not "to" the Petitioner, but that "at" was sufficient if it was "designed to upset" the Petitioner. However, the judge was provided no proof of intent to upset Petitioner. The judge said *Gjovik*'s "retweets" of the Petitioner's posts on Twitter, were enough to justify harassment.  The Judge then further attenuated the reasoning and said it was enough *Gjovik* posted content directed at other people and not at Petitioner, but if Petitioner intentionally bypassed the *Gjovik*'s account block to see content *Gjovik* was posting, and that content upset Petitioner, then that was harassment by *Gjovik*.[82] The court said:

> "In the course of the unpleasant relationship that came about between these two parties, [Petitioner] and Ms. *Gjovik*, that Ms. *Gjovik* began publishing things on various mediums, whether it was on her own Twitter, on other mediums or on her own blogs, that were things that were personal to [Petitioner]. And while [Petitioner] may have posted information, for instance, about her own medical conditions on her own Twitter feed, the reposting of them and the method that was used -- not really a retweet because she was blocked, but rather copying it, putting it in a PDF, and then reposting it in another medium in her own website is not something that is -- I guess I'm not explaining that very well. When [Petitioner] posts something on her own site, it's her followers who see it. When Ms. *Gjovik* posts something on her website, Ms. *Gjovik*'s website, far more people are going to see it than [Petitioner]'s followers. Different people are going to see it than

---

[82] *[REDACTED] v. Ashley Marie Gjovik*, Hearing Transcript, King County District Court, case no. 22CIV01704KCX (1 March 2022).

ORIGINAL COMPLAINT       **– PAGE 35 –**       ASHLEY M. GJOVIK

[Petitioner]'s followers [Petitioner] has a set of followers, an audience that she's cultivated, it's not the same as Ms. **Gjovik**'s audience. So she's certainly publishing this information to other people other than those that [Petitioner] would have chosen to see that. Now, is it out there? Sure. It's out there because she's got 55,000 followers of her own, [Petitioner] does. But does it mean that Ms. **Gjovik** can repost it to other people? No. The information about her mother, the information about her circumstance of growing up, her mother's home and pet, the information about her husband and a sealed court record or a record that Ms. **Gjovik** says she had no idea was sealed. Clearly -- there's only one purpose to posting that. That has nothing to do with an NLRB claim. The only purpose in posting information about [Petitioner]'s mother, [Petitioner]'s mother's whereabouts, home and pet, [Petitioner]'s husband and his criminal record is clearly designed to upset [Petitioner]. There's no lawful purpose. There is no absolute right to free speech. Free speech can be curtailed in many ways, one  of which is a protection order. The protection orders are clear that the course of conduct cannot be designed to alarm, annoy or harass. There's no other purpose for posting these things, none.. (3/15 Transcript, pg 46-47, line 2-24). [83]

108. The court added that, "*Posting this kind of information about somebody's medical condition, about someone's spouse's criminal history -- particularly when it's sealed, but even if it weren't sealed -- about someone's parents, about someone's name change, none of that serves any lawful purpose to disseminate. The only purpose for doing that is to harass, annoy and alarm. Clearly, Ms. **Gjovik** has more than a bit of animosity toward [Petitioner]. Clearly, she was directing this at her and was hoping to harm her, to upset her. There's no other purpose for this. I am going to issue **the order**, and I'm going to make it a five-year order.*" (3/15 Transcript, pg 48, line 8-19).[84]

109. **Gjovik** was surprised at the allegation about the "cat" & "pet." On March 1, Petitioner testified that **Gjovik** posted "*a screenshot from my mom's Facebook that has her name on it and a picture of her living room and her cat.*" (3/1 Transcript, page 16, lines 4-6). The Judge said, "The only purpose in posting information about [Petitioner's] mother's home and

---

[83] *[REDACTED] v. Ashley Marie Gjovik*, Hearing Transcript, King County District Court, case no. 22CIV01704KCX (1 March 2022).

[84] *[REDACTED] v. Ashley Marie Gjovik*, Hearing Transcript, King County District Court, case no. 22CIV01704KCX (1 March 2022).

1  pet…. is clearly designed to upset [the Petitioner]." (3/1 Transcript, 47, line 9-18). On a second

2  look the photo does appear to include a feline. So, <u>apparently Gjovik became a criminal by</u>

3  <u>tweeting a photo of a cat.</u>

4  110. The Judge order *Gjovik* to be restrained from 1) contact with Petitioner 2)

5  surveillance of Petitioner and 3) to stay 1000ft away from Petitioners a) residence b) place of

6  employment c) person d) vehicles e) anywhere petitioner is. [85]

7  111. The Judge wrote, *"Respondent [**Gjovik**] shall not make any statements or posts or*

8  *other publications about Petitioner, including but not limited to, petitioner's medical*

9  *information, petitioner's family, petitioner's names, on any social media or internet or other*

10 *medium. Nothing about this Order prohibits Respondent from testifying in administrative or*

11 *judicial proceedings."* [86]

12 112. Based Court's comments on the content posted by *Gjovik* on her website and on

13 Twitter, that Petitioner should not have even known about (due to the account block), *Gjovik*'s

14 interpretation is that *the order* prohibits *Gjovik* from saying anything about Petitioner, but also

15 prohibits *Gjovik* from posting anything that could upset Petitioner, or anything that Petitioner

16 could claim was somehow related to her. For the first month, out of fear, *Gjovik* applied *the*

17 *Order* to all of her *Apple Lawsuits.* **Gjovik** still fears speaking publicly about her *Apple*

18 *Lawsuits* could cause Petitioner to attack her again and to seek enforcement of *the Order.*

19 113. *The Order* was submitted to the Kirkland Police Department to enter into the

20 Washington Crime Information Center Data Entry system.[87] The current penalty for a violation

21

22 ─────────────
   [85] *[REDACTED] v. Ashley Marie Gjovik*, Order for Protection – Harassment, King County District Court, case no. 22CIV01704KCX (1 March 2022).

23 [86] *[REDACTED] v. Ashley Marie Gjovik*, Order for Protection – Harassment, King County District Court, case no. 22CIV01704KCX (1 March 2022).

24 [87] *[REDACTED] v. Ashley Marie Gjovik*, Order for Protection – Harassment, King County District Court, case no. 22CIV01704KCX (1 March 2022).

of ***the Order*** is "a gross misdemeanor"[88] and "contempt of court" with monetary fines and incarceration.

E.    **F. Post-Hearing Events**

114. On March 2 2022 at 6:56AM, Petitioner reported ***Gjovik***'s ***Legal Memo*** to ***Gjovik***'s webhost (web.com) as "Inappropriate Content – Child pornography complaint." Petitioner wrote, *"I have a protection order (attached) against the person who owns this domain and posted this document. This disallows her from continuing to post about me and my family, which is the majority of this document. The file is located:* [url]. (Exhibit G)

115. On March 9 2022, the U.S. NLRB Asst. General Counsel wrote ***Gjovik*** saying, "*To clarify, it is my understanding that neither [NLRB employee 1 named by Petitioner] nor [NLRB employee 2 named by Petitioner] gave [Petitioner] legal advice or offered their opinion on the merits of her claims against you.  They simply told her that the NLRB did not have jurisdiction over those claims."* [89] (Exhibit L)

116. Asst. General Counsel added, "*No one from the NLRB 'directed' or 'encouraged' [Petitioner] to report you to any other federal or state authorities. [Petitioner] was informed, as we have informed you, that the NLRB is concerned only with the allegations of unfair labor practices contained in the charges against Apple*."[90] (Exhibit L)

117. On March 23 2022, the U.S. NLRB Office of the Inspector General responded to a request for an investigation into the NLRB's involvement with any statements made by the Petitioner in the Washington courts. NLRB OIG responded, "*After reviewing the information, we*

---

[88] RCW 10.14.170

[89] NLRB OIG*; RE Follow up requested (now have a 5 year gag order from talking about Apple cases)* (March 9 2022).

[90] NLRB OIG*; RE Follow up requested (now have a 5 year gag order from talking about Apple cases)* (March 9 2022).

*will determine what, if any, appropriate action is necessary.  Because of Privacy Act restrictions regarding the release of information from our investigative records, we cannot confirm or deny the existence of any investigation involving named subjects*."[91]

118. On March 30, 2022 Petitioner emailed **Gjovik**'s counsel suggesting **Gjovik** contact a political official in Oregon. Petitioner attached an email with that official saying *"I know someone who worked [at Nike] for a long time and will see if she will reach out.."* **Gjovik**'s ex-counsel did not inform **Gjovik** of this email until his withdrawal. **Gjovik** does not think she could reach out to that political official without violating **the Order**, despite Petitioner's invitation to do so. (Exhibit H)

119. On April 3, 2022 an anonymous Twitter account posted publicly to **Gjovik** warning her to "*be careful*" with "what [she] Tweets" as **Gjovik** had "*been warned by Apple*" yet "**Gjovik** was still "throwing shade" at Apple which could result with **Gjovik** "*ending up in the clink [jail]*."[92]  **Gjovik** knows of no other method she would be incarcerated for Twitter posts, other than violating this Order.

120. On April 17, 2022 the Telegraph published a detailed profile on **Gjovik** in their Easter Sunday edition. **Gjovik** was interviewed and had a professional photoshoot. This was the first time **Gjovik** had been ever formally profiled in the press.

121. **Gjovik** did not discuss Petitioner with the journalist nor did she discuss "AppleToo." The Telegraph titled the article "*Apple whistleblower Ashley Gjøvik: 'My Life is a Goddamn*

---

[91] NLRB OIG*; RE Follow up requested (now have a 5 year gag order from talking about Apple cases)* (March 23 2022).

[92] Screenshots of Twitter posts can be provided

*Nightmare Now'.*" The subtitle was "*Ashley **Gjovik**, co-founder of whistleblower campaign AppleToo, finds being an enemy of the tech giant makes her life far more difficult.*" [93]

122. **Gjovik** was made aware that Petitioner and Petitioner's friends had been posting publicly about **Gjovik** and the article, including directly to the journalist on her public thread about **Gjovik**. Petitioner's comments included "*No one co-founded #AppleToo with me….I built the platform \*alone\*.*"[94] Note, on Feb 15 2022, Petitioner had introduced written testimony to the court which included, "*Ms. **Gjovik** and I became acquainted while working for Apple Inc in June of 2021…. We started a movement called AppleToo together.*" (Petitioner's Testimony, page 1, paragraphs 2 & 3).

