1                    IN THE KING COUNTY DISTRICT COURT

2                        REDMOND, WASHINGTON

3    _____

4    CHER SCARLETT,                    )

5                     Plaintiff,       )

6         v.                           ) Case No. 22CIV01704

7    ASHLEY GJOVIK,                    ) Appeal No. 22-2-03849-7 SEA

8                     Defendant.       )

9    _____

10                            HEARING

11        The Honorable Lisa Napoli O'Toole Presiding

12                        March 1, 2022

13   _____

14

15

16

17

18

19

20

21

22

23
     TRANSCRIBED BY:    Reed Jackson Watkins
24                      Court-Certified Transcription
                        206.624.3005
25

1                        A P P E A R A N C E S

2

3      On Behalf of Plaintiff:

4      CHER SCARLETT

5      Pro Se

6

7

8

9      On Behalf of Defendant:

10     MARK C. BLAIR

11     Blair Kim

12     215 NE 40h Street, Suite C-3

13     Seattle, Washington 98105

14

15

16

17

18

19

20

21

22

23

24

25

1                          -o0o-

2                       March 1, 2022

3

4        THE CLERK:  -- Judge O'Toole presiding.

5        THE COURT:  Thank you.  Please be seated.  Welcome to King

6    County District Court here in Redmond.  I guess we're

7    waiting for -- oh, there's Mr. Blair.  Okay.

8        If you could lower that.

9        THE CLERK:  Okay.

10       THE COURT:  All right.  Let me get my Zoom up and running

11   as well.

12       And you're Ms. Scarlett, correct?

13       MS. SCARLETT:  Yeah.

14       THE COURT:  You can go ahead and have a seat at one of the

15   tables.

16       All right.  This is the matter of Cher Swan Scarlett v.

17   Ashley Marie Gjovik, which is 22CIV01704KCX.

18       Ms. Gjovik now has counsel, Mr. Blair.  Ms. Gjovik and

19   Mr. Blair are attending by Zoom today.  Ms. Scarlett is

20   present in the courtroom.

21       Mr. Blair, I'll let you go ahead and make your appearance.

22       MR. BLAIR:  Good afternoon, Your Honor.  For the record,

23   my name is Mark Blair.  I'm the attorney for the respondent,

24   Ms. Gjovik.

25       THE COURT:  All right.  Thank you.  So we're here today

1       for a full order hearing.

2           And, Mr. Blair, are you ready to proceed?  I see you just

3       filed your notice of appearance recently.

4           MR. BLAIR:  Yes, Your Honor.  I've actually been on the

5       case longer than that.  There was a technical issue with the

6       filing, but I'm prepared.  I did provide a copy of all of

7       our filings to the petitioner by email.  I think she may

8       already have had them, but just as an abundance of caution,

9       I sent that with my NOA, I think, two days ago.  So we're

10      ready to go, Your Honor.

11          THE COURT:  All right.  So as I mentioned at our last

12      hearing, the Court in trying to determine whether to issue

13      an antiharassment order looks at our antiharassment

14      protection order statute.  That, of course is RCW 10.14.

15          What the Court is looking for is whether there is a

16      pattern of activity by Ms. Gjovik directed towards

17      Ms. Scarlett that serves no lawful purpose that would cause

18      any reasonable person to be placed in emotional distress or

19      placed in fear.  The standard is preponderance of the

20      evidence.

21          So what that means, Ms. Scarlett, basically is that the

22      Court has to find that more likely than not these events

23      occurred and it satisfies the standard of harassment.

24          So we'll start, Ms. Scarlett, and have you raise -- well,

25      let me tell you how the procedure will work.  So first --

1    you'll testify first.  You're the petitioner, so you go

2    first.  You get to give your sworn testimony.  Mr. Blair may

3    have questions for you.  And any documents you want me to

4    view that haven't already been filed, you can certainly

5    provide to our clerk as exhibits.

6      Ms. Gjovik will go second.  She'll get to give her sworn

7    testimony.  It sounds like their documents have been loaded

8    into electronic court records.  Mr. Blair has indicated he's

9    provided you with those.

10     And then toward the end, both parties will have the

11   opportunity to make whatever closing arguments they might

12   like.  Mr. Blair would be arguing why the order shouldn't be

13   issued, and then you could state why you believe the order

14   should be issued.

15     So let me ask, though -- we'll start, Ms. Scarlett, with

16   you -- whether you want to make an opening statement, just a

17   general statement about the case or whether you just wish to

18   go right into your testimony.

19     MS. SCARLETT:  You know, I had this whole thing written

20   out, which I filed.  But ultimately, you know, Ashley and I

21   had a disagreement and I shared some opinions, which she has

22   shared.  And in December she took it upon herself to start,

23   like, defaming me.  Making statements that were untrue that

24   caused other people to harass me.  She also started posting

25   about my family, my personal life.

1          And in January, when she filed her NLRB charge, which I'm

2     not -- I'm not asking her to do that -- she took it upon

3     herself to publish information that the NLRB said that they

4     would have redacted if they were the ones making that data

5     that she is publishing available.

6          I feel that she has infringed upon my rights, and it has

7     caused me damage in my relationships and my family.  And I

8     have been pushed to the brink while I'm trying to find a

9     job.  And no one deserves this.  And the only thing that I

10    am asking is that she please stop and respect my rights to

11    have the privacy of what I decide to be public be public and

12    not republish information about myself or my family that

13    even the State of Washington has determined is not of public

14    interest.

15         THE COURT:  All right.  And, Mr. Blair, your opening

16    remarks if you care to make any.

17         MR. BLAIR:  No opening remarks, Your Honor.  I'm ready to

18    ask questions when the opportunity arises.

19         THE COURT:  Sure.

20         So he doesn't want to make an opening statement, that's

21    fine.

22         So, Ms. Scarlett, I'm going to have you raise your right

23    hand, please.  And do you swear or affirm you'll testify

24    truthfully in this proceeding?

25         MS. SCARLETT:  I do.

1

2    CHER SCARLETT,                    Witness herein, having first been

3                                      duly sworn on oath, was examined

4                                      and testified as follows:

5

6         THE COURT:  Thank you.  And I should note that of

7    course -- and I think I mentioned this at our last

8    hearing -- Mr. Blair wasn't on board at that time -- but I

9    advised both Ms. Scarlett and Ms. Gjovik that there is

10   nothing about the NLRB matter that this Court will be able

11   to determine in any shape, way or form.  We don't have

12   jurisdiction over that, of course.

13        And that the only narrow little issue that this Court has

14   jurisdiction over in a protection order hearing is whether

15   there should be a protection order issued, whether this

16   rises to the level of harassment.

17        So all of the details of the NLRB claim and work-related

18   claims are not at issue here because we can't determine

19   them.  This isn't an opportunity to take a deposition

20   related to the NLRB claim.  This is solely limited to

21   whether Ms. Gjovik has taken action against Ms. Scarlett

22   that would rise to the level of harassment.

23        So I realize you may need a little latitude in terms of

24   background that you may wish to provide, but again, this is

25   not the opportunity for the NLRB hearing nor is it the

1    opportunity to engage in discovery related to that hearing.

2       All right.  So, Ms. Scarlett, if you could start from

3    scratch telling me when and how you knew Ms. Gjovik and what

4    she has done that has caused you to seek this order.

5       MS. SCARLETT:  So her and I both worked at Apple.  We

6    became acquainted with each other through workplace

7    activism.  Her and I were on opposite ends of where we

8    thought the direction of a particular piece of activism

9    should go.

10      Because I was personally impacted by what she was saying,

11   I felt that it would be best if I left the group, so I did

12   so.  Some people asked why, so I gave a statement saying

13   why.  I did not say it was her fault.  And I didn't look at

14   it that way.