123. Petitioner posted that **Gjovik** "*tormented [her] for months, dragging [her] family, drug addiction, and struggles in poverty into [**Gjovik's**] harassment campaign until [she] had to get a court-ordered anti-harassment order to stop [**Gjovik**].*" [95] Petition wrote about **Gjovik**'s profile article, which never mentioned Petitioner, "*I shouldn't have to be forever tied publicly to someone who cruelly harassed me for months.*"[96]

124. On or around April 18 2022, the Telegraph then updated the subtitle to "*Ashley Gjøvik, one of Apple's most outspoken whistleblowers, still believes she did the right thing despite the <u>consequences of her actions</u>*" assumably in response to the communications from Petitioner. [97]

---

[93] The Telegraph, Apple whistleblower Ashley Gjøvik: 'My life is a goddamn nightmare now', (April 17 2022), https://www.telegraph.co.uk/business/2022/04/17/apple-whistleblower-ashley-gjovik-life-goddamn-nightmare-now/

[94] Twitter, Petitioner, https://twitter.com/[redacted]thedev/status/1515826923632578571

[95] Twitter, Petitioner, https://twitter.com/[redacted]thedev/status/1515827673213321216

[96] Twitter, Petitioner, https://twitter.com/[redacted]thedev/status/1515828428204826629

[97] The Telegraph, Apple whistleblower Ashley Gjøvik: 'My life is a goddamn nightmare now', (April 17 2022), https://www.telegraph.co.uk/business/2022/04/17/apple-whistleblower-ashley-gjovik-life-goddamn-nightmare-now/

125. On May 24 2022, Petitioner posted on Twitter in response to an article *Gjovik* had published. Petitioner claimed she had sent the NLRB "novels" about *Gjovik*'s "behavior" alleging it may be "illegal." Petitioner thanked the NLRB for helping her "ensure [*Gjovik*] could not get away with unlawful settlements, supplemental affidavits, getting witness testimony."[98] *Gjovik* notified the NLRB investigator on her cases, the NLRB Asst. General Counsel, and the NLRB OIG as soon as she was made aware of Petitioner's statements, and Gjovik requested further investigation. It appears Petitioner is still working hard to ensure "*Gjovik does not exist in her world."*

F.   *Gjovik* **Appeal's District Court Decision**

127. *Gjovik*'s ex-counsel submitted appeal was submitted to King County Superior Court and notice was transmitted to Petitioner by prior Counsel on March 4th 2022. [99] The hearing is set for 26 August, 2022.  *Gjovik's* counsel withdrew, terminating their relationship in May 2022 and *Gjovik* is now *pro se.*

G.   **New Anti-Harassment Protective Order (1 July 2022)**

128.  On 1 July 2022, a new Washington antiharassment law is scheduled to become effective (RCW 7.105) replacing the previous statute (RCW 10.4) which expires same day.[100]

129. This change delete the harassment statute's previous Constitutional Savings clause, *"Nothing in this chapter shall be construed to infringe upon any constitutionally protected rights*

---

[98]  Twitter, Petitioner, https://twitter.com/[redacted]thedev/status/1529165851194056704; https://twitter.com/[redacted]thedev/status/1529166475235209216

[99]*[REDACTED] v. Ashley Marie Gjovik*, King County Superior Court, case no. 22-2-03849-7 (2022).

[100] https://apps.leg.wa.gov/RCW/default.aspx?cite=10.14; https://app.leg.wa.gov/RCW/default.aspx?cite=7.105

1   *including, but not limited to, freedom of speech and freedom of assembly*." (RCW 10.14.190) and

2   does not replace it.[101] It also increased liability and worsens punishments.

3

### V.   LEGAL CLAIMS

5   130. As a threshold matter, the ***state of Washington's*** enactment of statutes is inherently

6   a State Action, satisfying the nexus requirement for a Constitutional Challenge.

7

8   A.   **There Was No Harassment under RCW 10.14 or RCW 7.105**

9   *(Addition Basis for Later As-Applied Challenges)*

10   131. Plaintiff, ***Ashley Gjovik***, repeats and realleges paragraphs hereof and hereafter, as if

11   fully set forth herein.

12   132. A civil restraining order often lacks all the protections of a criminal case, despite the

13   result of the order being inherently penal and punitive. Anti-harassment protection orders are

14   inherently penal, originating from criminal law in 1960s[102] and slowly becoming codified. Yet,

15   civil harassment petitioners are heard in local courts of limited jurisdiction, with judges

16   unfamiliar with free speech law (or even by politicians without law degrees), and can be heard

17   within days of filing (a "rocket docket"). In these hearings, often customary rules of evidence do

18   not apply, hearsay is tolerated, and there is no jury. [103] Harassment protection orders must not be

19   used as a shortcut to avoid common law and constitutional limitations on established torts and

20   other cause of action. [104]

21

22   _____

[101] 10.14.190, https://app.leg.wa.gov/rcw/default.aspx?cite=10.14.190

23   [102] American Law Institute: Model Penal Code, 1961; Model Penal Code, 1980

[103] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013).

24   [104] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013)

133. The **state of Washington's** existing and impending harassment statutes are similar in substance. For a finding of harassment, they both require *"a series of acts over a period of time, however short, evidencing a continuity of purpose"* via any form of communication.[105] Both statutes define "unlawful harassment" as "*a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose. The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress, and shall actually cause substantial emotional distress*."[106]

134. The test for determining whether a "course of conduct" serves any legitimate or lawful purpose is the same in both statutes: [107]

**(5)(b) In determining whether the course of conduct serves any legitimate or lawful purpose, a court should consider whether:**
   **(i) Any current contact between the parties was initiated by the respondent only or was initiated by both parties;**
   **(ii) The respondent has been given clear notice that all further contact with the petitioner is unwanted;**
   **(iii) The respondent's course of conduct appears designed to <span style="color:red">alarm, annoy, or harass</span> the petitioner;**
   **(iv) The respondent is acting pursuant to any statutory authority including, but not limited to, acts which are reasonably necessary to:**
      **(A) Protect property or liberty interests;**
      **(B) Enforce the law; or**
      **(C) Meet specific statutory duties or requirements;**
   **(v) The respondent's course of conduct has the purpose or effect of <span style="color:red">unreasonably</span> interfering with the petitioner's privacy or the purpose or effect of creating an <span style="color:red">intimidating, hostile, or offensive living environment</span> for the petitioner; or**
   **(vi) Contact by the respondent with the petitioner or the petitioner's family has been limited in any manner by any previous court order.**

135. While Petitioner omitted **Gjovik**'s warning for Petitioner to cease harassment in December, otherwise Petitioner and **Gjovik** agreed that **Gjovik** had not directed any conduct

---

[105] RCW 7.105.010 (5)(a), RCW 10.14.020 (1)

[106] RCW 7.105.010 (35)(a), RCW 10.14.020 (2)

[107] RCW 7.105.010 (5)(b), RCW 10.14.030

towards Petitioner since on or around September 2021. It was undisputed that *Gjovik* was not initiating contact with Petitioner and that Petitioner was actually initiating contact with *Gjovik* against *Gjovik*'s wishes. *Gjovik* demanded Petitioner stop all contact with *Gjovik*, but Petitioner refused. Petitioner never asked *Gjovik* to stop all contact, but instead very specifically demanded *Gjovik* delete certain social media posts and modify her charges and evidence in the *Apple Lawsuits.*

136. In the proceedings, Petitioner made countless allegations against *Gjovik*, so many that *Gjovik* objected and requested fair notice to the accusations against her: "*Your Honor, if it -- if you -- I -- I'm a little bit worried because she's also been tweeting a lot about this hearing the last two weeks making new allegations and I'd like to be able to prepare my response. If she's making –*" (2/15 Transcript, page 24 line 3-9).

137. However, none of Petitioner's numerous allegations met the criteria for unlawful harassment. There was admittedly no knowing/willing course of conduct directed at Petitioner designed to cause emotional harm. The court landed on *Gjovik*'s legal filings and a selection of *Gjovik*'s Twitter posts containing public information about a public figure and matter of public concern as the basis for a criminal *Order* against *Gjovik*.

138. During the March 1 Hearing, Gjovik's prior counsel questioned Petitioner: "*So if I understand correctly, the information that you're accusing [Gjovik] of sharing online is information that was already publicly available to be viewed by anybody else online?*" Petitioner responded, "*Not in the manner in which she is publishing it, no.*" (3/1 Transcript, page 23, lines 3-7). Prior counsel then asked, "*So let me recap. You put in the public sphere information about yourself that other people could see and copy, and she took that information and she put into another format. Do I understand that correctly?*" Petitioner responded, "*That is correct.*" (3/1 Transcript, pg 25, line 6-10)

139. **Gjovik** reported Petitioners allegedly unlawful conduct through formal, appropriate channels. If there was a factual basis for Petitioner's accusations of meritless, harassing legal filings, the court should have redirected petitioner to a malicious prosecution cause of action or complaint. If there was a basis for defamation, Petitioner should have been redirected to civil court to file there. If there was a basis for false reporting and perjury, again, Petitioner should have pursued those legal paths. However, here, **the state of Washington** enabled the district court and the Petitioner to act as a private attorney general leading a sedition trial. [108]

140. Only three years ago, the 9th Circuit found a **state of Washington** cyberbullying statute to be a facial violation of the U.S. Constitution.[109] The court found that anonymous speech uttered or typed with the intent to **embarrass** a person is protected speech thus the plain meaning of the words render it facially unconstitutional.[110]  Social media posts which "often included invective, ridicule, and harsh language intended to criticize or call into question the actions and motives of these civic leaders and other public figures" were Constitutionally protected [111]

141. Further, only two years ago, the **state of Washington**'s Court of Appeals found that content-based restraining orders, just like **the Order** applied to **Gjovik**, are violations of the First Amendment. The Court also found an order has no legal basis when the RCW 10.14 harassment statute was applied to protected speech (public records).[112]

**i. Publishing Public Records**

---

[108] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013)

[109] RCW 9.61.260(1)(b); *Rynearson v. Ferguson*, 355 F. Supp. 3d 964, 967 (W.D. Wash. 2019)

[110] *Rynearson v. Ferguson*, 355 F. Supp. 3d 964, 972 (W.D. Wash. 2019)

[111] *Rynearson v. Ferguson*, 355 F. Supp. 3d 964, 967 (W.D. Wash. 2019)

[112] *Catlett v. Teel,* 15 Wash. App. 2d 689, 701–02, 477 P.3d 50, 57 (2020)

142. Speech to others about a Petitioner receives even more protection than speech directly to the Petitioner. These complaints are usually based on defamation, which is a formal civil tort and is designed to be difficult to prove including truth as a defense, protection for pure opinion, right to a jury trial, testimonial privilege, etc.[113]

143. The U.S. Supreme Court held that "the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection."[114]  Making public records requests publicly available is constitutionally protected speech and activity.[115] The First Amendment protects publication of facts contained in lawfully obtained public records, even if reasonable people would want them concealed.[116] [117]

144. The Washington Supreme Court has explained that the Washington Constitution provides broader protection than does the First Amendment to the publication of public records. The state constitution provides that *"[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."[118]*  The Washington Constitution & Public Records Act also protect publication of public information.[119] When information enters

---

[113] Robert D. Sack, SACK ON DEFAMATION (4th ed. 2021); David A. Anderson, *First Amendment Limitation on Tort Law*, 69 Brooklyn L. Rev 755 (2004).

[114] *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975),

[115] See, *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (state cannot sanction publication of accurate information obtained from public records); *State v. Coe,* 101 Wn.2d 364 (1984) (Washington Constitution guarantees absolute right to publish lawfully obtained information that is a matter of public record); *Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010) (statute prohibiting publication of social security numbers obtained from recorded real property records held unconstitutional).

[116] See, *Nieman v. VersusLaw, Inc*., 512 Fed. App'x. 635, 637 (2013) (publication of court documents from former employee's prior lawsuit against his employer was protected by First Amendment privilege)

[117] *Florida Star*, 491 U.S. at 541, 109 S.Ct. 2603; *Catlett v. Teel,* 15 Wash. App. 2d 689, 699–700, 477 P.3d 50, 56 (2020); *State v. Becklin* 163 Wn.2d 519, 528, 182 P.3d 944 (2008).