15      She reached out to me again later and she said that she

16   was impressed by the way that I stand up for other people.

17   And so I gave it another chance and started assisting her

18   and her assisting me.  Mainly, I gave her -- I at the time

19   had, you know, around like 45,000 followers on Twitter, and

20   she didn't have very many at all.  I started lifting up, you

21   know, what she was going through at Apple and supporting

22   her, and a lot of people followed her off of my platform.

23   And so initially I was being very supportive of her.

24      Unfortunately, some of the things that she started to say

25   publicly were not matching up with what she was saying

1     privately and in some cases also publicly.

2       I privately expressed some concerns to a few people.  I

3     never said anything about it publicly with the exception on

4     the application Blind, I did write a post saying that I

5     believed that it was going to be difficult for her to

6     prove -- or win a retaliatory discharge case because she had

7     done what Apple was claiming, and that I wasn't concerned

8     about her financially, but I was concerned about her for

9     other reasons because of the way that she was representing

10    herself and just being concerned for another woman going

11    through anything.

12      But with the exception of that, I never said anything

13    about her publicly and, you know, she -- there were members

14    of the press because we were both involved sort of in, you

15    know, separate workplace activism things.  I have my own

16    NLRB charge that's pending.  And journalists were reaching

17    out to me asking me to verify some of the things that she

18    had said, and I couldn't do that because I care with telling

19    the truth.  Whether it comes to me, whether it comes to

20    other people, I am not out to get anyone, I simply want

21    things to -- I care with the outcome and the outcome is

22    dependent on people representing themselves accurately and

23    fairly.

24      I didn't realize at the time what I was getting myself

25    into about her, but several people started reaching out

1        including journalists saying that she was saying things off

2        the record about me that were extremely negative, and I

3        still tried to remain cordial with her.  I reached out to

4        her a couple of times about some of the things that other

5        people were concerned with that I shared concerns with,

6        again, privately, and none of that ever really landed very

7        well.

8          And then publicly, I asked her about a case that she was

9        posting about.  And she tried to make it seem like I was

10       trying to dox, though the plaintiff in the case, when I

11       wasn't.  So I deleted all of those Tweets.

12         And then interestingly enough, later she posted that case,

13       which had both the person's name and the case number in it.

14       So I don't really understand what her big issue was with

15       that.  But I dropped it at that point.  And then her and I

16       blocked each other.  And nothing really happened for a long

17       time there until -- that was in September of 2021, the

18       beginning of September.

19         And then in December -- well, there was something that

20       happened with somebody else that was separate where her and

21       I disagreed and she convinced another woman that I was also

22       writing her out of the press, when I was actually actively

23       trying to get this woman press coverage, which I told Ashley

24       in the email that I later sent to her.

25         But in December, Ashley started naming me and claiming

1       that I was doing and saying things that I wasn't doing.  It

2       started out kind of minor, just saying that I was bullying

3       her.  I didn't really say anything about it because a lot of

4       people were like, you know what, if somebody asks you about

5       this, just share both sides.  I did not -- because of the

6       size of my platform, if I call somebody out on my Twitter as

7       in doing something to me or lying, it is going to cause a

8       huge pile on and cause them to be bullied, not necessarily

9       because that's the intention of my followers, but just

10      because that's the way that the platform works.  And I did

11      not want anything negative to happen to her.  I did not want

12      her to have any negative feelings.

13         So when it continued to escalate and escalate and escalate

14      because she believed that random accounts who disagreed with

15      her or were editing her Wikipedia or what have you or me

16      into talking with my family, posting about them, posting my

17      previous legal name, knowing full well that I had changed my

18      name for a safety concern.  I reached out to somebody who I

19      had had a falling out with and pleaded with her that her and

20      I reconcile and if she could try to work things out between

21      Ashley and I.

22         I told her I would sign, you know, whatever document.  I

23      said she's -- you know, she's in school to become a lawyer,

24      I will sign whatever document she wants.  And she came up

25      with a totally lopsided agreement that said that I would

1      never mention her name to anyone at all, never talk about

2      her anywhere and she would simply stop talking about me on

3      Twitter.  And I said that I would agree to that.

4         And then suddenly it turned into that she wanted me to

5      post about her Go Fund Me on Twitter, that she wanted me to

6      publicly apologize for things that I hadn't done on Twitter.

7      And the person that I was speaking with told me that she

8      felt that Ashley was trying to extort me and that I should

9      call the FBI and report it as extortion, so that's what I

10     did.

11        From there it continued to escalate.  I had -- during this

12     conversation, I had begged for Ashley to remove the private

13     and personal information about my family, and in addition

14     the clearly defamatory things that she was saying that was

15     not true.  And she essentially just laughed about it,

16     calling me a psycho, saying that I tried to destroy her as a

17     reason that she thought it was okay to treat another person

18     this way.

19        She does not have any proof that I was person or people

20     who were writing things that she didn't like.  She just

21     decided that it was me and that I was going to pay for it.

22     And she told mutuals that because -- I had reached out to a

23     mutual friend at the time -- who is no longer a friend of

24     mine, who has actually provided written testimony in this --

25     that I was concerned because something that Ashley told her

 1        was not what Ashley had communicated to me multiple times,

 2        and all I suggested was to protect herself, she reach out

 3        and at least ask so that she could say that she did before

 4        she published possibly defamatory information about a

 5        company that was trying to harm all of us.

 6          And after that, I came into this courtroom because it had

 7        continued to escalate.  Saying things that I was trying to

 8        destroy her, that I was trying to have her swatted, and

 9        that's calling emergency services that are armed in order

10        to -- in the hopes of having them physically harmed.  I've

11        never done that.  I would never do that.  Coercing her.

12        Telling her to remove federal charges.  Bullying her.

13        Saying that I'm under investigation by numerous federal

14        agencies and law enforcement.

15          So I wrote her an email after I came to court because

16        ultimately, again, I did not want any of this to harm her

17        career, to harm her, to do further harm to me.  And I wrote

18        this email and I was like, look, here's all these

19        misconceptions that you've heard, here's the reality of

20        them.  And I even apologized for the things that I said that

21        are nothing, you know, just that one comment that I made.

22          And she decided to escalate further instead.  I said that

23        at that point I had no choice but to hire a process server

24        for this proceeding.  And the way that she represented that

25        was that I -- a member of Apple's global security hired

1      someone to track down and find her at her home and hand her

2      something physically.  So, again, making these statements

3      that are -- not necessarily full on lies, but complete

4      misrepresentations that do nothing but to try to maliciously

5      frame that I have done something that I haven't done.

6         With the NLRB charge -- I'm not bringing up the charge

7      specifically.  I'm talking specifically about Ashley --

8      excuse me, Ms. Gjovik, posting -- publishing these things on

9      a platform called Scribd, which actually removed it for

10     account abuse.  A platform of her website.  These are not

11     government websites that are hosting these, these are things

12     that Ashley -- that Ms. Gjovik is writing herself and

13     publishing herself that she is claiming are related to these

14     federal charges.  But they're really just her, and that's

15     who is publishing this information.  She's just doing it

16     under the guise that it is federally protected.

17        THE COURT:  All right.  Can you give me some more

18     specifics?  You note in your petition that she's made public

19     health information as well.  You just testified that she'd

20     made specific posts about your family, publishing your prior

21     name that you had changed for security reasons.  Your

22     petition talks about medical information.

23        So can you give me just some specifics about what it is

24     she's posted publicly about your family and about medical

25     information that you believe was out of context or not

1     appropriate and has caused you concern?