[118] CONST. art. I, § 5., *Catlett v. Teel*, 15 Wash. App. 2d 689, 699–700, 477 P.3d 50, 56 (2020)

[119] *Catlett v. Teel,* 15 Wash. App. 2d 689, 704, 477 P.3d 50, 59 (2020); RCW 42.56.550(3).

the public record—regardless of how that occurs—the public generally has access to that information pursuant to the Public Records Act, chapter 42.56 RCW. Info that is publicly known or publicly accessible cannot be considered private.[120]

145. "The interests in privacy fade when the information involved already appears on the public record." [121] An individual's right to privacy cannot prevent the publication of information that has previously been lawfully disclosed. The Washington Supreme Court has stated that "*an individual has no constitutional privacy interest in a public record."[122]* Therefore, Article I, Section 5 guarantees an individual's right to publish accurate, lawfully obtained public records.[123] Matters already in the public domain are not private and publications of those matters are protected.[124]

146. Here, **Gjovik** is subject to **the Order** based entirely on making public records publicly available. The public records requests and responsive documents at issue are neither private, obscene, defamatory, fraudulent, inciting, a true threat, or integral to criminal conduct, nor do they use other forms of expression that may be lawfully curtailed or punished as unlawful conduct consistent with the First Amendment to the United States Constitution and the Washington Constitution. Under RCW 10.14.020(1) constitutionally protected speech and activity cannot be the basis for an order for protection.

## ii. Publishing Legal Complaints

---

[120] *Haynes v Alfred A Knopf*, 8 F.3d 122 (7th Circuit 1993)

[121] *Catlett v. Teel,* 15 Wash. App. 2d 689, 704, 477 P.3d 50, 59 (2020)

[122] *Nissen v. Pierce County*, 183 Wash.2d 863, 883, 357 P.3d 45 (2015).

[123] *Catlett v. Teel,* 15 Wash. App. 2d 689, 701–02, 477 P.3d 50, 57 (2020)

[124] *Diaz v Oakland Tribune*, 139 Cal. App. 3d 118, 131 (1983).

147. A federal court in New York found that publishing legal complaints is protected, as legal filings are matters of public record, even if the filing contains someone's home address.[125] So the publishing of the *Legal Memo* is generally protected. Gjovik's legal memos were submitted to agencies as part of her testimony to them, and thus if Gjovik made false statements she could face penalties. The agencies added the memos and complaints to her case files. For all intents and purposes related to free speech, Gjovik's' *Legal Memo* is no different than a complaint submitted to a federal court for a lawsuit.

148. As the records in *Gjovik*'s *Legal Memo* are public information, which is protected, both the memo itself and the contested information within are protected as public records. Even police reports are known to be public records.[126] In fact, the Supreme Court has found that there is a presumption in favor of allowing the public to examine the contests of evidence in legal proceedings.[127]

149. Because the public records that *Gjovik* caused to be published are all court reports, public records, and already published information, *Gjovik*'s actions enjoy protection under the First Amendment. [128] For the statute and *the Order* to be valid under the First Amendment, then, the protection order must be "narrowly tailored to a state interest of the highest order." [129] "*Do not make any statements about Petitioner on any mediums*" is not either of those things. *The Order* is implicitly a prior restraint on *Gjovik*'s ability to make public records requests and

---

[125] *Kenneth Eng v Tim Cushing (TechDirt)*, US District Court, Eastern Dist of NY, 14CV39123905 Memo & Order (2014).

[126] *Florida Star v BJF* 491 US 524 (1989).

[127] *US v Mitchell*, 551 F.2d 1252 (1976); *Application of National Broadcasting Co*, 635 F.2d 2045 (1961).

[128] See *Florida Star*, 491 U.S. at 541, 109 S.Ct. 2603 (holding that the publication of publicly-available police reports is subject to strict scrutiny under the First Amendment); Cox Broad. Corp., 420 U.S. at 495, 95 S.Ct. 1029 (holding that the First Amendment "command[s] nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection").

[129] *Florida Star*, 491 U.S. at 541, 109 S.Ct. 2603.; *Catlett v. Teel*, 15 Wash. App. 2d 689, 702, 477 P.3d 50, 58 (2020)

publish public records in the future, write and publish articles, work with the press on matters of public record.[130]

B.    **Count 1: Laws are Vague in Violation of the First Amendment**

*(Claim Against all Defendants; Facial Challenge to Statutes & As Applied Challenge to Statutes & Order)*

150. Plaintiff, ***Ashley Gjovik***, repeats and realleges paragraphs hereof and hereafter, as if fully set forth herein.

151. Harassment has no widely accepted legal definition. [131] Harassment is an "*unascertainable standard.*"[132] Some statutes now use a "reasonable person" standard, however that is generally a question of fact for a jury. [133] A statute is unconstitutionally void if it is so unclearly undefined, so uncertain, that persons of common intelligence must guess at its meaning and differ to its application."[134] Overly vague statutes related to speech are forbidden as they enable excessive judicial and political discretion. [135] From the beginning, the American Law Institute worried the entire "harassment" cause of action may be "unconstitutional vague." [136] Indeed, statutes criminalizing act of "annoying" someone are Constitutionally vague.[137]

---

[130] *Cox Broad. Corp*., 420 U.S. at 495, 95 S.Ct. 1029 (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)).; *Catlett v. Teel,* 15 Wash. App. 2d 689, 699–700, 477 P.3d 50, 56 (2020)

[131] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013); Eugene Volokh, THE DANGEROUS DRIFT OF 'HARASSMENT' IN FROM DATA TO PUBLIC POLICY: AFFIRMATIVE ACTION, SEXUAL HARASSMENT, DOMESTIC VIOLENCE, AND SOCIAL WELFARE (1996).

[132] *Coates v City of Cincinnati*, 402 US 611 (1971).

[133] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013)

[134] *Connally v General Const* 269 US 385 (1926)

[135] *Packingham v North Carolina* 582 US ___ (2017).

[136] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013) .

[137] Evertt v Moore, 37 Washington Ct. App 862 (1984).

152. Harassment orders are "mini-criminal statutes" because a violation leads to a criminal prosecution. [138] A penal statute/law is unconstitutionally vague if it does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. [139]

153. The law must establish reasonably clear guidelines for law enforcement officials and triers of fact to prevent arbitrary and discriminatory enforcement. The terms "*seriously*" and *"no legitimate purpose*," while possibly showing the drafter's recognition of this problem, do not distinguish complaints to the government or retweeting Twitter posts. Under the language of the harassment statutes and orders: policemen, prosecuting attorneys, judges and juries are permitted to pursue their personal predilections in enforcing the law.[140]

> **"A knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose. The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress, and shall actually cause substantial emotional distress."[141]**

154. Here, *Gjovik* was subject to a vague, unlimited, stay away, no-contact Order. *Gjovik* has no idea whether making other public records act requests about, or somehow touching on, Petitioner, or writing, speaking, or posting on topics that are somehow touching on Petition, will result in criminal prosecution or contempt proceedings. For instance, *Gjovik* is unsure whether she can actually be writing or submitting this pleading without violating *the order*.

> **"Respondent [*Gjovik*] shall not make any statements or posts or other publications about Petitioner, including but not limited to, petitioner's medical**

[138] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013); *Dunham v Roer*, 708 N.W. 2d 552 (Minn Ct. App 2006).

[139] *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *City of Everett v. Moor*e, 37 Wash. App. 862, 866, 683 P.2d 617, 619 (1984)

[140] Smith v. Goguen, 415 U.S. 566, 575, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974).; City of Everett v. Moore, 37 Wash. App. 862, 867, 683 P.2d 617, 620 (1984)

[141] RCW 7.105.010 (35)(a), RCW 10.14.020 (2)

**information, petitioner's family, petitioner's names, on any social media or internet or other medium. Nothing about this Order prohibits Respondent from testifying in administrative or judicial proceedings." [142]**

155. By reason of the foregoing, plaintiff(s) seek(s) injunctive relief, writ of prohibition, and declaratory relief against defendant, the state of Washington.

C.   **Count 2: Laws are Overbroad in Violation of the First Amendment**

*(Claim Against all Defendants; Facial Challenge to Statute & As Applied Challenge to Statute & Order)*

156. Plaintiff, ***Ashley Gjovik***, repeats and realleges paragraphs hereof and hereafter, as if fully set forth herein.

157. The overbreadth doctrine permits an individual whose own speech or conduct may be prohibited to challenge a statute on its face "*because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.*"[143] Overbreadth leads to chilling of speech and the risk of selective enforcement.[144]

158. There is no categorical "harassment exception" to the First Amendment's free speech clause.[145] In fact, statutes have often been unconstitutionally overbroad when defining the crime of harassment and criminalized various forms of conduct wherein the actor had the intent to harass – as they have been found to lack the "*precision of regulation required by the First*

---

[142] *[REDACTED] v. Ashley Marie Gjovik*, Order for Protection – Harassment, King County District Court, case no. 22CIV01704KCX (1 March 2022).

[143] *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992). *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, (1987)

[144] *Arnett v Kennedy*, 416 US 134 (1974); *Broaddrick v Oklahoma*, 413 US 601 (1973).

[145] " *Rodriguez v. Maricopa County Cmty. Coll. Dist*., 605 F.3d 703, 708 (9th Cir. 2010) (quoting Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 204 (3d Cir. 2001)).

*Amendment.* [146] When it comes to undesired expression, under the U.S. Constitution's first amendment protections, it is up to the unwilling listen to avoid the expression. Courts cannot restrain messages simply because they are unwelcome. [147]  The closest exception is "true threats," though its speech must rise to a "serious expression of intention to commit unlawful physical violence to a particular individual or group." Petitioner never alleged anything related to this. [148]

159. There is full protection on speech if it is on matter of public interest, even if pain comes from content of message, even if emotional harm was intended.[149] Public concerns are any matter of political, social, or other concerns of the community and is a subject of legitimate interest.

160. Offending someone is a viewpoint, and highly protected. [150] Courts cannot even restrict derogatory terms.[151] Speech and activity do not lose protection simply because it is harmful to a third party's business reputation.[152] The constitution prohibits content moderation, even of unprotected speech, even if it stirs anger (fighting words, hate speech etc).[153] "A function of free speech under our system of government is to invite dispute." [154]

---

[146] *Moore*, 37 Wash. App. at 866, 683 P.2d 617 (*quoting Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 438, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963)). *City of Everett v. Moore,* 37 Wash. App. 862, 867, 683 P.2d 617 (1984).

[147] *Hill v Colorado* 530 US 703 (2000)

[148] *Elonis v US*, 135 St. Ct. 2001 (2015); *Virginia v Black,* 538 US 343 (2003); *Watts v US,* 394 US 705 (1969).

[149] *Snyder v Phelps*, 131 St.C. 1207 (2011).

[150] *Matel v Tam*, 137 S.Ct 1744 (2017).

[151] *Matel v Tam,* 137 S.Ct 1744 (2017).