2        MS. SCARLETT:  Okay.  So for the name, this Tweet is from

3     January 8th, 2022.  She says:  "Okay, well, it's been an

4     exciting day.  I still haven't eaten and I need to do

5     homework for school next week, so I'll just let you all dig

6     through everything I just posted and we'll see if Cheryl's

7     in a more negotiable mood tomorrow.  Oh, yeah, her name is

8     Cheryl."

9        On January 11th:  "I recommend you send this document

10    retention notice and some sort of cease and desist missive

11    to them now."

12       She lists some people that she believes are involved in

13    some Apple scheme, and in there she lists me as Cher

14    Scarlett/Stewart, which is my former legal last name.

15       On January 9th, 2022, she says:  "Listen, I don't usually

16    give a shit about people's personal crap, they can handle

17    their own business.  The only reason I'm exposing Cheryl

18    Scarlett's grift is she harassed and bullied and defamed me

19    for months and now she says she's a defense witness for

20    Apple against me."

21       About my mother, she said:  "Here's another interesting

22    one.  Cher posted about growing up poor like, tract house

23    poor she says.  Maybe" -- that's actually not what I said --

24    "but also her mom is over here with tassels on her ottoman

25    and looking like a fucking late '80s, early '90s goddess."

1      And posted a family portrait of my mother and my brother and

2      my sister and I from 1990.  And then a bunch of -- two of my

3      Tweets.

4        And then also a page from -- a screenshot from my mom's

5      Facebook that has her name on it and a picture of her living

6      room and her cat.

7        And then my husband's criminal record.  And then his name

8      is not in any of her Tweets, I don't think.  They're only in

9      the thing that she published on Scribd and her website.  And

10     that is where the medical information that I posted is.  She

11     had Tweeted it but they were deleted before I got them.  But

12     they talk about my bipolar disorder.

13       I am a recovering drug addict.  And through all of this, I

14     have -- I've relapsed from the stress and she posted about

15     that.

16       This one -- in the document, it says:  "Remove details

17     about Cher's husband, David Reimers being a convicted sex

18     offender.  Which is something that was sealed and relieved

19     by the State because of the manifest injustice that was done

20     that we worked really hard to get taken off.  It says --

21     THE COURT:  So this is a sealed court record?

22     MS. SCARLETT:  Yes.

23     THE COURT:  Which state?

24     MS. SCARLETT:  This state.

25     THE COURT:  Washington?

1          MS. SCARLETT:  I included the court filings in the -- in

2     what I filed.  I can bring them if you'd like.

3       She's posted things that other people posted in this memo

4     that she published.  This one says:  "You should be more

5     concerned with the health and safety of Alexis" -- which is

6     my daughter -- "who is being raised in an unsafe

7     environment.  I've downloaded all of Cher's Tweets and media

8     articles and will be filing a report with Child Protective

9     Services."  Which they did.

10      She has some of my Tweets posted in here -- in this thing

11    she's published which talk about that I'm bipolar.  Again, I

12    don't understand the purpose or what public interest that

13    would be of.

14      She posted:  "How are you claiming to run out of funds

15    when you can afford to support your daughter, but percocet,

16    a snowboard, your husband, and post all of that here.  You

17    seem like you're lying with not being able to pay your

18    bills."  Poor people can go snowboarding.

19      She posted about the fact that I'm unemployed, that I was

20    in the ER because I -- on December 20th, I overdosed

21    accidentally.  That I had Covid.  And again with the

22    percocet.  All of this -- like, if even you get the 911

23    call, it's redacted by FOIA.

24      She has a post in here from somebody else that says:  Cher

25    was soliciting money for her honeymoon fund, and that has my

1    old name and my husband's name and a link to our wedding

2    registry that I assume they found just by searching on the

3    internet.

4       She posted this one that I said:  "I live alone with just

5    my daughter.  I don't get child support.  I also support a

6    second household.  My family is -- my family business is my

7    business, not the world's."

8       This one I talk about my addiction and she published that

9    in here.  And these ones, again, talk about my bipolar

10   disorder and my ADHD.  And in this document, I was mentioned

11   more than 400 times, much of which are republishings of my

12   Tweets.  And I don't -- I'm not trying to bring up copyright

13   law.  I just asked her again that the personal medical stuff

14   be redacted and instead -- and in this one she posts to my

15   husband's -- the link to my husband's Instagram and his

16   name.

17      THE COURT:  I'm sorry; so are you saying that the

18   information about your medical -- various medical

19   conditions, your mother's whereabouts and those sorts of

20   things that she's reposting things that you have already

21   posted on Twitter?

22      MS. SCARLETT:  Some of it are things that I posted on

23   Twitter that she's republishing in this document.  Some

24   things are things that other people -- I don't know how they

25   found.  And then my mother's personal information, she

1    actually posted that -- or my mother's name, she actually

2    posted that stuff.

3        So some of it is her republishing things in this memo.

4    Some of the stuff is her republishing other people's -- the

5    things that other people say that has private information

6    about it that I didn't consent to in this memo.  And then

7    some of it is things that she has posted on Twitter herself.

8        THE COURT:  All right.

9        MS. SCARLETT:  And then she does have in this memo, my

10   former name and my current name at least the last time that

11   I looked at it.

12       THE COURT:  Okay.

13       MS. SCARLETT:  And I do want to say really fast that after

14   I mentioned that I had hired a process server, she actually

15   did delete a lot of the Tweets that had personal information

16   about it except for two of them.

17       THE COURT:  All right.  And anything else you want me to

18   know before I ask Mr. Blair if he has any questions for you?

19       MS. SCARLETT:  No, I think that's -- oh, and she had

20   filed, like, a complaint with Wikipedia or something because

21   she thought that somebody who was editing her Wikipedia

22   article was me.  And they investigated and found that that

23   wasn't her and they contacted me and told me that she had

24   sent them a background report of myself and a background

25   report of my husband and asked me if I wanted any

1    information to be considered in their investigation, and I

2    just sent them a lot of what you -- what I filed here and

3    they banned her from Wikipedia for abusing me or rather

4    harassing me.

5        THE COURT:  Okay.  All right.

6        Mr. Blair, then, questions that you have for Ms. Scarlett.

7        MR. BLAIR:  Yes, thank you, Your Honor.

8

9                C R O S S - E X A M I N A T I O N

10   BY MR. BLAIR:

11   Q.   So Ms. Scarlett, first question:  Are you bipolar?

12       THE COURT:  Wait, wait, wait, wait, wait.  Whoa, whoa,

13   whoa, whoa, whoa.

14       MR. BLAIR:  Is that an objection, Your Honor?

15       THE COURT:  Mr. Blair -- Mr. Blair.  You've got an

16   unrepresented individual and this is where you're starting?

17       MR. BLAIR:  So if I may, Your Honor, the allegation is

18   that my client is making -- sharing either false information

19   or personal, private information.  The allegation is that

20   she said my client said that this individual is bipolar.

21       So it's a factual question that the Court has to address

22   to determine whether there's a false statement or whether

23   it's private, privileged information.  I mean, I'm not the

24   one that's sharing it, Your Honor.

25       THE COURT:  That's not the standard.  That's not the

1      standard in an antiharassment order.  Whether it's true or

2      not doesn't matter in an antiharassment order.

3      Ms. Scarlett's already said that's the case.  She -- so

4      that's -- she's already offered her testimony.

5         MR. BLAIR:  I didn't understand that she said she was,

6      Your Honor -- I understood she said --

7         THE COURT:  But that is not the standard in an

8      antiharassment order.  Whether she is or whether she isn't

9      is completely irrelevant to this Court's inquiry in this

10     very narrow proceeding.