[152] See, Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) Annemarie CATLETT, Respondent, v. Robert Lee TEEL, Appellant., 2019 WL 6828254 (Wash.App. Div. 1),

[153] *R.A.V. v City of St. Paul,* 5050 US 377 (1992) ; *Terminiello v Chicago*, 337 US 1 (1949)

[154] *Terminiello v Chicago*, 337 US 1 (1949)

161.  Government restrictions on speech and activity are content based when, "[i]n order to enforce the regulation, an official must necessarily examine the content of the message that is conveyed."[155] The speaker's intentions are completely irrelevant to the question of constitutional protection over the speech.[156]

162. Unprotected speech is an enumerated list: incitement, defamation, obscenity, fraud, clear/present danger, and speech integral to criminal conduct (like conspiracy to commit a crime). Not everything *except your NLRB* case. Examples of subjects the Supreme Court refused to add include depictions of animal cruelty[157] and factually false, material statements.[158]

163.  Determining whether online speech about someone (but not delivered to or directed at that person) was intended to alarm, annoy, harass, harm, or be distressful will necessarily require examination of the speech's content. Here, these antiharassment statutes are "sweeping."[159]

> **"A knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose. The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress, and shall actually cause substantial emotional distress."[160]**

164.  The ***state of Washington*** statutes are unconstitutionally overbroad.  Viewpoint moderation is unlawful, period.[161] With the exception of certain time/place/manner restrictions,

---

[155] ACLU of Nev. v. City of Las Vegas, 466 F.3d 784, 794 (9th Cir. 2006); see also Sheehan v. Gregoire, 272 F. Supp. 2d 1135, 1146 (W.D. Wash. 2003) ("When an *24 individual enforcing a statute must examine the content of speech to determine whether the statute governs, the statute is content-based.").

[156] *REC v Wis. Right to Life Ins,* 551 US 449, 468 (2007).

[157] *US v Stevens,* 130 St. Ct. 1577 (2010)

[158] *US v Alvarez*, 132 St.C. 2537 (2012).

[159] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013)

[160] RCW 7.105.010 (35)(a), RCW 10.14.020 (2)

[161] *Boos v Berry*, 485 US 312 (1988).

content moderation is also unlawful by default, even related to unprotected speech like

defamation or fraud. Any moderation of non-content/non-viewpoint protected speech must still

survive strict scrutiny.[162] I will not here.

165. For the "as applied" challenge to the trial court's application of the civil anti-

harassment statutes and orders, *Gjovik* need only show that the government unconstitutionally

restricts her own speech and activity.[163]

> **"Respondent [*Gjovik*] shall not make any statements or posts or other publications about Petitioner, including but not limited to, petitioner's medical information, petitioner's family, petitioner's names, on any social media or internet or other medium. Nothing about this Order prohibits Respondent from testifying in administrative or judicial proceedings."** [164]

166. An order, even against a serial defamer, that says "do not say anything about

petitioner" is "hopefully overbroad." [165] Nothing can salvage a civil harassment order that limits

a respondent's communication with third parties. [166] *The Order* is a content-based restriction on

constitutionally protected speech, and as such it is presumptively invalid, subject to strict

scrutiny. *Gjovik's* speech entitled to the full protection of the First Amendment.

167. There is nothing about the content of the speech in this case that is unlawful or that

in any way justifies restriction. The public records *Gjovik* posted were neither misleading nor

related to any unlawful or otherwise prohibited activity by *Gjovik*.

---

[162] Wichmor v Vincent, 454 US 263 (1981).

[163] See *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1174-75 (9th Cir. 2018); *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).

[164] *[REDACTED] v. Ashley Marie Gjovik*, Order for Protection – Harassment, King County District Court, case no. 22CIV01704KCX (1 March 2022).

[165] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013)

[166] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013); Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev 157, 163, 167, 172 (2007).

168. By reason of the foregoing, plaintiff(s) seek(s) injunctive relief, writ of prohibition, and declaratory relief against defendant, the state of Washington.

D. **Count 3: Criminalizing Protected Speech, use Prior Restrains, & Impinging on Freedom of the Press in Violation of First Amendment**

*(Claim Against all Defendants; Facial Challenge to Statutes & As Applied Challenge to Statutes & Order)*

169. Plaintiff, **Ashley Gjovik**, repeats and realleges paragraphs hereof and hereafter, as if fully set forth herein.

170. Under the First Amendment, "*government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.*" [167]  Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. [168] Further, content-based restrictions on speech are presumptively unconstitutional and are thus subject to strict scrutiny.[169] Speech-restrictive injunctions are to receive even more heightened first amendment protection analysis than speech-restrictive statutes. [170] The line between protected speech and unprotected speech is very fine, and thus any Orders must have pin-point accuracy towards a narrow objective.[171]

---

[167] *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972). *Bering v. SHARE*, 106 Wash.2d 212, 244-45, 721 P.2d 918 (1986). *Catlett v. Teel*, 15 Wash. App. 2d 689, 706, 477 P.3d 50, 59 (2020)

[168] *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015).

[169] *Collier v. City of Tacoma*, 121 Wash.2d 737, 748-49, 854 P.2d 1046 (1993) (citing City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46-47, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986)); see also Bering, 106 Wash.2d at 244-45, 721 P.2d 918 (applying a strict scrutiny analysis to a content-based restriction challenged under article I, section 5).Catlett v. Teel, 15 Wash. App. 2d 689, 706, 477 P.3d 50, 59–60 (2020)

[170] *Madsen v Women's Health Ctr Inc*, 512 US 733 (1994). Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013) .

[171] *Carrol v President*, 393 US 174 (1968), *In Re Marriage of Sharon Suggs,* 152 Wn.2d 74

171. "A prior restraint is an official restriction imposed on speech or another form of expression in advance of its occurrence." [172] They only very narrow exceptions for prior restraint are obscenity, incitements to violence, and restrictions during times of war.[173] Prior restraint coerces people to surrender their constitutional rights as they appeal the decisions, out of fear of punishment for violating **the Order**, even if clearly unconstitutional.  The Press have almost absolute immunity from pre-publishing restraints. [174] Truthful information about legal procedures or law enforcement cannot be crime to publish.[175] The Press have a right to access trials and pre-trial processes. [176] Pre-trial gag orders are unlawful.[177] Prior restraint is assumed to be unconstitutional.

**i. Public Records**

172. The publishing of accurate and lawfully obtained public records is constitutionally protected speech, thus any prior restraint imposed by the protection order based on or impinging that protected speech, violates the United States and Washington Constitutions. [178]  Thus, these statutes and order as applied or if can be applied (facially) to public records, then they are all violations of the Constitution.

173. **The Order** is content-based restriction subject to strict scrutiny, and fails strict scrutiny because the challenged restrictions are not narrowly tailored to serve a compelling state

---

[172] *Bradburn. N. Cent. Reg'l Library Dist*., 168 Wash.2d 789, 802, 231 P.3d 166 (2010)

[173] *.Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 716, 51 S. Ct. 625, 75 L. Ed. 1357 (1931).

[174] The Pentagon Papers: *New York Times v. United States* (1971)

[175] *Cox v Cohn* 420 US 469 (1975); *Smith v Daily Mail*, 443 US 97 (1979), *Landmark Comm v Virginia*, 435 829 (1978).

[176] *Richmond v Virginia*, 448 US 555 (1980).

[177] *Nebraska v Stuart*, 427 US 539 (1976).

[178] *Bradburn. N. Cent. Reg'l Library Dist*., 168 Wash.2d 789, 802, 231 P.3d 166 (2010)

interest.[179] The risk of being subject to the penalties of violating the protection order could coerce *Gjovik* to follow the safe course and avoid publishing certain public records—a constitutionally protected activity—because such action could lead to government-imposed penalties.[180]

> **"Respondent [*Gjovik*] shall not make any statements or posts or other publications about Petitioner, including but not limited to, petitioner's medical information, petitioner's family, petitioner's names, on any social media or internet or other medium. Nothing about this Order prohibits Respondent from testifying in administrative or judicial proceedings." [181]**

174. This content-based restriction is not narrowly tailored to promote a compelling governmental interest. Petitioner has no privacy interest in the identified public records and the protection order conflicts with the state interest promoted by the Public Records Act. Moreover, the protection order inflicts a chilling effect on *Gjovik*'s protected speech—a key evil sought to be avoided by the adopters of the First Amendment.[182]

> **"A knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose. The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress, and shall actually cause substantial emotional distress."[183]**

175. In 2019, a similar *state of Washington* statute failed to define the parameters of speech which could embarrass or harass, among others, and thereby criminalized a range of

---

[179] *In re Marriage of Suggs*, 152 Wn.2d 74 79, 93 P.3d 161 (2004). *Littleton v Grover, State of Wa Div 2 Appeals No 51217-3-11*

[180] *Catlett v. Teel*, 15 Wash. App. 2d 689, 707, 477 P.3d 50, 60 (2020)

[181] *[REDACTED] v. Ashley Marie Gjovik*, Order for Protection – Harassment, King County District Court, case no. 22CIV01704KCX (1 March 2022).

[182] Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 244, 94 S. Ct. 2831, 41 L. Ed. 2d 730 (1974)

[183] RCW 7.105.010 (35)(a), RCW 10.14.020 (2)

speech which was neither obscene nor threatening but was allegedly harmful through its

repetition, anonymity, or intent. The federal Court upheld well established First Amendment

protections on speech which may be deemed "*outrageous*" or "*emotionally distressing*,"

especially where "*it touches on matters or political, religious or public concern*."[184] The Court

found speech intended to "*harass, intimidate, torment, or embarrass*" was not included in the list

of unprotected speech, and further, the statute fails to define those terms..[185]

176. Under such circumstances, the Court found that straightforward public criticism of

public officials could easily result in criminal prosecution based on the "*plain meaning view of

the statute*," which required a "*prompt curative response*."[186] The same need arises now with

these statutes and order.


**ii. anti-SLAPP**

177. Anti-SLAPP statutes are implicated when the alleged harassment consists in whole

or in part of speech to others, as the primary purpose is often to silence critics through the

burdens of litigation. [187] Writing on websites, social media, and blogs about the Petitioner, not

directed to the petitioner, is comparable to an article published in a book or newspaper. [188]

Twitter and Facebook are public forums.[189]  Further, the Communications Decency Act protects

---

[184] *Rynearson v. Ferguson*, No. 17-35853 (9th Cir. 2018)

[185] *Rynearson v. Ferguson*, No. 17-35853 (9th Cir. 2018),

[186] *Rynearson v. Ferguson*, No. 17-35853 (9th Cir. 2018)

[187] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013)

[188] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013); Towner v Ridgway 182 P.3d, 347, 352 (Utah 2008). Reno v ACLU, 521 US 844 (1997); Ashbury v ACLU, 542 US 656 (2004).

[189] *Packingham v North Carolina,* 137 S.Ct. 1730 (2017)

individuals who re-publish other's content. Users are immune from civil liability for publishing material written by someone else.[190]

178. At the February 15 hearing, **Gjovik** asked for "*at least a 14-day delay and use th[e] opportunity as notice to petitioner in [Gjovik's] intent to file an anti-SLAPPP motion against her.*" The court responded, "*Wait. An anti-what motion?*" **Gjovik** repeated, "*SLAPP. Anti-SLAPP.*" The court replied again*, "I don't know what that is.*" **Gjovik** explained, "That would be, in Washington, it's -- she did not meet prima facie allegations. It was a retaliatory lawsuit. It was abusive and she is trying to kill my constitutionally protected rights and ability to complain to the government. It's RCW 5.105.020 motion. That's Washington's new anti-SLAPP that prevents against retaliatory litigation." (2/15 Transcript, page x, lines x-x).