11        So what we're trying to figure out is whether there's a

12     pattern of activity over time directed at Ms. Scarlett that

13     serves no lawful purpose.

14        And if you want to address -- maybe address your questions

15     toward how any of these postings serves a lawful purpose,

16     that might serve your client well.

17        MR. BLAIR:  May I ask questions, Your Honor?

18        THE COURT:  Yes, you may, but not that one.

19        MR. BLAIR:  Thank you, Your Honor.

20  Q.  (By Mr. Blair)  Ms. Scarlett, you live here in Washington?

21  A.  I do.

22  Q.  And Ms. Gjovik, she lives in California; is that right?

23  A.  Yes, I assume.

24  Q.  Okay.  So the communications, the conduct that you're

25      talking about, that is all on Twitter; is that correct?

 1   A.   That is correct.  And her website.

 2   Q.   So when you're saying -- I'm sorry.

 3   A.   And Scribd and her website.

 4   Q.   Online social media communication tools; is that a fair

 5        statement?

 6   A.   I would just say she's using internet.

 7   Q.   Okay.  The communications that you're referencing, are those

 8        messages sent directly to you or are they something that she

 9        posts to the public at large?

10   A.   They are what she is posting to the public, as I have

11        stated.

12   Q.   So they are not the equivalent of a text message or an email

13        or a letter or even walking up and saying directly to you

14        something of substance; is that correct?

15   A.   That is correct.

16   Q.   Okay.  And the information that you have accused her of

17        sharing online -- and I use the words private, personal

18        information, that's what you called it -- did I hear you

19        correctly say that the information she shared was obtained

20        from other Tweets or posts from the internet.  Did I hear

21        that correctly?

22   A.   I said that some of what she has posted in her memo that is

23        published on her website, some of which are Tweets that she

24        is republishing that are mine that contain information that

25        I should be able to control the flow over.  Some of it is

1      contained in Tweets that are other people have posted in

2      reply to her, and some of it is things that she has posted.

3   Q. So if I understand correctly, the information that you're

4      accusing her of sharing online is information that was

5      already publicly available to be viewed by anybody else

6      online.  Do I have that right?

7   A. Not in the manner in which she is publishing it, no.

8   Q. So let's break it down.  When you Tweet something, that's a

9      message that you post on Twitter, your followers can see

10     that, correct?

11  A. That is correct.

12  Q. And they can do what's called a reTweet; is that right?

13  A. That is correct.

14  Q. And a reTweet is I take what you said and I share that in

15     another Tweet so that other people can read it; is that

16     right?

17  A. That is correct.

18  Q. And that's exactly what my client did.  She reTweeted what

19     you had already shared on the internet; do I have that

20     right?

21  A. No, because reTweeting is something that you can actually

22     control by blocking someone.  Which I blocked her, so she

23     would not be able to reTweet my Tweets.  She took my Tweets

24     and published them in a PDF under, you know, the rights that

25     she has in terms of how she -- or what she alleges that

1      these Tweets mean.  But I did not give her permission nor

2      does the way that the platform work allow her to republish

3      things on her own website in a manner that is an archival of

4      that information.

5   Q.  Do you work for Twitter?

6   A.  No.

7   Q.  All right.  Are you a lawyer?

8   A.  No.

9   Q.  So can you tell the Court for the authority for your

10     argument that someone can't reTweet what you've Tweeted?

11     Can you just show us some example, some authority that says

12     that when I go on Twitter and I see what you Tweeted, I

13     can't reTweet that?

14  A.  Because the blocking mechanism doesn't allow the other

15     person to interact with your Tweets.

16  Q.  But they were shared, right?  Right?

17  A.  Again, you -- what you said is that she reTweeted the

18     Tweets, which I allowed her to do by way of that I posted

19     them on Twitter.  I said that, no, she did not reTweet them

20     and the reason she couldn't have reTweeted them is because I

21     blocked her on Twitter which disallows her from interacting

22     with my Tweets --

23  Q.  So then how did she --

24  A.  She published those -- can I please finish, sir?

25  Q.  Sure, go ahead.

1  A.  Thank you.  She published those Tweets in a PDF and posted

2      them on a different platform called Scribd and then on her

3      website after it was taken down from the platform for

4      abusing that platform.

5  Q.  Thank you for the clarification.

6      So let me recap.  You put in the public sphere information

7      about yourself that other people could see and then copy,

8      and she took that information and she put into another

9      format.  Do I understand that correctly?

10 A.  That is correct.

11 Q.  All right.  And that information that you shared, how many

12     people did you share that with?

13 A.  My entire Twitter feed.

14 Q.  45,000?

15 A.  55,000.

16 Q.  Okay.  Do only people who follow your Twitter feed see that

17     or can anybody see that?

18 A.  People who haven't been blocked can see it.

19 Q.  Okay.  So is it fair to say that it's not private or

20     confidential at the point that 45,000 people have seen it?

21 A.  I didn't say the word confidential, I said personal.

22 Q.  Okay.  So it's not privileged information that someone needs

23     permission to see or share; is that correct?

24 A.  No.  And that's not what I'm trying to say.  What I said in

25     the beginning was that this is something that she is

1   republishing, and if she were to say, send this document to

2   the NLRB and not publish it -- if somebody were to request a

3   copy of this information, even though I have publicly said

4   my name, my medical information, my husband's name, my

5   child's name, all of this information would be redacted in

6   FOIA because of Exemption 6.

7       It is not Ms. Gjovik's decision to decide who to pass out

8   my personal information about.  It is my decision, and she

9   has taken that right away from me in a way that to me

10  demonstrates that she intends to do this maliciously.

11  Q.  Was any of the information that Ms. Gjovik shared in

12      whatever fashion online, was it inaccurate, false,

13      misleading?

14  A.  Are you talking about in general or in regards to the

15      personal and/or private information?

16  Q.  Let's start with personal and/or private.

17  A.  Some of it was inaccurate, yes.

18  Q.  What was inaccurate?

19  A.  There are statements that she has posted that are implying

20      things about my husband.  She also implied that I didn't

21      grow up poor because my mom was wearing makeup in the only

22      family photo of us that exists, which again she got not from

23      me posting it but from her going to -- or somebody going to

24      my mom's Facebook page and pulling it off of there.

25          And this says that my husband is a registered sex

```
 1        offender, and she also actually posted that later as well.

 2        And I believe that's actually in her filings as well.  And

 3        my husband is not a registered sex offender.

 4   Q.   So let's talk with Facebook.  That's a public platform that

 5        anybody can view, correct?

 6   A.   I mean, you can't view my Facebook.  I have it privated.

 7   Q.   So if your mom has not a private Facebook page, anybody can

 8        look at any photo she has and really they can copy whatever

 9        she puts there, right?

10   A.   I suppose so, yes.

11   Q.   Right.  And then they could take that copy and they can post

12        it on their website.  There's nothing to prevent them from

13        doing that, right?

14   A.   Well, no.  But the question begs:  One, I don't have my -- I

15        don't use my real name on Facebook because I have a large

16        enough audience that people harass me.  And I've never

17        posted my mom's name on Twitter or anywhere else publicly,

18        not one time.

19   Q.   And the information with your husband, I did read the

20        records.  I think he was convicted; isn't that right?

21   A.   That order has been sealed.  He was 12-year-old.

22   Q.   Okay.  But he did get convicted at one time, correct?

23            THE COURT:  You know, Counsel, we can move on from that.

24        She's made it clear that there's a sealed court record.

25            MR. BLAIR:  Thank you, Your Honor.  I don't really have
```

1    any questions of Ms. Scarlett.