179. **Gjovik** added, "I will be filing the anti-SLAPP motion in the two weeks." The court again questioned, "What is the statute that you keep referring to as anti-SLAPP? Because I'm not familiar with it." **Gjovik** explained, *"It's in the filing that -- hopefully your e-filing you get it later today."* …. The court replied, "*So that the -- you cited 12 RCW 105.010 --. the- Uniform Public Expression Protection Act."* **Gjovik** confirmed and explained, "*The law requires a 14-day notice to give the petitioner a chance to address."* The court confirmed, "*Oh. We've already got a 14-day notice… All right. And then let me see one other thing. So the other statute you're citing is 16 RCW 4.24.510. It has to do with communication to a government agency or self-regulatory organization. So again, that has to do with reporting things like to the NLRB or other governmental agencies; wouldn't have to do with personal tweets or so on.*" **Gjovik** replied, "*The personal tweets have been deleted, which I made clear.*" (2/15 Transcript, pg 31-34, line 19-23)

---

[190] Communications Decency Act, 47 USC Section 230; *Barrett v Rosenthal*, California Supreme Court (Nov 2006).

180. The Court should have heard *Gjovik*'s motions and made a decision on them. Both or either laws should have forced a dismissal before *Gjovik* was subject to even more injury from Petitioner.

### iii. Public Figures & Matters of Public Concern

181. Public concerns are generally matters of legitimate news interest.[191] Anything published by the news media is in the public interest.[192] To a significant extent, the mere act of publishing material in the mass media creates public interest in its contents. The more sensational and hence injurious a statement is, the more "public interest" it generates.[193] Statements concerned with harassment have been found to be matters of public concern, especially if they are self-published instead of covered by outside media.[194] The majority of topics raised by *Gjovik* and contested by Petitioner have been news worth topics, even formally written about in the news.

182. The designation of a person as a 'public figure' results in a decrease of the protections against invasions of privacy and defamation of character provided by law."[195] The purpose of these and related doctrines is to provide needed "'breathing space'" to the freedoms of speech and the press guaranteed by the First Amendment.[196] Even for full torts like defamation and IIED, actual malice must be proven in court if the subject is a public figure.[197]

---

[191] *San Diego v Roe*, 543 US 77 83-84 (2004).

[192] *Brown v. Kelly Broadcasting Co.*, 48 Cal.3d at p. 752. (1989)

[193] *Carney v. Santa Cruz Women Against Rape*, 221 Cal. App. 3d 1009 (Cal. Ct. App. 1990)

[194] *Carney v. Santa Cruz Women Against Rape*, 221 Cal. App. 3d 1009 (Cal. Ct. App. 1990)

[195] *Tilton v. Cowles Publ'g Co*., 76 Wn.2d 707, 716, 459 P.2d 8 (1969).

[196] See *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) (quoting NAACP v. Button, 371 U.S. 415, 433, 83 S. Ct. 328, 8 L. Ed. 2d 405 (1963)); Tilton, 76 Wn.2d at 714-16.

[197] *Hustler Magazine v Falwell,* 485 US 46 (1988)

Public figures who reap the benefits of public power or notoriety "need to develop thick skin" and public figures initiating civil lawsuits can often "resemble sedition prosecutions." [198]

183. The weaponization of these statutes by a public figure, about public information, related to matters of public concern, and directly attacking *Gjovik's* pre-existing federal lawsuits -- in a local state court of limited jurisdiction – and somehow bypassing anti-SLAPP & witness intimidation motions -- and resulting in a gag order against a whistleblower about her own federal lawsuits, an order so broad that she cannot even utter the name of the Petitioner alone in private without fear of incarceration-- signals this statute is incredibly unconstitutional, easily abused, and must be dealt with quickly.

184. By reason of the foregoing, plaintiff(s) seek(s) injunctive relief, writ of prohibition, and declaratory relief against defendant, *the state of Washington.*

E. **Count 4: Violation of 1st Amendment, 14th Amendment, Prohibition on Ex Post Facto Laws & Bills of Attainder, etc.**

*(Claim Against all Defendants; Facial Challenge to Statutes & As Applied Challenge to Statutes & Order)*

185. Plaintiff, *Ashley Gjovik*, repeats and realleges paragraphs hereof and hereafter, as if fully set forth herein.

186. The *state of Washington*, on 1 July 2022, will enact RCW 7.105(1)(o), which will apply to *Gjovik* via *the Order* against *Gjovik*. Starting July 1, during or after a harassment protection order hearing, there will be essentially a new cause of action formatted as a "motion."

---

[198] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013)

ORIGINAL COMPLAINT           **– PAGE 61 –**           ASHLEY M. GJOVIK

These "motions" can apparently be brought at any time for five years after an order is granted, even after the order expires.

187. Instead of initiating a formal complaint for these causes of action after the conduct occurs, ***the state of Washington*** courts will now allow Petitioners to submit a "motion" requesting a respondent/defendant to be deprived of their rights to access courts and deprive them of their constitutional right to free speech.

188. In response to already vague and overbroad claims of "*unlawful harassment*" a judge may now order:

> **An order restricting the respondent from engaging …. in frivolous filings against the petitioner, making harassing or libelous communications about the petitioner to third parties, or making false reports to investigative agencies.**

> **A petitioner may request this relief in the petition or by separate motion.**

> **A petitioner may request this relief by separate motion at any time within five years of the date the protection order is entered even if the order has since expired.[199]**

189. The "motions" are based on the same general allegations of "harassment" (even indirect publication that simply upset the Washington resident) and these "motions" enable a judge to create prior restraint orders prohibiting "harassment," "libel" or "false reports." There are no definitions for these forms of "frivolous filings" or "harassing communications." It's unclear why a prior restraint order would be needed when these are existing causes of action (thus implicitly people already know they should not do these things), unless the ***state of Washington*** is intending to criminalize these general ideas in addition to the existing formal causes with reduced due process. This statute is ripe for misuse.

---

[199] RCW 7.105.310 (1) (o)

190. The *state of Washington* just created a new cause of action that codifies prior restraint, lack of due process, and rampant violations of the right to Freedom of Expression. Further, these new "motions" don't explain the hearing required, the standard of review, evidence required, ability to appeal, conflict of laws, or impact on other litigation.

191. The Constitution deeply disfavors and almost always forbids prior restraint. Further, the new statute allows for a motion within five years of the protection order (even if expired). It's entirely unclear how a Petitioner could legally justify stripping a Respondent of their core Free Speech rights with no other basis or allegations than accusations of "harassing communications to third parties."

192. As the Petitioner in this matter has already spent much time reporting, badgering, and suing *Gjovik* over *Gjovik*'s federal charges against Apple, *Gjovik* fears this new weapon will also be used against her imminently and severely in an attempt to derail *Gjovik*'s litigation. The statute doesn't simply prohibit instigating litigation – it says "*engaging in it.*" Petitioner already alleged *Gjovik*'s cases against Apple harassing the petitioner. When Petitioner files this motion on/after 1 July 2022 claiming <u>again</u> that *Gjovik*'s charges against Apple are "*meritless, bad faith, and harassing*" and the state court approves the motion – *Gjovik* could potentially be legally required to withdraw her labor & whistleblower charges against Apple or else face incarceration. This statute is reckless and unlawful and needs to be nipped in the bud quickly.

193. By reason of the foregoing, plaintiff(s) seek(s) injunctive relief, writ of prohibition, and declaratory relief against defendant, *the state of Washington.*

F.   **Count 5: Statute Violates First Amendment Right to Freedom of Assembly**
*(Claim Against all Defendants; Facial Challenge to Statutes & As Applied Challenge to Statutes & Order)*

194. Plaintiff, **Ashley Gjovik**, repeats and realleges paragraphs hereof and hereafter, as if fully set forth herein.

195. **Gjovik** was still heavily involved in employee labor organizing in January 2022 when this Petition was submitted by Petitioner who is also involved in labor organizing with Apple employees. Many, if not most, of the Apple employees involved in organizing efforts know of or had communicated with the Petitioner as well as **Gjovik**.

196. **The Order** is content-based prior restraint, the most disfavored of all free speech restrictions, regardless of the basis. Following **the Order**, **Gjovik** promptly ceased associating with any people or groups who may overlap with Petitioner.

197. **Gjovik** was ordered not to "surveil" Petitioner, so **Gjovik** resorted to having to mute or block people she previously followed if they shared news mentioned the Petitioner. **Gjovik** feared any communication with labor organizations involved with Petitioner, or someone showing **Gjovik** "saw" news about Petitioner, could lead to **Gjovik**'s incarceration. Gjovik has been afraid to read the news.

198. **Gjovik** worried about this for some time, but her fears were validated in April 2022 when Petitioner directly referenced **the Order** against **Gjovik** as justification to demand a sub-title change on an article solely profiling **Gjovik**. The Telegraph subtitle was "**Ashley Gjovik, co-founder of whistleblower campaign AppleToo, finds being an enemy of the tech giant makes her life far more difficult.**" [200]

199. **Gjovik** was made aware that Petitioner and Petitioner's friends had been posting publicly about **Gjovik** and the article, including directly to the journalist on her public thread about **Gjovik**. Petitioner's comments included "*No one co-founded #AppleToo with me….I built*

---

[200] The Telegraph, Apple whistleblower Ashley Gjøvik: 'My life is a goddamn nightmare now', (April 17 2022), https://www.telegraph.co.uk/business/2022/04/17/apple-whistleblower-ashley-gjovik-life-goddamn-nightmare-now/

the platform *alone*."[201]  Yet, on Feb 15 2022, Petitioner had introduced written testimony to the court which included, "*Ms. Gjovik and I became acquainted while working for Apple Inc in June of 2021…. We started a movement called AppleToo together*." (2/15 *Written "Statement by [Petitioner]"* submitted before the hearing and incorporated in 3/1 Transcript, page 5, line 19-20).

200. This "AppleToo" (aka "Apple Together") group now holds itself out as the formal voice for Apple employee organizing and unionizing, and per **the Order**, **Gjovik** is now implicitly forbidden from engaging with it, even though per Petitioner, **Gjovik** helped "start the movement" with Petitioner.

201. The right to join with others to pursue goals independently protected by first amendment such as political advocacy and unionization is highly protected.[202] Restrictions must be compelling and necessary.  These are not. **Gjovik** had reported Petitioner for union-busting behavior and now due to Petitioner's lawsuit against **Gjovik**, it is now a criminal offense for **Gjovik** to participate in the unionization efforts. If **Gjovik** was to post "*we're stronger together*" now, instead of getting yelled at, she might be visited by law enforcement.

202. By reason of the foregoing, plaintiff(s) seek(s) injunctive relief, writ of prohibition, and declaratory relief against defendant, the state of Washington.


G.    **Count 6: Violation of 14th Amendment, Right to Substantive Due Process**

*(Claim Against all Defendants; Facial Challenge to Statutes & As Applied Challenge to Statutes & Order)*

---

[201] Twitter, Petitioner, https://twitter.com/[redacted]thedev/status/1515826923632578571
[202] *NAACP v Alabama*, 357 US 449 (1958) -

203. Plaintiff, **Ashley Gjovik**, repeats and realleges paragraphs hereof and hereafter, as if fully set forth herein.

**i. Right to Travel**

204. **The Order** against **Gjovik** prohibits **Gjovik** being anywhere near Petitioner, where ever she is – yet at the same time **Gjovik** is forbidden from surveilling Petitioner, thus never knowing where Petitioner is. Because **Gjovik** had no previous contacts in the **state of Washington**, she now fears if she were ever to travel to the **state of Washington** with **the Order** in place against her, she could be accused of trying to contact Petitioner or could even find herself in the same location as Petitioner without intending to do so. Any reasonable person in **Gjovik**'s situation would avoid traveling to the **state of Washington**, especially moving to **the state of Washington**, as long as **the Order** is in place.