2        THE COURT:  All right.  Thank you.

3        Ms. Scarlett, is there any other evidence -- I mean, any

4    other witnesses or evidence you want me to consider?

5        MS. SCARLETT:  I mean, my husband is here, he could speak

6    to how this has personally affected me.  But I don't -- I

7    mean, I don't think that that is necessary.

8        I feel like it's just very clear that these -- what she

9    has done here, it does not serve a lawful purpose and all I

10    am asking is that she please stop.

11        THE COURT:  Okay.  All right.  So you're resting your

12    case.  You've provided all the documents you want to

13    provide, you've given all the testimony you want to give?

14    Okay.  Very good.

15        All right.  So, Mr. Blair.

16        MR. BLAIR:  Your Honor, I'm -- before I have my client

17    testify, may I confirm that the Court has read her filings?

18    They are fairly lengthy, and I do think they address all

19    issues, and I don't want to repeat anything the Court

20    already knows.

21        THE COURT:  Read your client's filings?

22        MR. BLAIR:  Yes, Your Honor.

23        THE COURT:  Yes.  Yeah, I have seen the materials, yes.

24        MR. BLAIR:  All right.

25        THE COURT:  All any (inaudible).

1

2                    D I R E C T   E X A M I N A T I O N

3    BY MR. BLAIR:

4    Q.   Ms. Gjovik, you've heard the testimony today and you've read

5         everything that was filed.  I believe your filings answer

6         all those questions, but I don't want to prevent you from

7         sharing with the Court any relevant information after

8         hearing testimony today.

9           Is there something you feel like we've missed or do you

10        want to address right now that's relevant to the issue of

11        course of conduct directed to her for no legitimate lawful

12        purpose?

13   A.   Thank you.  And thank you, Your Honor.

14          I feel like my filings, my reply address all the issues.

15          The only thing I would mention is I had no idea that her

16        husband's record was sealed until actually the evidence she

17        submitted for this hearing.  It sounds like it was done in

18        the last couple weeks.  I would have never tried to evade a

19        court sealing of records like that.  Had I known, I would

20        have not shared that.

21   Q.   And let me just follow up with one question:  To the extent

22        that you had any postings on your Twitter feed or your

23        website about Ms. Scarlett, what's the purpose behind that?

24        What was your reason for posting any information at all?

25   A.   Ms. Scarlett has been taking actions towards me for months

1       now, since September, that have caused me great harm.  I

2       have two witness statements submitted of people who have

3       seen it firsthand and have testified to actions she's taken

4       in relation to them and me.

5         I just wanted her to leave me alone and to stop, you know,

6       telling people, what I feel are lies about me and trying to

7       hurt my case against Apple.  She's caused me an enormous

8       amount of pain, as you can see from my messages with Melissa

9       McEwen, which were just initiated by her trying to get Cher

10      to leave me -- Ms. Scarlett to leave me alone.  And I said

11      there that, you know, she's caused me so much depression and

12      anxiety and panic and all I want, as I posted on December

13      31st when I warned Ms. Scarlett that I would go after a

14      restraining order if she didn't leave me alone, is just to

15      be left alone.

16        MR. BLAIR:  Thank you, Ms. Gjovik.

17        Your Honor, we don't have anything other -- else to add.

18      I'm happy to go to argument when appropriate.

19        THE COURT:  All right.  And, Ms. Scarlett, do you have

20      questions you need to have directed towards Ms. Gjovik?

21        MS. SCARLETT:  Yes.

22        THE COURT:  Which you have to basically direct to me.  But

23      she still has to answer them.  You get a cross-examination

24      opportunity as well.

25

1               C R O S S - E X A M I N A T I O N

2   BY MS. SCARLETT:

3   Q.    Okay.  Your Honor, she said that if she had known that the

4         court records was sealed, she wouldn't have said anything.

5         But in her filing, you can see that she posted with it after

6         I emailed her and she was informed that she was going to be

7         served with the process for this --

8         THE COURT:  So you want to ask a question about that?

9   Q.    (By Ms. Scarlett)  Yes.  So in the email that she has in

10        hers and I have in mine that she says that she read, I did

11        bring this up and I want to know if she did not read the

12        entirety of the email because in that email, I actually

13        brought up my husband and I explained to her that it

14        happened when he was 12.  Can I read that?

15        THE COURT:  Yes.

16  Q.    (By Ms. Scarlett)  "I am asking you to please remove his" --

17        his, being my husband -- "his personal information from your

18        Twitter, your NLRB charge and anywhere else.  His criminal

19        history is literally no one's business.  He's done his time.

20        He also comes from an abusive home and poverty full of drugs

21        and alcohol.  The incident that happened when he was 12

22        years old was a manifest injustice in which he was also a

23        victim to an adult who got found not guilty in a trial.  And

24        all of the information about what that adult did was

25        stricken from my husband's case?

```
 1              We've been working with a program in our county to get it

 2          all fixed which is why we got married because it's traumatic

 3          for him and legally I can speak to his free attorney on his

 4          behalf to keep everything moving forward.  His life was

 5          destroyed by a new judge and he was institutionalized as a

 6          child until he was 18.  That same judge got us into the

 7          program.  Words on a piece of paper with no context don't

 8          tell you what happened.  It is deplorable for you to tell

 9          anyone's story based on what you think is public and fact."

10          THE COURT:  All right.  So what's the -- thank you for

11          that information.

12    Q.    (By Ms. Scarlett)  I guess I'm asking --

13          THE COURT:  The question is?

14    Q.    (By Ms. Scarlett)  I'm asking if she didn't read that if she

15          didn't seem to understand that it was -- it was all being

16          sealed and taken care of?

17    A.    I did read the email to the best of my ability.  It made

18          some very harsh accusations against me, so I did have some

19          emotional issues processing all of the 3,000 words.  But the

20          email didn't say anything with a court sealing the record.

21             And I'll reiterate, if I knew that the court -- a court

22          sealed his record, I would have respected that.  I just did

23          not know that.

24          MS. SCARLETT:  Can I ask another question?

25          THE COURT:  Of course.
```

1          MS. SCARLETT:  What did you -- or what did Ms. Gjovik

2     think is meant when I said that a -- the court was taking

3     care of it?

4          MR. BLAIR:  Your Honor, may I interject?  As a lawyer who

5     does sealing, the fact that a court record is sealed does

6     not prevent people in the public from seeing it.  I'm sorry,

7     it's not a relevant issue, Your Honor.

8          THE COURT:  Pardon me, it's not a what?

9          MR. BLAIR:  It's not relevant to the issue before the

10    Court.  You can pull up sealed records at any time.  It's

11    not private in the sense -- all it does is prevent the court

12    from sharing it.  If somebody already has the information of

13    a conviction, the fact that it was sealed later does not

14    prevent someone from disseminating that information.  Only

15    the court is prevented from disseminating it.  That's what

16    sealing means.  It doesn't govern private citizens, so it's

17    really not relevant.

18         MS. SCARLETT:  I guess my question --

19         THE COURT:  You know, that -- that's counsel's view.

20  Q.   (By Ms. Scarlett)  My question then is:  Did she actually

21       have the juvenile case that was sealed before it was sealed?

22  A.   No.  I referenced the public records available on the

23       Washington State websites, everything publicly available.  I

24       did not get any case records nor did I look for them.

25  Q.   One more question then.  Which public records did you have

1    access to that you are referencing?  Can you name the

2    specific charges?

3        MR. BLAIR:  Your Honor, I'm going to object again.  Her

4    husband is not the petitioner.  It's not about conduct

5    directed at the husband or whether it affected him.