205. The U.S. Constitution creates a fundamental right to be able to physically travel from state to state.[203] States are forbidden from abridging national citizenship, and any restriction must survive strict scrutiny analysis. **Gjovik** has now been deprived of this right to travel related to the **state of Washington**, or whatever state Petitioner choses to move to next.

**ii. Right to Occupation**

206. **The Order** against **Gjovik** could lead to ineligibility for **Gjovik** related to professional licenses that require a moral character finding, such as her in progress California Bar Moral Character exam.[204] The Constitution provides a Right to Occupation, that precludes arbitrary deprivations, including related to the Bar licensing process.[205] Harassment orders can

---

[203] *Twinning v NJ,* 211 US 78 (1908); *Saenz v Roe*, 526 U.S. 489 (1999),

[204] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013); *Comm'n for Lawyer Discipline v Benton*, 980 SW 2d 425, 439 (Tex 1998).

[205] *Schware v Board of Bar Exam*, 353 US 232 (1957).

lead to unjustified arrests. [206] Harassment orders show up on court files and credit reports, which can harm credit, and harm opportunities for employment and renting. [207] This order arbitrarily depressives *Gjovik* of her rights.

**iii. Right to Privacy**

207. The Supreme Court has ruled that the rights to "personal autonomy, bodily integrity, self-dignity, and self-determination" are protected by the Due Process Clause. Together, these interests are invoked to justify a constitutionally protected right to privacy.[208] There is also a fundamental right to freedom of thought.[209]

208. Under this Order, *Gjovik* does not believe she can speak or write about Petitioner even with her therapist or doctors. *Gjovik* does not believe she could journal privately about the pain caused by the Petitioner & *the Order* without violating *the Order. Gjovik* does not believe she could even say the Petitioner's name alone in her home, without violating *the Order*.

209. If something is criminalized, that means the when/where the conduct could occur can be monitored. Further, because *the Order* was based on *Gjovik*'s speech that Petitioner would need to surveil *Gjovik* in order to see, *the Order* implicitly authorized ongoing surveillance of *Gjovik*'s activities by Petitioner. This means *Gjovik* no longer has freedom of speech or thought, even while she is alone in her own home.[210]

**iv. Access to Courts**

210. The Constitution provides a fundamental right of access to the courts. Because *Gjovik* is forbidden from "making any statements" about the Petitioner "on any medium,"

---

[206] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013) .

[207] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013) .

[208] *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Roe v. Wade,* 410 U.S. 113  (1973)

[209] *West v Barnette*, 319 US 624 (1943).

[210] See: Right to Privacy & Intrusion upon Seclusion, Restat. 2nd of Torts Section 652(b)

*Gjovik*, a law student, may be unable to legally represent herself in court, instead having to pay thousands of dollars in attorney's fees.  Due to the complexity of the case and the lack of attorney's willing to take on the complicated matter, *Gjovik* is currently proceeding to appeal the case in state court & in federal court at personal risk of large fines, contempt of court, a gross misdemeanor, and years of incarceration.

211. There is not even a rational basis to link the goal of preventing non-criminal harassment,[211] by regulating communication of protected speech, and deploying a punishment for protected behavior that it itself intrudes upon a fundamental right. By exercising Constitutionally protected rights, the *state of Washington* is willing to deprive those of their rights. This is unlawful.

212. By reason of the foregoing, plaintiff(s) seek(s) injunctive relief, writ of prohibition, and declaratory relief against defendant, the state of Washington.

H.   **Count 7: Violation of 14ᵗʰ Amendment, Right to Procedural Due Process** *(Claim Against all Defendants)*

*(Claim Against all Defendants; Facial Challenge to Statutes & As Applied Challenge to Statutes & Order)*

213. Plaintiff, ***Ashley Gjovik***, repeats and realleges paragraphs hereof and hereafter, as if fully set forth herein.

214. *Gjovik* resides in and works from the state of California. *Gjovik* does not travel to, work with, or otherwise associate with the state of Washington. *Gjovik* has no "continuous and

---

[211] ***RCW 10.14.010 Legislative finding, intent.***

1  systematic" affiliations to justify no general jurisdiction,[212] nor does **Gjovik** have minimum

2  contacts with the ***state of Washington***. as she has not purposefully conducted activities in the

3  state in order to take advantage of the benefits of the state's laws.[213]

4  215. **Gjovik**'s transient presence in the state of Washington was induced solely due to

5  fraud (false allegations against her) and duress (the likelihood of a default judgment against

6  her).[214] Further, **Gjovik** did not expect to receive a judgement against her based on her

7  understanding of the policy behind protection orders and personal jurisdiction.

8  216. The ***state of Washington*** has no specific jurisdiction over **Gjovik**, as **Gjovik** has no

9  connections with the state,[215] making the enforcement of a ***state of Washington*** anti-harassment

10  law against **Gjovik** a violation of the Due Process clause of the U.S. Constitution.

11  217. In addition to **Gjovik**'s reply and motions clearly stating the allegations against her

12  were meritless and retaliatory (and as such there were no "connections" via the alleged conduct),

13  **Gjovik**'s ex-counsel also directly objected to the issues of Personal Jurisdiction during the trial.

14  218. After the Judge issued ***the Order***, **Gjovik's** ex-counsel objected, "*So the Court's*

15  *telling her to have no contact with her when there's been no allegations, she's -- they live in*

16  *different states, Your Honor…. How does the Court have jurisdiction?  … No messages have been*

17  *sent to [Petitioner].  These are postings on the internet that [Petitioner] has to go find."* (3/1

18  Transcript, pg 50, lines 19-25)

19

20

---

21  [212] *Daimler AG v. Bauman,* 134 S.Ct. 746, 761 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011))

22  [213] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), *Walden v. Fiore*, 134 S.Ct. 1115, 1122 (2014), *Burnham v. Superior Court of Cal.,* 495 U.S. 604, 619 (1990*); J. McIntyre Mach., Ltd. v. Nicastro,* 131 S. Ct. 2780 (2011),

23  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985))

24  [214] Rest Conflicts 2nd 582

[215] *Bristol-Myers Squibb Co. v. Superior Court of Cal.,* San Francisco County, 137 S. Ct. 1773, 1781 (2017)).

219. The Court responded, "*Clearly this contact has been going on via the internet. It doesn't matter whether they're in the same state or they're not…. The Court has jurisdiction over anything that is received by [the Petitioner]. We enter protection orders over -- that are designed to get to [Petitioner]."* (3/1 Transcript, pg 50, lines 19-25).

220. Counsel argued: "*…that [Petitioner] has to go find.*" (3/1 Transcript, pg 50, lines 25). "*That's not what the statute says…. No communication took place in this state. My client lives in California. Where is the Court's jurisdiction?*" (3/1 Transcript, pg 51, lines 2-14).

221. The Court concluded, "*You can certainly appeal this. You're welcome to do that…. I'm not going to argue with you about it…. The Court has jurisdiction over the communications that are designed to reach her via the internet. The communication itself does not have to be directed to her. It only has to be directed at her.*" (3/1 Transcript, pg 51, lines 3-14).

222. In addition to this clear "as applied" violation of the U.S. Constitution, Washington's personal jurisdiction statutes for harassment protection orders are also facially unconstitutional. Both statutes, the one expiring 1 July 2022 (RCW 10.14) and the one replacing it that day (RCW 7.105) include specific sections related to out of state defendants.

223. Both statutes have sections dedicated to non-resident individuals and ambitiously (or perhaps tyrannically) attempt to extend the **state of Washington** legal jurisdiction around the world, based simply upon the vague, attenuated idea of indirect contacts that *"has an adverse effect"* on a resident of the state of Washington, or even a member of their family. [216]

> **(1) A court of this state may exercise personal jurisdiction over a nonresident individual if:**
> **(d) (i) The act or acts of the individual or the individual's agent giving rise to the petition or enforcement of an order for protection occurred outside this state and are part of an ongoing pattern of <span style="color:red">harassment</span> that has an <span style="color:red">adverse effect</span> on the petitioner or a member of the petitioner's family or household and the petitioner resides in this state;**

---

[216] RCW 7.105.080; RCW 10.14.155

**(2)   For jurisdiction to be exercised under subsection (1)(d)(i) or (ii) of this section, the individual must have communicated with the petitioner or a member of the petitioner's family, directly or indirectly…. while the petitioner or family member resides in this state.**

> **"Communicated or made known" includes, but is not limited to, through the mail, telephonically, or a posting on an electronic communication site or medium. Communication on any electronic medium that is generally available to any individual residing in the state shall be sufficient to exercise jurisdiction**

The state of Washington's Personal Jurisdiction statute appears to be modeled after "Bacon's Law" (aka the "*Six Degrees of Kevin Bacon*" parlor game). [217]

224. In reality, the U.S. Constitution demands that Personal Jurisdiction requires directed, intentional contacts with the forum state. [218] A court cannot form sufficient state contacts for an out of state defendant based solely on the in-state plaintiff's own affiliation with the state and their "harm" occurring within the state. [219]  Contacts also many not be: random, fortuitous, or attenuated. States may not establish their own rules of procedure on an issue arising out of federal law if the outcome substantially impacts a federal right (such as criminalizing speech and created content-based prior restraint orders).[220]

225. The required "contacts" for harassment protection orders should at least match the contact requirements torts. However, these protection orders are criminal in nature, as a violation may result in incarceration. The burden for contacts arguably should be higher than civil matters which would simply result in damages, not jail. The *state of Washington* is apparently unilaterally attempting to become the world's "*be nice'* police.

226. Here, *state of Washington* facially violates the U.S. Constitution in attempting to extend its jurisdiction to anyone who acts "outside the state" with "indirect" communication at

---

[217] Wikipedia, Bacon's Law, https://en.wikipedia.org/wiki/Six_Degrees_of_Kevin_Bacon

[218] *Walden v Fiore*, 134 S. Ct 1115 (2014).; Calder v Jones, 465 US 783 (1984)

[219] *Walden v Fiore*, 134 S. Ct 1115 (2014).

[220] *Central VT Railway v White*, 238 US 507 (1915)

the Petitioner or "their family" via positing electronic communications that are generally

available.  The **state of Washington** violated the U.S. Constitution in applying this statute to

**Gjovik**, and violates the U.S. Constitution generally by having it on the books and enforcing it.

227. By reason of the foregoing, plaintiff(s) seek(s) injunctive relief, writ of prohibition,

and declaratory relief against defendant, the state of Washington.

I.   **Count 8: Violation of the U.S. Supreme Court Principle Against Extraterritorial**

**Reach of Legislation; Abuse of Full Faith & Credit Clause**

*(Claim Against all Defendants; Facial Challenge to Statutes & As Applied Challenge to Statutes*

*& Order)*

228. Plaintiff, **Ashley Gjovik**, repeats and realleges paragraphs hereof and hereafter, as if

fully set forth herein.