6        THE COURT:  Whether --

7        MR. BLAIR:  It's with conduct directed at Ms. Scarlett.

8        THE COURT:  Overruled.  Go ahead.

9    Q.   (By Ms. Scarlett)  Which charges are you referring to that

10       you said were public?

11   A.   I don't have them at hand.  But, again, I went through

12       Washington state court systems and searched for public

13       records.  So whatever would have come up when I looked, I

14       guess in early January.

15   Q.   So not his juvenile record?

16   A.   There was failure to register as a sex offender as recently

17       as 2017.  There's an additional felony charge for it that I

18       saw.  And I believe that's what I referenced.

19       MS. SCARLETT:  All right.  Thank you.

20       THE COURT:  All right.  Any other questions you have for

21       Ms. Gjovik?

22   Q.   (By Ms. Scarlett)  So you mentioned that you had your

23       friends -- we spoke about Dawn, and my conversation with her

24       in which I expressed both concern for her and concern for

25       you over what she had posted.  But also, you mentioned my

1        communications with Kate as -- in your witness statements.

2        I actually have those conversations that are being

3        referenced.  I'm wondering if you would like to hear them?

4            MR. BLAIR:  Is there a question, Your Honor?

5            THE COURT:  Yeah, basically right now we're supposed to be

6        asking your questions that you have specifically for

7        Ms. Gjovik.

8    Q.  (By Ms. Scarlett)  Okay.  I guess I'd like to know what

9        conversations did I have with Kate that you viewed were

10       abusive?  Do you have any particular comments?

11   A.  I don't believe I ever made that allegation.

12   Q.  Okay.  I'm curious then what her testimony has to do with

13       your harassment of me?

14           MR. BLAIR:  Is there a question, Your Honor?

15           THE COURT:  Yes, she asked a -- you can repeat your

16       question.

17   Q.  (By Ms. Scarlett)  My question is:  I'm wondering what Kate

18       Rotondo's testimony has to do with your harassment of me?

19   A.  Kate's testimony -- and I don't want to speak on Kate's

20       behalf, she wrote a very thoughtful witness statement that

21       she should take at her face value.  But she was trying to

22       point out a pattern and practice of not just you harassing

23       us, but as soon as we tried to stand up for ourselves, you

24       began attacking us and saying we were harassing you and

25       trying to cut off communications so we could no longer even

1   defend ourselves against your harassment, I believe was the

2   point.  And that seems very relevant to this.

3       Your Honor, as my filings included, the judge directions

4   for domestic violence retaliatory litigation, which is what

5   this very much feels like.  If not retaliation for the

6   federal charges, it seems like this is the retaliation for

7   me, asking, pleading for Ms. Scarlett to stop harassing me,

8   which she had been since September and instead she switched

9   the offender and victim.

10  Q.  So I wrote you one single email in which I apologized for

11      the two things that I said in one single post.  How does

12      that -- you haven't presented anything that I have actually

13      said to be harassment.  And when I've asked you -- which

14      again, you just said that I harassed Kate, I have our

15      messages here.  She was reTweeting things that you were

16      posting that was defamatory, and I said to her that I

17      blocked her because she was lying about me.

18      MR. BLAIR:  Is this a question or is it testimony or

19      argument?

20      MS. SCARLETT:  I'm just -- I'm trying to understand how

21      she's both saying that I harassed these other two women,

22      which there is no evidence that I have harassed them, and I

23      have evidence that I was not harassing either of them, and

24      what that has to do with Ms. Gjovik's harassment of me.

25      THE COURT:  So what's the --

```
 1              MR. BLAIR:  That sounds like an argument, Your Honor.

 2              THE COURT:  Just tell us the question.

 3    Q.   (By Ms. Scarlett)  Why do you think -- why have you made

 4         statements like that that I am stalking anybody who --

 5         stalking you, coercing you, harassing you, intimidating you,

 6         threatening you, and telling people that bad things will

 7         happen to them if they support you?

 8           Why were you saying that I was harassing, defaming,

 9         swatting, threatening, illegally coercing you to modify

10         federal charges.  Why we were saying -- it should be

11         mentioned that I am currently under investigation by

12         numerous federal agencies and law enforcement for federal

13         witness intimidation and obstruction of justice.

14           Why have you said that I'm in active communication with

15         Apple helping Apple in their campaign of harassment, threats

16         and horror against the safety whistle blower.  Why did you

17         say I'll report you to Apple if I leak Apple's crimes?  Why

18         did you say --

19              MR. BLAIR:  Your Honor, can we have some help here?  I

20         don't know what she's asking.

21              THE COURT:  I just need a question, basically.

22    Q.   (By Ms. Scarlett)  Why do you -- why do you believe that

23         saying these things about me and posting this personal

24         information about me is for a lawful purpose?

25              THE WITNESS:  Your Honor, I'd like to object to this
```

1    question.  She's trying to compel me to testify on my

2    federal charges.

3         THE COURT:  Ma'am, you've got an attorney.  He'll make

4    whatever objections are necessary.

5         MR. BLAIR:  I'm going to object for my client, Your Honor.

6    At this point I don't see a question.  What I hear is an

7    argument.

8         THE COURT:  She asked a question.

9         MR. BLAIR:  That's what I think --

10        THE COURT:  She asked a question and it is -- she wants to

11   know how Ms. Gjovik thinks this serves a lawful purpose.

12        MR. BLAIR:  What serves a lawful purpose?

13        THE COURT:  Her posting the things that she's listed.

14        THE WITNESS:  I'll answer --

15        MR. BLAIR:  Ms. Gjovik, go ahead.

16   A.   Yeah.  These are part of my federal and state charges, which

17        have already met prima facie for subsequent harassment after

18        termination of my time at Apple.

19        I'm hesitant to testify to anything specific because it is

20        part of the ongoing investigation.

21        And I will say, I am single handedly representing myself

22        fighting the biggest company in the entire world with a long

23        history of horrible labor abuses and intimidation of anyone

24        challenging it.  I'm terrified every single day since I

25        started reporting Apple to the government.  I'm terrified

1    for my safety.

2        MR. BLAIR:  That's enough, Ms. Gjovik.

3        THE WITNESS:  Okay.

4        MR. BLAIR:  I don't want to go into that.  I think the

5    Court made it clear that that's not relevant.  Unless the

6    Court wants to hear more on that -- you know, what I would

7    respond in argument is that it's free speech.  You know, you

8    can post whatever you want.

9        But I'll get to that in a minute, Your Honor.  That will

10   be the answer to the question.  It doesn't have to serve a

11   legitimate lawful purpose if it's protected by free speech.

12       I want to go on the street corner and I want to say Donald

13   Trump's an idiot, I have that right to do that.  If I go on

14   the street corner and say he committed rape against someone,

15   that's a factual allegation, and I can be sued for that.

16       So can we go on from this question and get to the argument

17   section?

18       THE COURT:  Well, I've heard what answer she's given.

19       Do you have any other questions?

20       MS. SCARLETT:  I just have one more question just based

21   off of what her attorney just said.

22   Q.   (By Ms. Scarlett)  So you're arguing that everything she

23   said, the lawful purpose is free speech, so --

24       THE COURT:  We're going to get to argument.  I just want

25   to know if you have any more questions for Ms. Gjovik?

1          MS. SCARLETT:  No, no.

2          THE COURT:  All right.  So now that takes us to argument.

3     And so what -- of course, I'm going to remind us that we

4     have a very narrow scope:  Whether there's a pattern of

5     activity over time by Ms. Gjovik directed at Ms. Scarlett

6     that serves no lawful purpose that would cause any

7     reasonable person to be placed in fear or suffer emotional

8     distress.