229. There is a general presumption against the extra-territorial application of a state

statutes.[221] U.S. state decisions about extraterritorial reach often compare the reach into other

U.S. states the same as foreign countries. [222] A statute of one state has no extraterritorial effect

beyond its borders.[223]  The California Supreme Court has had a presumption against

extraterritorial application of state laws for nearly a century.[224] If a law crosses state lines,

---

[221] *Longaker v. Boston Sci. Corp.,* 872 F.Supp. 2d 816, 819 (D. Minn. 2012) ("A general presumption exists against the extraterritorial application of a state's statutes."), aff'd, 715 F.3d 658 (8th Cir. 2013); See, e.g., *In re Pratt*, 219 Minn. 414, 18 N.W.2d 147, 153 (1945);

[222] *Jahnke v. Deere & Co.,* 912 N.W.2d 136 (Iowa 2018), *Glob. Reins. Corp.-U.S. Branch v. Equitas Lt*d., 969 N.E.2d 187, 195 (N.Y. 2012); William S. Dodge, *Presumptions Against Extraterritoriality in State Law*, 53 UC Davis Law Review 1389 (2020).

[223] *Bernhard v. Harrah's Club*, 546 P.2d 719 (Cal. 1976); *Powell v. Khodari-Intergreen Co.,1334 N.W.2d 127* (Iowa 1983).

[224] *North Alaska Salmon Co. v. Pillsbury*, 174 Cal. 1 (1916), *Wright v. Adventures Rolling Cross Country, Inc*., No. C-12-0982 EMC, 2012 WL 12942824, at *4 (N.D. Cal. May 3, 2012)

without a presumption against extraterritorial reach, courts are supposed to look to Conflict of Laws analysis, not blindly apply their domestic law to another state.[225]

230. The *state of Washington* is fly fishing for out of state defendants upon which they may inflict their own arbitrary and tyrannical laws upon, while also ignoring the laws of the defendant's home state. For example, in California, harassment protection orders require a showing of unlawful violence or threats of violence, and a reasonably certain fear the harm will be repeated.[226] This is far more specific than the *state of Washington's* sweeping statute, and thus seems impracticable that a California resident would even have notice they could be violating a *state of Washington* law by simply posting spicey things on Twitter. [227]

231. It's entirely unclear how the *state of Washington* plans to enforce any of this. Will the *state of Washington* attempt to commandeer the police forces of other states and foreign nations to arrest people who post sassy things online? If someone violates an order, if *Gjovik* violates *the Orde*r against her, will the *state of Washington* send their own police and troops to arrest *Gjovik* and other social media criminals? Will the *state of Washington* ask foreign police to forsake their own duties to their own residents, and instead assist the *state of Washington* in detaining these Twitter perpetrators and transfer them into custody within the *state of Washington*?

232. The *state of Washington* disregarded *Gjovik*'s mention of the California law explicitly prohibiting protection orders on matters arising out of labor disputes. [228] The statute specifically prohibits any court from having jurisdiction to issue any restraining order or

---

[225] Restat. 4th of Foreign Relations Law of the US, US Am Law Inst (2018)

[226] Cal. Code Civ. Proc. § 527.3; California Labor Code 1138.2 (also see federal version, Norris-LaGuardia Act)

[227] *Gdowski v. Gdowski*, 95 Cal.Rptr.3d 799 (2009); *Scripps Health v Marin*, 72 Cal.App.4th 324 (Cal. Ct. App. 1999),

[228] CA LAB § 1138.1

preliminary or permanent injunction in cases involving any conflicting or competing interests in a "labor dispute" with "persons participating or interested" therein, including a person participating or interested in a labor dispute if relief is sought against her."[229]

> **Gjovik: "*There's also another statute I was going to request, a California one, that prevents interference with citizens reporting legal acts to the government, which is the basis of her charge here.*"**

> **Court responds, "*Slow -- slow down just a minute …*" (changes the subject). (2/15 Transcript, page 25, line 18-22)**

233. Finally, another issue, which may have been the point of the petition against *Gjovik*, is the availability of misuse of this state statute to instigate confusion around claim and issue preclusion issues for open cases outside the court of limited jurisdiction. *Gjovik* expects that Apple Inc will attempt to hijack the Full Faith & Credit clause and argue there is now issue preclusion on the matter. Indeed, *Gjovik* believes Apple may have already obtained a copy of *the Order* against her. While the Constitution demands that state and federal courts give Full Faith & Credit to state judgement, it's an abuse of that right to attempt to gain a favorable judgement on an issue currently under review in a federal administrative proceeding, and another state court, through a process that requires far less due process and equity (the limited jurisdiction "rocket docket").

234. By reason of the foregoing, plaintiff(s) seek(s) injunctive relief, writ of prohibition, and declaratory relief against defendant, the *state of Washington.*

---

[229] CA Civil Procedure 527.3

J.   **Count 9: Violation of U.S. Constitution's Prohibition on Retroactive, Ex Post Facto Laws**

*(Claim Against all Defendants; Facial Challenge to Statutes & As Applied Challenge to Statutes & Order)*

235. Plaintiff, ***Ashley Gjovik***, repeats and realleges paragraphs hereof and hereafter, as if fully set forth herein.

236. The U.S. Constitution's Right to Fair Notice prohibits state governments from enacting ex post facto laws.[230] "*Nullum crimen sine lege, Nulla poena sine lege*," or "*no crime no law, no punishment without law*." [231] A cardinal sin of criminal law is to issue ex post facto statutes – to create new laws, with new consequences, that apply in the past, thus making previously lawful behavior now criminal, or making small fines now substantial. It is inherently unfair and tyrannical, which is why the founder captured this prohibition directly in the U.S. Constitution.[232]

237. Laws are found to be criminal/penal when they call for incarceration or a punitive measure such as a punitive fine. These anti-harassment protection orders are confusing hybrid of criminal and small claims actions. The views of due process and civil procedure for these actions more resemble a small claims action, while the outcome of the petition and order is undeniably criminal/penal. Washington's harassment laws (RCW 10.4) are even currently under its Penal Code. ***Gjovik*** was even added to a criminal registry. [233]

---

[230] U.S. Constitution Article I § 10

[231] *Crimen Sine Lege: Judicial Lawmaking*, Beth Van Schaack, 97 Georgetown Law Review 119 (2008)

[232] *Calder v Bull,* 3 US 386 (1798).

[233] *Carr v. United States*, SCOTUS (2010)

238. Here, the consequences for **Gjovik** breaking **the Order** potentially include large fines, forced court appearances, compelled testimony, and long-term incarceration (potentially years), for simply <u>posting the wrong thing on Twitter.</u> Under both harassment statutes, **Gjovik's** punishment for violating **the Order** includes "*contempt of court and subject to penalties under chapter 7.21 RCW (Contempt of Court),*"[234] and a "*gross misdemeanor.*"[235] Violations would also require **Gjovik** to appear in **a state of Washington** court "*the next day*" following an arrest.[236]

239. However, on 1 July 2022, the new harassment statute will add substantially more punishment for the same order violations: an ex post facto statute. Washington's new harassment statute (7.105) is scheduled to become effective with new punishments, applying to previous orders, including **the Order** against **Gjovik**. RCW 7.105.550(2) explicitly states:

> **Nothing in chapter 215… affects the validity of protection orders issued prior to July 1, 2022, under chapter …. 10.14….RCW. Protection orders entered prior to July 1, 2022, under chapter … 10.14…. RCW are subject to the provisions of chapter 215, Laws of 2021 and are fully enforceable under the applicable provisions of RCW 7.105.450 through 7.105.470 and may be modified or terminated in accordance with the applicable provisions of RCW 7.105.500 through 7.105.550.[237]**

240. The new statute will require compliance hearings, which were already found to violate the U.S. Constitution under a similar Washington statute in 2020 by an en banc court. The court found "compliance hearings" and "mandatory proof of compliance" were violations of the U.S. Constitution as unlawful compelled testimony.[238] It's unclear why **the state of**

---

[234] RCW 10.14.120; RCW 7.105.455

[235] RCW 10.14.170; RCW 7.105.455

[236] RCW 7.105.455; RCW 10.14.210

[237] Orders under this and other chapters—Enforcement and consolidation—Validity and enforcement of orders under prior chapters. (Effective July 1, 2022.)

[238] *State v. Zachary James Marshall*, No. 236501011 (2020).

1    *Washington* is still trying to effectuate statutes with unconstitutional provisions, even after they

2    are directly informed those provisions are unconstitutional.

3    241. These compelled testimony provisions give the subject of an order the choice of

4    submitting to the requirements and thereby incriminating himself, refusing to testify (with

5    ensuing liability for contempt of court and criminal proceedings), or providing incomplete or

6    inaccurate testimony (exposing him to perjury and other charges).[239] These provisions seek to

7    compel testimony to accomplish what the Fifth Amendment prohibits, by forcing testimony from

8    a defendant's lips during a criminal prosecution.[240]

9    242. Further, RCW 7.105 is set to roll out outrageous new punishments as part of new

10   anti-harassment orders. Previously these harassment protection orders were "mini-criminal

11   statutes," following a hearing as to whether the mini-criminal statute would even be ordered.

12   Now, the initial protection order hearing can result in immediate punishment including electronic

13   monitoring (an inherently penal order).[241]

14   243. RCW 7.21 penalties include 1) "remedial sanctions" 2) "punitive sanctions"

15   including a) fines up $5,000.00 per individual violation and b) imprisonment for up to 364 days

16   per individual violation c) or both.[242] The statute says the person alleged to have "committed

17   contempt of court" is not required to have an "opportunity to speak" in the matter.[243] Yet

18   another provision that is no doubt unlawful.

19   244. As *Gjovik* is now more likely than before to be subject to additional orders (as future

20   Judges are likely to defer to the first Judge that *Gjovik* is indeed a "harasser"), and because

21

22   [239] *State v. Zachary James Marshall*, No. 236501011 (2020).

     [240] *State v. Zachary James Marshall*, No. 236501011 (2020).

23   [241] RCW 7.105.310

     [242] RCW 7.21.040, https://app.leg.wa.gov/RCW/default.aspx?cite=7.21.040

24   [243] RCW 7.21.050, https://app.leg.wa.gov/RCW/default.aspx?cite=7.21.050

ORIGINAL COMPLAINT                 – PAGE 77 –                 ASHLEY M. GJOVIK

Petitioner has already publicly stated her interested in coming after *Gjovik* for additional Washington charges including cyberbullying. *Gjovik* now faces direct and likely risk of criminal penalties.

245. Because there is apparently no statute of limitations on the conduct giving rise to "*unlawful harassment*," (the Twitter posts *Gjovik* was found liable for were posted nearly two months prior to the hearing and deleted before the hearing) it is also possible Petitioners will ask for orders (and the associated electronic monitoring) for *Gjovik*'s conduct that occurred before 1 July 2022. [244]

246. As for the new "motions,"[245] they apply up to five years after an order is granted, and thus would have retroactive effect on tens of thousands of respondents who previously thought after their order expired, that they were no longer subject to punishment, but they are now open to more punishment (and worse punishments). These tens of thousands of people may soon discover the hard way that they are now open to even more liability and infringement of their rights. This is Ex Post Facto lawmaking and is highly unlawful.

247. By reason of the foregoing, plaintiff(s) seek(s) injunctive relief, writ of prohibition, and declaratory relief against defendant, the state of Washington.