9        And, Ms. Gjovik, the -- or pardon me, Ms. Scarlett, the

10    petition is yours, so you get to go first in your argument,

11    Mr. Blair will then get to give his argument, and then you

12    get rebuttal.

13       So, Ms. Scarlett, go right ahead.

14       MS. SCARLETT:  This behavior started in December and it

15    continued on in increasing escalation in terms of what was

16    being posted and the veracity of the defamation increased

17    until I posted on Twitter that I had hired a process server.

18    And then we appeared in court, and that is when it stopped.

19       I am not an employee of Apple.  I'm not an agent of Apple.

20    I am not being paid by Apple.  I don't even own Apple stock.

21    I don't have the financial resources to get a lawyer.

22       There is no reasonable person who would be able to go

23    through what I have been through because of this on top of

24    all of the other things that I have to deal with in my

25    personal life.  And I can't imagine anyone coming into this

1      courtroom and trying to argue that there's lawful person

2      <sic> to say these types of things and post this type of

3      information about people.

4        I understand that some of this she alleges is a part of,

5      you know, something to do with Apple's culture and I respect

6      that.  I do not wish to, you know, impede on anyone's free

7      speech, but when those things are taken outside of those

8      legal context:  Twitter, Scribd, your personal website,

9      those are not government proceedings.

10       You are going outside of the bounds of the law to do what

11     feels like to me is malicious and intentional just to harm

12     me, to cause me distress, and I only ask you that you please

13     just stop.  That's all I want is for you to stop so that I

14     can be okay and my family can be okay and I can just move

15     on.  That's it.

16       THE COURT:  Thank you.

17       And, Mr. Blair.

18       MR. BLAIR:  Thank you, Your Honor.  So my response is

19     twofold:  First off, is as I understand it, the information

20     that's being shared is via the internet in at least three

21     forms:  Twitter, Scribd and one other.  As I understand

22     Ms. Scarlett's testimony is she accuses my client of sharing

23     information that she labels personal and private and putting

24     it either a Tweet on her own or on her own website.

25       So my first position is that if you have shared

1    information on the internet with 45,000 followers, you no

2    longer control that information.  Anybody, my client, you,

3    me, could take that information and do whatever we want with

4    it.  I mean, there's no limitations that I can think of that

5    prevents someone from taking publicly available information

6    and sharing it with someone else and making a comment on it.

7       And that brings me to the second issue.  You have the

8    absolute right of free speech.  The course of conduct, as

9    it's defined within this statute, does not encompass free

10   speech.  So if I want to take issue with statements that

11   Scarlett has shared with her 45,000 followers, I have a

12   right to do that.

13      What limits me is if I make false statement, misleading

14   statements, things that I know are wrong.  That's what

15   defamation is.  And this is not a forum to fight defamation.

16   If you feel that you've been the victim of libel or slander,

17   then you file a civil lawsuit, you get a judgment and you

18   get an injunction.

19      But this Court doesn't have the jurisdiction over that.

20   That's not the issue before this Court.  It's whether my

21   client engaged in a course of conduct directed at

22   Ms. Scarlett that serves no lawful, legitimate purpose and

23   is not protected by free speech.

24      One may question Ms. Gjovik's reason for doing what she

25   did, but she has every right to do it.  This is a dialog

1     between two people -- I'm going to rephrase that.  It's not

2     actually a dialog.  She's not speaking to Ms. Scarlett.

3     There's no communication directly with her.  There's no

4     email, there's no text message, there's no letter, there's

5     no showing up at her workplace or home saying, hey, I want

6     to talk to you.  This is my client publishing -- and I'm

7     not -- posting information that Ms. Scarlett herself has

8     already put out in the internet.  You can't control that any

9     longer.

10       You may disagree with what my client's motive is but

11     that's not a basis for issuing a protection order.  One

12     would even question whether the conduct was directed

13     strictly at her when given the information, at least in

14     part, involves information from a family member -- I think

15     it's a picture of her mother -- or her husband's criminal

16     record.

17       And I'm going to be clear on this, Your Honor, I do

18     motions to seal and vacate, that only governs the court.

19     And it doesn't mean the information isn't already out there

20     in the public database.  If you have a conviction as a sex

21     offender, you get it vacated, it's still out in the public

22     sphere.  You can look it up and it can be posted, and

23     there's no law that prevents you from doing that.  You may

24     question my client's motives for doing that but it doesn't

25     prevent her from doing it under this statute.

1     Your Honor, while it's clear that there is animosity

2     between the two people and they should stay away from each

3     other, that would be my advice, there's no basis for issuing

4     an order under the evidence presented today, such as there

5     is, and under the legal documents I've cited to.

6     Thank you, Your Honor.

7     THE COURT:  Thank you.

8     And rebuttal, Ms. Scarlett.

9     MS. SCARLETT:  You know, you said that, you know, your

10    client has the right to post this information because of the

11    First Amendment.  But in her testimony, she said that the

12    reason that she did so was because of something that I said

13    publicly that she believed to be a lie, and that was that I

14    said that her retaliatory discharge one is going to be tough

15    to prove because she leaked IP.  She actually posted the

16    conversation that I had with her about that leaked IP.

17    And it's hard for me to hear her attorney now argue that

18    she has the right to free speech when she did not give me

19    that right myself.

20    That's it.

21    THE COURT:  Okay.  Thank you.  So give me a minute here.

22    All right.  So I've certainly heard the testimony, I've

23    reviewed the documents.  Both parties have produced a number

24    of documents and a number of written statements, all of

25    those are incorporated in by this reference, including the

1      statements of the witnesses that Ms. Gjovik has submitted,

2      and the filings that both Ms. Gjovik and Ms. Scarlett have

3      filed in our electronic court records, and I do incorporate

4      all of those by this reference.  And I've certainly listened

5      to the testimony and argument of all parties.

6          So RCW 10.14 governs our antiharassment statute.  And

7      unlawful harassment is a knowing and willful course of

8      conduct directed at a specific person which seriously

9      alarms, annoys, harasses or is detrimental to such person

10     and serves no legitimate or lawful purpose, and the course

11     of conduct is such that would cause a reasonable person to

12     suffer substantial emotional distress and actually cause

13     such emotional distress.

14         The course of conduct is further defined in RCW 10.14.30,

15     and it notes that in determining whether the course of

16     conduct -- pardon me.  In determining whether the course of

17     conduct serves any legitimate or lawful purpose the Court

18     should consider whether -- and one of those, subsection 3,

19     is that Respondent's course of conduct appears designed to

20     alarm, annoy and harass.

21         So what I have here, No. 5, which is also an important

22     one, that the respondent's conduct has the purpose of or the

23     effect of unreasonably interfering with Petitioner's privacy

24     or has the purpose or effect of creating an intimidating or

25     hostile living environment.

1          So what I have here is two people who at some point had

2      a -- at least working relationship and that that

3      relationship has deteriorated over time, that there's now a

4      dispute.  Both had previously worked for Apple, both were

5      unhappy with things that were going on at Apple.  Apparently

6      there's an NLRB claim that both have some role in.  And the

7      respondent, Ms. Gjovik, in the course of the unpleasant

8      relationship that came about between these two parties,

9      Ms. Scarlett and Ms. Gjovik, that Ms. Gjovik began

10      publishing things on various mediums, whether it was on her

11      own Twitter, on other mediums or on her own blogs, that were

12      things that were personal to Ms. Scarlett.

13        And while Ms. Scarlett may have posted information, for

14      instance, about her own medical conditions on her own

15      Twitter feed, the reposting of them and the method that was

16      used -- not really a reTweet because she was blocked, but

17      rather copying it, putting it in a PDF, and then reposting

18      it in another medium in her own website is not something

19      that is -- I guess I'm not explaining that very well.