K.     **Count 10: Violation of U.S. Constitution's Prohibition on Bills of Attainder, 5th and 14th Amendment**

*(Claim Against all Defendants; Facial Challenge to Statutes & As Applied Challenge to Statutes & Order)*

---

[244] RCW 7.105.310

[245] RCW 7.105.310 (1) (o)

248. Plaintiff, **Ashley Gjovik**, repeats and realleges paragraphs hereof and hereafter, as if fully set forth herein.

249. The U.S. Constitution prohibits Bills of Attainder or Bills of Pains and Penalties. The U.S. Constitution's Right to Fair Notice also prohibits state governments from creating Bills of Attainder.[246] These Bills are legislative acts (or acts delegated by the legislature) which inflict punishment on a specific/identifiable person. [247]  This prohibition is because these Bills provide "*irresponsible despotic discretion*" and allow courts to operate under influence of "*unreasonable fears or unfounded suspicions*." [248]

250. A free speech scholar summarized the legal enigma that is harassment protection orders: "*a civil harassment order creates a new crime that can only be committed by the respondent*." [249] Actions that would otherwise be lawful, now become potentially criminal, but only for a specific person. That is a Bill of Attainder.

> **"Respondent [*Gjovik*] shall not make any statements or posts or other publications about Petitioner, including but not limited to, petitioner's medical information, petitioner's family, petitioner's names, on any social media or internet or other medium. Nothing about this Order prohibits Respondent from testifying in administrative or judicial proceedings." [250]**

251. These "orders," like **the Order** against **Gjovik** above, is punitive and creates a new crime that only **Gjovik** may commit, be found guilty of, and sentenced to jail (potentially years of jail) for. The heavy burden of potential incarceration for otherwise completely lawful (and even

---

[246] U.S. Constitution Article I § 10

[247] *U.S. v. Lovett*, 328 U.S. 303 (1946); Kenneth R. Thomas, *Bills of Attainder: The Constitutional Implications of Congress Legislating Narrowly,* Congressional Research Service (2014).

[248] *Joseph Story's Commentaries on the Constitution of the U.S.* 1338, Boston: Hilliard, Gray And Company. Cambridge: Brown, Shattuck, And Co. (1833).

[249] Andrew H. Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781 (April 2013) .

[250] *[REDACTED] v. Ashley Marie Gjovik*, Order for Protection – Harassment, King County District Court, case no. 22CIV01704KCX (1 March 2022).

protected) acts cannot be reasonably tied to a non-punitive, legitimate legislative purpose. It is also clear with RCW 10.14's statutory placement within the state's criminal laws, that the legislative intent was to punish.

252. While it is a court creating these "orders," they were delegated this rule making authority by the legislature. If the court was to simply check a prescribed box, that would be adjudication. However, when a Judge is provided a free-form text box, to draft whatever law they so desire, they are exercising a legislative function. The *state of Washington* government is similar to the federal government that delegation of legislative power is very limited and requires clear standards when it does occur.[251] These harassment protective orders are likely an unlawful delegation of legislative authority (with the free-form text boxes), as well as these other issues.

253. By reason of the foregoing, plaintiff(s) seek(s) injunctive relief, writ of prohibition, and declaratory relief against defendant, the *state of Washington.*

L.  **Count 11: Violation of Constitutional Preemption & Primary Jurisdiction Doctrine**
*(Claim Against all Defendants; As Applied Challenge to Statutes & Order)*

254. Plaintiff, *Ashley Gjovik*, repeats and realleges paragraphs hereof and hereafter, as if fully set forth herein.

255. Federal preemption is the power of the federal government under the Supremacy Clause of the U.S. Constitution to displace a state law in favor of a federal law or regulation, when the state law conflicts with the federal law or regulation.[252]  Further, state courts have no

[251] Unconstitutional Delegations of Power, Washington Attorney General, 53-55 No 177 (1953); WASH. CONST. art. II, § I ("The legislative authority of the state of Washington shall be vested in the legislature, consisting of a senate and house of representatives, which shall be called the legislature of the state of Washington .....

[252] LexisNexis, Federal Preemption as a Defense to State Court Tort Proceedings (2008)

power to effectuate the judgments of the federal courts.[253] The policy as to why federal statutes may preempt state statutes (field, conflict, and/or objective), similarly suggests that state courts should show deference to pending federal litigation or agency procedures on matters that preempt (or have Primary Jurisdiction) on the matter before them.

256. The Primary Jurisdiction Doctrine dictates that by default, initial decision-making responsibility should be performed by the relevant agency rather than the courts.[254]  The application of the Primary Jurisdiction Doctrine implies the case "*requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency*."[255] If the court concludes that the dispute which forms the basis of the action is within the agency's primary jurisdiction, the case should be dismissed without prejudice so that the parties may pursue their administrative remedies.[256]

257. However, here, a ***state of Washington*** court agreed to hear this petition against ***Gjovik***, with allegations directly related to, and even directly involving, ***Gjovik***'s federal cases.

258. During the February 1st TRO hearing, Petitioner claimed ***Gjovik's*** NLRB charge against Apple Inc was but-for the reason Petitioner filed for the harassment order. Petitioner said, *"This is what caused me to do this, is because the director of security at the National Labor Relations Board believes that [**Gjovik**] filed a charge with the intent to harass me on January 11th…. They contacted me. I have a voicemail from them. They told me that I needed to do something locally like getting a protection order or contacting the police."* (2/1 TRO Transcript, page 14-15, 16-5)

---

[253] *McKim v. Voorhies*, 11 U.S. (7 Cr.) 279 (1812); *Riggs v. Johnson County*, 73 U.S. (6 Wall.) 166 (1868).; U.S.C. Article III, Section 1: State Court Interference with Federal Jurisdiction

[254] *Syntek Semiconductor Co., Ltd v. Microchip Technology, Inc.*, 307 F.3d 775, 780 (9th Cir. 2002).

[255] *Brown v. MCI WorldCom Network Servs., Inc*., 277 F.3d 1166, 1172 (9th Cir.2002).

[256] *Syntek Semiconductor Co., Ltd v. Microchip Technology, Inc.*, 307 F.3d 775, 780 (9th Cir. 2002).

259. The Judge responded, *"You're saying there's an official with the National Labor Relations Board who is telling you that they believe that was filed to -- solely to harass you. And if that's the case, then some sort of communication from that official would be useful.*" The judge added, "*we're not going to rule one way or the other. That's for the National Labor Relations Board.... I'm assuming she's filed it against Apple as opposed to you personally?*" (2/1 TRO Transcript, page 15-16, 21-7)

260. Petitioner responded, "*She did. She filed it against Apple... She said that the reason that she started doing this is because I am cited in Apple's defense against her for a wrongful termination charge.... and the thing that is cited in Apple's defense is the conversation that her and I had where she told me what she had leaked to The Verge.*" (2/1 TRO Transcript, page 16, 7-23)

261. During the February 15 hearing, the Court raised the topic of NLRB jurisdiction again, saying: "*There's a number of issues regarding National Labor Relations Board filings, the standard as I mentioned of antiharassment requires that the complained of activity serve no lawful purpose-- making filings with the National Labor Relations Board certainly is anyone's right, and so you have to know that that is considered a lawful purpose. Another thing that I want to make very clear is that this Court won't make any determination on any of those claims on either side, because this Court has absolutely no jurisdiction over the National Labor Relation Board claims.*" (2/15 Transcript, page 27, line 8-24)

262. **Gjovik** added: "The charges, which are public information, it's all public, are U.S. NLRB, U.S. Department of Labor Whistleblower Protection Program, the California Department of Labor DIR 22 Retaliation Group, and now filing to the DOJ as well with alleging 18 U.S.C. 1513 and 1514." The court agreed, saying: "*No, I understand.... I understand you have a number of federal claims.... Obviously, this Court has absolutely no jurisdiction under -- over any of*

1    *them and so they will not be resolved in a hearing in this court in any shape, way, or form*."

2    (2/15 Transcript, page 29-30, line 19-8)

3    263. Petitioner replied, "*This isn't about the filing itself; it is about what Ms. **Gjovik** is*

4    *publishing herself outside of the balance of the NLRB. The NLRB director of security told me*

5    *that if, let's say, the press was to request the documents that Ms. **Gjovik** files, that the*

6    *information that Ms. **Gjovik** is publishing unredacted would be redacted as -- I believe they said*

7    *it was section -- Exemption 6 six of FOIA in the Department of Justice Guide to the Freedom of*

8    *Information Act, which would include my personal information, my children, my husband, my*

9    *medical information. These are all things that she's publishing herself outside of the NLRB.*"

10   (2/15 Transcript, page 28, line 11-21)

11   264. During the March 1 hearing, the same King County Judge said: "*This isn't an*

12   *opportunity to take a deposition related to the NLRB claim*" (3/1 *Transcript page 7, line 19-20*).

13   However, the Judge added, "*I realize you may need a little latitude in terms of background that*

14   *you may wish to provide, but again, this is not the opportunity for the NLRB hearing nor is it the*

15   *opportunity to engage in discovery related to that hearing.*" (3/1 Transcript page 7 line 23

16   through page 8 line 1). Apparently the judge was making these statements to **Gjovik**, as if **Gjovik**

17   somehow orchestrated getting sued by Petitioner about simply reporting her employers unlawful

18   activity to the government.

19   265. Despite this warning, **Gjovik** had to plea to the Judge, requesting for Petitioner to

20   cease trying to compel **Gjovik** to testify on matters related to her charges against Apple Inc.

21   **Gjovik** said, *"Your Honor, I'd like to object to this question. She's trying to compel me to testify*

22   *on my federal charges." (3/1 Transcript, page 38)*. The Judge insisted **Gjovik** answer. **Gjovik**

23   responded, "*These are part of my federal and state charges, which have already met prima facie*

24

*for subsequent harassment after termination of my time at Apple. I'm hesitant to testify to anything specific because it is part of the ongoing investigation."* (3/1 Transcript, page 38).

266. The ***state of Washington*** court should not have interfered with the federal cases or the California state cases. The ***state of Washington*** court should never have involved itself in matters already under review by the federal government, matters of complex litigation, matters so closely connected to federally Constitutionally protected rights, including free speech -- and matters and people so distant from their state – in distance and connections. As our U.S. Supreme Court wrote, "*our federal system prizes state experimentation, but not state experimentation in the suppression of free speech.*"[257]

267. By reason of the foregoing, plaintiff(s) seek(s) injunctive relief, writ of prohibition, and declaratory relief against defendant, ***the state of Washington***.

---

[257] *Boy Scouts of America v Dale*, 530 US 640, 660 (2000); *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020).

ORIGINAL COMPLAINT                – PAGE 84 –                ASHLEY M. GJOVIK

## VI.  DEMAND FOR RELIEF

WHEREFORE, Plaintiff ***Ashley M. Gjovik*** requests judgment as follows:

268. On all counts, Plaintiff requests this federal court provide declaratory judgment on legality of statute, permanent injunction of enforcement of noted statutes and orders against ***Gjovik***, writ of prohibition, and writ of mandamus; none of which are prohibited by the 11th amendment precedent, as non-monetary relief is sought to remedy violations of federal law.

269. The court may also granting ***Gjovik*** such other and further relief as the Court deems just and proper, including but not limited to attorney's fees for the state district court hearing, legal fees for the pending Washington state Superior court appeal, and legal fees for the case at hand.

# VII. CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.[258]

Executed on:                    June 9th 2022

Signature of Plaintiff

Printed Name of Plaintiff     Ashley M. Gjovik

Address: P.O. Box 119, Santa Clara, California 95050
Email: amgjovik@gmail.com
Phone: (408) 883-4428