20        When Ms. Scarlett posts something on her own site, it's

21      her followers who see it.  When Ms. Gjovik posts something

22      on her website, Ms. Gjovik's website, far more people are

23      going to see it than Ms. Scarlett's followers.  Different

24      people are going to see it than Ms. Scarlett's followers.

25      Ms. Scarlett has a set of followers, an audience that she's

1     cultivated, it's not the same as Ms. Gjovik's audience.  So

2     she's certainly publishing this information to other people

3     other than those that Ms. Scarlett would have chosen to see

4     that.

5      Now, is it out there?  Sure.  It's out there because she's

6     got 55,000 followers of her own, Ms. Scarlett does.  But

7     does it mean that Ms. Gjovik can repost it to other people?

8     No.

9      The information about her mother, the information about

10    her circumstance of growing up, her mother's home and pet,

11    the information about her husband and a sealed court record

12    or a record that Ms. Gjovik says she had no idea was sealed.

13    Clearly -- there's only one purpose to posting that.  That

14    has nothing to do with an NLRB claim.

15     The only purpose in posting information about

16    Ms. Scarlett's mother, Ms. Scarlett's mother's whereabouts,

17    home and pet, Ms. Scarlett's husband and his criminal record

18    is clearly designed to upset Ms. Scarlett.

19     There's no lawful purpose.  There is no absolute right to

20    free speech.  Free speech can be curtailed in many ways, one

21    of which is a protection order.  The protection orders are

22    clear that the course of conduct cannot be designed to

23    alarm, annoy or harass.  There's no other purpose for

24    posting these things, none.

25     It isn't -- the antiharassment statute does not require

1     that Ms. Gjovik direct this specifically by directly

2     speaking to her, it's designed -- it prohibits directing

3     this at her.  So it can be directed at other people knowing

4     that Ms. Scarlett is going to see it and be aware of it.  It

5     can be communicated to others.  It doesn't have to be

6     communicated directly to Ms. Scarlett to be prohibited under

7     our antiharassment statute.

8       Posting this kind of information about somebody's medical

9     condition, about someone's spouse's criminal history --

10    particularly when it's sealed, but even if it weren't

11    sealed -- about someone's parents, about someone's name

12    change, none of that serves any lawful purpose to

13    disseminate.  The only purpose for doing that is to harass,

14    annoy and alarm.

15      Clearly, Ms. Gjovik has more than a bit of animosity

16    toward Ms. Scarlett.  Clearly, she was directing this at her

17    and was hoping to harm her, to upset her.  There's no other

18    purpose for this.

19      I am going to issue the order, and I'm going to make it a

20    five-year order.

21      This doesn't affect the NLRB claim.  Obviously Ms. Gjovik

22    can participate in other legal proceedings, whether it's an

23    administrative proceeding or a court proceeding.  She's

24    obviously going to get to testify in her NLRB proceeding,

25    and she can testify in any legal proceeding she is involved

1     in.

2         But Ms. Gjovik may have no contact with Ms. Scarlett,

3     none.  She cannot contact her in any way.  She cannot keep

4     her under any kind of surveillance.  She cannot be within

5     1,000 feet of Ms. Scarlett's home, her workplace, her

6     person, her vehicle, or anywhere she is present.

7         Ms. Gjovik may not make any statements, any posts or other

8     publications about the petitioner, Ms. Scarlett, including

9     but not limited to -- but not limited to:  Petitioner's

10    medical information, petitioner's family, petitioner's names

11    on any social media, any internet or any other medium.

12    Nothing about this order, of course, affects or prohibits

13    the respondent from testifying in administrative or judicial

14    proceedings.

15        This will be entered into the Crime Information Center

16    database.  The respondent is present and is informed of

17    this, and so no further service is necessary.  This

18    antiharassment protection order lasts until March 1st of

19    2027.

20        A couple months before that date rolls around,

21    Ms. Scarlett, if you believe there's any reason you need to

22    have that extended, you may apply to the court to have it

23    extended.

24        But the two of you -- you know, obviously this order

25    prohibits Ms. Gjovik from having any contact at all with

1    Ms. Scarlett in any shape, way or form.

2      Ms. Scarlett, of course -- I'm not issuing a separate

3    order but of course, no contact with Ms. Gjovik either would

4    be well advised.

5      So that's been added to electronic court records.

6      Mr. Blair, you can, of course, provide a copy to your

7    client.  And we are going to provide a copy to Ms. Scarlett

8    because she is present.

9      Thank you, everyone, for your presentations.  All right.

10     MR. BLAIR:  So the Court's telling her to have no contact

11   with her when there's been no allegations she's -- they live

12   in different states, Your Honor.

13     THE COURT:  Mr. Blair.

14     MR. BLAIR:  Yes, Your Honor, what?

15     THE COURT:  Clearly this contact has been going on via the

16   internet.  It doesn't matter whether they're in the same

17   state or they're not.

18     MR. BLAIR:  So how does the Court have jurisdiction?

19     THE COURT:  The Court has jurisdiction over anything that

20   is received by Ms. Scarlett.  We enter protection orders

21   over --

22     MR. BLAIR:  No messages have been sent to Ms. Scarlett.

23   These are postings on the internet that --

24     THE COURT:  That are designed --

25     MR. BLAIR:  -- Ms. Scarlett has to go find.

1          THE COURT:  -- that are designed to get to Ms. Scarlett.

2          MR. BLAIR:  That's not what the statute says.

3          THE COURT:  As I said, there is -- you know, I'm not going

4     to argue with you about it.

5          MR. BLAIR:  Well, you know --

6          THE COURT:  You can certainly appeal this.  You're welcome

7     to do that.

8          MR. BLAIR:  I absolutely will appeal it.

9          THE COURT:  But the communication -- the communication

10    itself does not have to be directed to her.  It only has to

11    be directed at her.

12         MR. BLAIR:  No communication took place in this state.  My

13    client lives in California.  Where is the Court's

14    jurisdiction?

15         THE COURT:  The Court has jurisdiction over the

16    communications that are designed to reach her via the

17    internet.

18         You're welcome to appeal.  I'm not going to argue further.

19    I've issued the order and --

20         MR. BLAIR:  Thank you, Your Honor.

21         THE COURT:  -- you're certainly free to appeal.

22         MS. SCARLETT:  Thank you, Your Honor.

23         THE COURT:  Thank you very much.

24         And, Ms. Scarlett, if you'd come forward, the clerk will

25    give you -- I've printed a copy of the order.  The clerk

1          will give you a copy of that order.

2              MS. SCARLETT:  Thank you.

3                          (Conclusion of hearing)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                C E R T I F I C A T E

2

3   STATE OF WASHINGTON        )

4                              )

5   COUNTY OF KING             )

6                I, the undersigned, do hereby certify under penalty

7   of perjury that the foregoing court proceedings or legal

8   recordings were transcribed under my direction as a certified

9   transcriptionist; and that the transcript is true and accurate to

10  the best of my knowledge and ability, including changes, if any,

11  made by the trial judge reviewing the transcript; that I received

12  the electronic recording in the proprietary court format; that I

13  am not a relative or employee of any attorney or counsel employed

14  by the parties hereto, nor financially interested in its outcome.

15

16                IN WITNESS WHEREOF, I have hereunto set my hand this

17  29th day of April, 2022.

18

19   _Bonnie Reed_____

20  s/ Bonnie Reed, CET

21  Reed Jackson Watkins, LLC

22  800 Fifth Avenue, Suite 101-183

23  Seattle, Washington 98104

24  Telephone: (206) 624-3005

25  E-mail: info@rjwtranscripts.com
```